Vamsidhar Vurimindi,
Plaintiff, Pro Se
821 Gunter Street
Austin, TX 78702
Telephone: 737-262-3477
Email: Vamsidhar.R.Vurimindi2021@GMail.com

**FILED**

September 11, 2025
CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY: _Christian Rodriguez_
DEPUTY

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TEXAS

| | |
|---|---|
| VAMSIDHAR VURIMINDI,<br>821 Gunter Street,<br>Austin, TX 78702.<br><br>　　　　　　　Plaintiff<br><br>　　　　Vs.<br><br>UNITED STATES OF AMERICA,<br>C/o. Federal Tort Claims Act Section,<br>Torts Branch, Civil Division<br>U.S. Department of Justice ("DOJ")<br>175 N Street, NE<br>Washington, DC 20002.<br>　　　　　　AND<br>PAM BONDI, substituted for<br>MERRICK GARLAND,<br>U.S. Attorney General,<br>U.S. Department of Justice ("DOJ")<br>950 Pennsylvania Avenue, NW<br>Washington, DC 20530-0001.<br>　　　　　　AND<br>KRISTI NOEM, substituted for<br>ALEJANDRO MAYORKAS,<br>Secretary,<br>U.S. Department of Homeland<br>Security, ("DHS")<br>MS 0525,<br>2707 Martin Luther King Jr Ave SE<br>Washington, DC 20528-0525.<br>　　　　　　AND | Case No.:25-cv-00023-RP<br><br>FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE FOURTH, FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION (BIVENS V. SIX UNKNOWN NAMED AGENTS OF FEDERAL BUREAU OF NARCOTICS; 42 U.S.C. § 1983); ABUSE OF PROCESS, FALSE IMPRISONMENT; WRONGFUL DEPORTATION; SLANDER; DEFAMATION; LIBEL; NEGLIGENCE; INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS<br><br>DEMAND FOR JURY TRIAL |

1

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS**

TODD LYONS, substituted for
PATRICK LECHLEITNER,
Director,
U.S. Immigration and Customs
Enforcement ("ICE"),
500 12th Street, S.W. Stop 5010,
Washington, D.C. 20536-5010.
AND
Marcos Charles, substituted for
RUSSELL HOTT,
Director, Office of Detention and
Removal,
U.S. Immigration and Customs
Enforcement ("ICE"),
500 12th Street, S.W. Stop 5010,
Washington, D.C. 20536-5010.
AND
RUSSELL HOTT,
Director, Office of Detention and
Removal,
U.S. Immigration and Customs
Enforcement ("ICE"),
500 12th Street, S.W. Stop 5010,
Washington, D.C. 20536-5010.
AND
THOMAS DECKER,
Director, Field Office,
U.S. Immigration and Customs
Enforcement ("ICE"),
114 North 8th Street,
Philadelphia, PA 19107.
AND
JENNIFER RITCHEY,
Deputy Director, Field Office,
U.S. Immigration and Customs
Enforcement ("ICE"),

2

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS**

| | |
|---|---|
| 114 North 8th Street,<br>Philadelphia, PA 19107.<br>AND<br>SEAN ERVIN,<br>Director, Field Office,<br>U.S. Immigration and Customs<br>Enforcement ("ICE"),<br>114 North 8th Street,<br>Philadelphia, PA 19107.<br>AND<br>ANDREW KWIATOWSKI,<br>Supervisory Detention and<br>Deportation Officer,<br>U.S. Immigration and Customs<br>Enforcement ("ICE"),<br>1605 Clugston Road,<br>York, PA 17404.<br>AND<br>CHRIS HOFFMAN,<br>Enforcement Officer,<br>U.S. Immigration and Customs<br>Enforcement ("ICE"),<br>1605 Clugston Road,<br>York, PA 17404.<br>AND<br>JOSH REID,<br>Enforcement Officer,<br>U.S. Immigration and Customs<br>Enforcement ("ICE"),<br>1605 Clugston Road,<br>York, PA 17404.<br>AND<br>ROBERT WRIGHT,<br>Enforcement Officer,<br>U.S. Immigration and Customs<br>Enforcement ("ICE"), | |

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS**

| | |
|---|---|
| 114 North 8th Street, Philadelphia, PA 19107. AND JOHN RIFE, Enforcement Officer, U.S. Immigration and Customs Enforcement ("ICE"), 114 North 8th Street, Philadelphia, PA 19107. AND CESAR ESPINOZA, Enforcement Officer, U.S. Immigration and Customs Enforcement ("ICE"), 1777 NE Loop 410, 15th Floor, San Antonio, TX 78217. AND VERONICA ULLOA, Enforcement Officer, U.S. Immigration and Customs Enforcement ("ICE"), 3600 Presidential Blvd. Ste. 111 Austin, TX 78719. AND WILLIAM JOYCE, Director, Field Office, U.S. Immigration and Customs Enforcement ("ICE"), 202 Metroplex Drive Pearl, MS 39208. AND DIANE WITTE, Director, Field Office, U.S. Immigration and Customs Enforcement ("ICE"), 202 Metroplex Drive | |

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS**

| | |
|---|---|
| Pearl, MS 39208.<br>                    AND<br>DANIEL BIBLE,<br>Director, Field Office,<br>U.S. Immigration and Customs<br>Enforcement ("ICE"),<br>126 North Point Dr,<br>Houston, TX 77060.<br>                    AND<br>JOSE CORREA,<br>Director, Field Office,<br>U.S. Immigration and Customs<br>Enforcement ("ICE"),<br>1777 NE Loop 410, 15th Floor,<br>San Antonio, TX 78217.<br>                    AND<br>JO ANN McLANE,<br>Chief Counsel for San Antonio Office<br>of the Principal Legal Advisor<br>(OPLA),<br>U.S. Immigration and Customs<br>Enforcement ("ICE"),<br>1015 Jackson-Keller Road, Suite 100<br>San Antonio, TX 78213.<br>                    AND<br>KERRY DOYLE,<br>Principal Legal Advisor,<br>Office of the Principal Legal Advisor<br>(OPLA),<br>U.S. Immigration and Customs<br>Enforcement ("ICE"),<br>500 12th St SW<br>Washington, DC 20536.<br>                    AND<br>SIRCE E. OWEN, substituted for<br>DAVID OWEN, Director and | |

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS**

| | |
|---|---|
| MARY CHENG, Acting Director Executive Office for Immigration Review ("EOIR"), 5107 Leesburg Pike, Falls Church, VA 22041. AND ANNA C. LITTLE, substituted for SHEILA McNULTY, Chief Immigration Judge and DANIEL WEISS, Chief Immigration Judge, Executive Office for Immigration Review ("EOIR"), 5107 Leesburg Pike, Falls Church, Virginia 22041. AND Garry D. Malphrus, substituted for DAVID WETMORE, Chief Appellate Immigration Judge Board of Immigration Appeals ("BIA"), 5107 Leesburg Pike, Falls Church, Virginia 22041. AND WALTER DURLING, Immigration Judge, 3400 Concord Rd, York, PA 17402; AND | |
| ROGER PAULEY, Member, Board of Immigration Appeals ("BIA"), 5107 Leesburg Pike, Falls Church, Virginia 22041. AND | |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**

JOHN GUENDELSBERGER,
Member, Board of Immigration
Appeals ("BIA"),
5107 Leesburg Pike,
Falls Church, Virginia 22041.
                AND
MARCOS GEMOETS,
Member, Board of Immigration
Appeals ("BIA"),
5107 Leesburg Pike,
Falls Church, Virginia 22041.
                AND
BLAIR O'CONNOR,
Member, Board of Immigration
Appeals ("BIA"),
5107 Leesburg Pike,
Falls Church, Virginia 22041.
                AND
JEFFREY BUBIER,
Assistant Chief Counsel,
U.S. Immigration and Customs
Enforcement, ("ICE")
3400 Concord Rd,
York, PA 17402.
                AND
MAUREEN GAFFNEY,
Assistant Chief Counsel,
U.S. Immigration and Customs
Enforcement, ("ICE")
3400 Concord Rd,
York, PA 17402.
                AND
MARY WITHROW,
Assistant Chief Counsel,
U.S. Immigration and Customs
Enforcement, ("ICE")

7

| IN THE UNITED STATES DISTRICT COURT<br>FOR THE WESTERN DISTRICT OF TEXAS | |
|---|---|
| 3400 Concord Rd,<br>York, PA 17402.<br>AND<br>VICTORIA SANTORA,<br>A/K/A VICTORIA BRAGA,<br>Trial Attorney, Civil Division<br>Office of Immigration Litigation<br>("OIL")<br>U.S. Department of Justice ("DOJ")<br>P.O. Box 878,<br>Ben Franklin Station,<br>Washington, D.C. 20044.<br>AND<br>BRIAN G. McDONNELL,<br>Assistant Chief Counsel,<br>U.S. Immigration and Customs<br>Enforcement, ("ICE")<br>3400 Concord Road<br>York, PA 17402<br>AND<br>MATTHEW H. DOLL,<br>Assistant Chief Counsel,<br>U.S. Immigration and Customs<br>Enforcement, ("ICE")<br>2503 Freedom Way, Suite 254<br>York, PA 17402<br>AND<br>LEONIDAS ADDIMANDO,<br>414 S 16th St Ste 100,<br>Philadelphia, PA 19146,<br>AND<br>ALLISON BOROWSKI,<br>630 W 168th St,<br>New York, NY 10032<br>AND<br>RAJANI PATTINSON, | |

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS**

| | |
|---|---|
| N/K/A RAJANI WATSON,<br>C/o. Lisa M. Hopkins, Esq.<br>1425 Crooked Hill Road<br>P.O. Box 61312<br>Harrisburg, Pennsylvania 17106<br>AND<br>ICE DOES 1-10,<br>Officials and Agents,<br>Immigration and Customs<br>Enforcement.<br>Defendants | |

# TABLE OF CONTENTS

TABLE OF CONTENTS ...............................................................................................I

INTRODUCTION .................................................................................................... 1

JURISDICTION AND VENUE ................................................................................ 5

PERSONAL JURISDICTION OVER OUT-OF-STATE DEFENDANTS........................ 10

STATUTE OF LIMITATIONS, CONTINUING VIOLATIONS, AND EQUITABLE TOLLING ................................................................................................................ 12

LEGAL BASIS FOR CLAIMS: IMMUNITY, CONTEXT, AND JURISDICTIONAL BARS 16

I.    Absolute Immunity Does Not Apply to Ultra Vires Conduct .................. 16

II.   Plaintiff's Claims Do Not Present a "New Context" Under Egbert v. Boule...................................... 19

III.  The Discretionary Function Exception Does Not Apply to Ultra Vires Conduct ............................. 20

IV.   Plaintiff's Claims Are Independent of Removal Proceedings and Not Barred by 8 U.S.C. § 1252(g) 22

PARTIES ............................................................................................................... 23

I.    Plaintiff.................................................................................................. 23

II.   Defendant United States of America .................................................... 24

III.  Agency and Official-Capacity Defendants ........................................... 24

IV.   Individual-Capacity Defendants ........................................................... 26

    1.    ICE Supervisory and Field Office Directors ................................ 26

    2.    ICE Deportation and Enforcement Officers ................................ 28

    3.    OPLA Attorneys and DOJ Trial Attorneys.................................. 29

    4.    Immigration Judges and BIA Members ...................................... 31

    5.    Private Individual Defendants ................................................... 32

LEGAL FRAMEWORK .......................................................................................... 35

I.    Finality of Conviction as a Jurisdictional Prerequisite to Removal and Determination of Finality of Non-Citizen's Conviction ........................... 35

II.   U.S. Supreme Court Mandated Formal Categorical Approach to Impose Immigration Consequences for Criminal Conviction ................... 38

III.  Racketeer Influenced and Corrupt Organizations Act (RICO) ............ 41

IV.   Disability Protections........................................................................... 43

PRELIMINARY STATEMENT: CRIMINAL ENTERPRISE NATURE ............................ 45

I.    Nature of Enterprise Conduct.............................................................. 45

II.   Criminal Enterprise Objectives Distinguished from Immigration Enforcement ...... 45

III.  Ultra Vires Conduct Piercing All Immunity Claims .............................. 45

IV.   Pattern of Racketeering Activity .......................................................... 46

FACTUAL ALLEGATIONS ..................................................................................... 47

I.    The Coordinated Criminal Enterprise Structure ................................. 47

    1.    Enterprise Formation and Coordination (Pre-Conviction Targeting)............ 47

        a)    Discriminatory Targeting and Intelligence Gathering Phase ............ 47

    2.    Criminal Prosecution Manipulation Phase (2010-2014) ............ 50

        a)    State Court Process Corruption ................................................. 50

        b)    False Evidence Generation....................................................... 54

        c)    Prosecutorial Misconduct ........................................................ 56

        d)    Judicial Manipulation .............................................................. 63

        e)    Appeal Process Sabotage........................................................ 72

        f)    Plaintiff's Post-Sentence Motion .............................................. 74

II.   Federal Immigration Enforcement As Criminal Law Enforcement ....................................... 75
    1.   Unlawful Detainer and Extended Punishment Phase ........................................... 75
        a)   Criminal Sentence Extension Through Immigration Detainers ........................ 75
            i.    Intelligence Fabrication ............................................................ 77
            ii.   Coordination with State Parole System ..................................... 85
            iii.  Criminal Punishment Extension ................................................ 86
    2.   Void Legal Proceedings Phase ............................................................... 87
        a)   Jurisdictional Fraud and Process Abuse ............................................ 87
    3.   Coercive Detention Scheme .................................................................. 89
    4.   Extended Criminal Law Enforcement Operations ............................................... 91
        a)   Unlawful Federal Detention and Transport Operations ............................ 91
        b)   Warrantless Arrest and Property Seizure .......................................... 92
        c)   Interstate Transport and Detention ............................................... 96
        d)   Extended Supervision Scheme ...................................................... 98
III.  Litigation Success and Continued Supervision ................................................... 100
IV.   OPLA Leaders' Unlawful Continuation of Supervision ............................................. 102
V.    Judicial Process Corruption Phase .............................................................. 104
    1.   Immigration Court and BIA Manipulation ..................................................... 104
        a)   Enterprise Members Corrupted Administrative Adjudication: ........................ 104
            i.    Jurisdictional Denial: ............................................................ 104
            ii.   Evidence Suppression and Witness Coordination ........................... 109
                a.   Refused Subpoenas For Relevant Evidence While Admitting Prejudicial Rebuttal
                     Testimony ................................................................... 109
                b.   The Government-Created "Hobson's Choice" ............................. 112
                c.   Judicial Abdication of Duty to Safeguard Competency and Fairness ... 113
                d.   Blocked Plaintiff's Access to 220 Hours of Exculpatory Video Evidence ... 114
                e.   Coordinated With Private Witnesses (Borowski, Pattinson) Before Testimony ... 116
                f.   Prosecutorial Misconduct in Ambushing a Pro Se Litigant ............ 117
                g.   Judicial Failure to Ensure Fundamental Fairness ..................... 118
                h.   Judicial Prejudgment and Denial of Due Process ..................... 119
                i.   Defendant Withrow Knowing Use of Inadmissible Evidence ............ 120
                j.   Judicial Abdication of the Gatekeeping Function .................... 121
                k.   Prejudicial Impact and Lack of Probative Value .................... 121
                l.   Ultra Vires Relitigation of Criminal Conviction ................... 123
                m.   Ultra Vires Adjudication and Immunity Evasion ..................... 124
                n.   Punishing Constitutional Rights .................................... 125
                o.   Prejudgment and Bias ............................................... 126
                p.   Judicial Admission of Disability and Failure to Act ............... 127
                q.   Defendant Withrow's Frivolous Misstatement of Binding Law ........ 128
                r.   Knowingly Creating a Test Case to Overturn Precedent ............. 129
                s.   Defendant Durling Refusal to Protect Plaintiff's Safety and Facilitate Evidence ... 131
                t.   Willful Ignorance and Refusal to Consider Exculpatory Evidence ... 132
                u.   Contradiction of Binding Precedent (Alaka v. Attorney General) ... 134
VI.   ICE, BIA and EOIR Defendants Administrative Fraud ............................................. 136
    1.   Defendant Withrow Deliberate Omission of Jurisdictional Arguments in Bad Faith .............. 139
    2.   Defendant Pauley Knowing Mischaracterization of Appeal And Refusal to Address Jurisdictional
         Arguments: ................................................................................. 141
    3.   Defendant Guendelsberger Strategic Administrative Closure to Avoid Termination and Maintain
         Pressure Campaign .......................................................................... 143

ii

4.    Defendant Withrow's Bad Faith Motion to Recalendar Upon Technical Finality, Ignoring Categorical Defect ...........................................................................................146
5.    Plaintiff's Legally Sophisticated Challenge to Finality and Jurisdiction.........................148
6.    Defendants' Knowingly False Legal Construction of the "Crime of Stalking"................150
7.    Defendant Guendelsberger's Bad-Faith Reinstatement of the Facially Invalid Removal Order...152
8.    The Enterprise's Blatant Refusal to Acknowledge Its Own Legal Errors ....................155
9.    The Enterprise's Culminating Act of Bad-Faith: Defendant Gemoets's Summary Denial ...........157
10.   The Enterprise's Conspiratorial Falsification of the Record      to Subvert Due Process..............159
11.   Vindication by the Third Circuit and the Enterprise's Continued Obstruction on Remand..........160
12.   The Enterprise's Final Act of Evasion: DHS's Motion to Dismiss Without Prejudice ..................162
13.   Defendant O'Connor's Punitive and Non-Judicial Termination Without Prejudice ....................163
VII.   The Enterprise's Appellate Process Manipulation....................................................165
1.    Defendant Braga's Bad-Faith Litigation and Systematic Misrepresentation.............................165
2.    The Enterprise Exposed: A Systemic Pattern of Governmental Overreach .............................167
3.    The Enterprise's Multi-District Strategy to Maintain Unlawful Detention...................................169
VIII.  Criminal Enterprise Objectives And Methods.........................................................171
1.    Primary Criminal Objective: Unlawful Sentence Extension ....................................................171
2.    Secondary Criminal Objective: Obstruction of Civil Rights ....................................................171
3.    Criminal Methods: Racketeering Pattern ...............................................................................172
IX.    Ultra Vires Nature Piercing Immunity ....................................................................174
AGENCY LIABILITY UNDER FTCA FRAMEWORK .............................................................176
I.     United States Liability Under FTCA .......................................................................176
1.    ICE Institutional Policies And Practices .................................................................................178
2.    EOIR Institutional Failures ....................................................................................................179
3.    BIA Institutional Practices......................................................................................................180
4.    DOJ Litigation Practice Violations .........................................................................................181
5.    DHS Oversight And Coordination Failures..............................................................................182
II.    Vicarious Liability For Employee Conduct .............................................................183
1.    Scope of Employment Determinations ...................................................................................183
2.    Policy-Level Decision Making .................................................................................................183
III.   Negligence And Intentional Tort Liability ...............................................................184
1.    Negligent Training and Supervision ........................................................................................184
2.    Intentional Infliction of Emotional Distress ............................................................................185
3.    Abuse of Process and False Imprisonment .............................................................................186
IV.    Supervisory and Policy-Maker Liability ..................................................................187
1.    Final Policy-Maker Actions ....................................................................................................187
V.     Jurisdictional Averments and Statutory Waiver of Sovereign Immunity..........................188
CLAIMS FOR RELIEF .........................................................................................................189
I.     FIRST CLAIM FOR RELIEF..................................................................................189
II.    SECOND CLAIM FOR RELIEF..............................................................................191
III.   THIRD CLAIM FOR RELIEF ..................................................................................194
IV.    FOURTH CLAIM FOR RELIEF ..............................................................................196
V.     FIFTH CLAIM FOR RELIEF...................................................................................200
VI.    SIXTH CLAIM FOR RELIEF ..................................................................................205
VII.   SEVENTH CLAIM FOR RELIEF ............................................................................209
VIII.  EIGHTH CLAIM FOR RELIEF ...............................................................................212
IX.    NINTH CLAIM FOR RELIEF ..................................................................................215
X.     TENTH CLAIM FOR RELIEF .................................................................................220

XI.    ELEVENTH CLAIM FOR RELIEF ..................................................................224

XII.    TWELFTH CLAIM FOR RELIEF...................................................................227

XIII.    THIRTEENTH CLAIM FOR RELIEF ............................................................231

XIV.    FOURTEENTH CLAIM FOR RELIEF ..........................................................232

    1.    The RICO Enterprise.................................................................................233

    2.    Enterprise Purpose ..................................................................................235

    3.    Pattern of Racketeering Activity –  Predicate Acts ..................................235

        a)    Fabrication of False Government Record ..............................................236

        b)    Suppression of Exculpatory Evidence to Obstruct Judicial Review.........238

        c)    Retaliatory Interstate Transport to Obstruct Litigation ..........................240

        d)    Witness Tampering and False Complaints..............................................242

        e)    Perjury and Ambush Testimony..............................................................244

        f)    Fraud on the Court and Transcript Destruction......................................245

        g)    Falsification of Appellate Records .........................................................247

        h)    Mail and Wire Fraud (18 U.S.C. §§ 1341, 1343).....................................248

        i)    Summary and Continuity of Racketeering Pattern ..................................249

    4.    Personal Benefit of Enterprise Members ..................................................251

    5.    Conducting Enterprise's Affairs Through a Pattern of Racketeering Activity ...............................253

    6.    Injury to Business or Property...................................................................254

    7.    Ultra Vires Conduct Piercing Immunity ....................................................256

XV.  FIFTEENTH CLAIM FOR RELIEF ................................................................258

PRAYER FOR RELIEF.............................................................................................260

DEMAND FOR JURY TRIAL.....................................................................................261

VERIFICATION .........................................................................................................262

APPENDIX

    I.    APPENDIX-A  [CRIMINAL COURT RECORD]

    II.    APPENDIX-B  [CIVIL COURT RECORD]

    III.    APPENDIX-C  [IMMIGRATION  COURT RECORD]

    IV.    APPENDIX-D  [BIA RECORD]

    V.    APPENDIX-E  [FTCA NOTICE RECORD]

**INTRODUCTION**

1.      This civil rights, tort, and RICO action arises from a coordinated and systematic abuse of federal authority by officials within U.S. Immigration and Customs Enforcement ("ICE"), the Department of Homeland Security ("DHS"), the Department of Justice ("DOJ"), including the Executive Office for Immigration Review ("EOIR"), the Board of Immigration Appeals ("BIA"), and government litigators within the Office of the Principal Legal Advisor ("OPLA") and DOJ's Office of Immigration Litigation. Acting in concert with the Pennsylvania Board of Probation and Parole and private individuals (including Allison Borowski, Rajani Pattinson, Ann Boris, John Boris, and others), these officials unlawfully usurped state court sentencing authority and weaponized federal immigration processes to extend Plaintiff's punishment, obstruct his civil litigation, and secure his removal from the United States, despite binding precedent establishing he was not removable.

2.      The sophistication of this enterprise is evidenced by the coordinated actions of five DHS prosecutors, four BIA members, and four separate ICE Field Offices (PA, MS, LA, TX), operating across jurisdictions to perpetuate the scheme and evade detection.

3.      Cloaked in the appearance of lawful immigration enforcement, Defendants engaged in conduct amounting to a de facto criminal law

1

enforcement enterprise with three unlawful objectives:

a) Extend Plaintiff's criminal sentence through immigration detention and supervision, converting a 2.5-year state sentence into over a decade of federal punishment.

b) Obstruct Plaintiff's civil litigation against enterprise members and coordinating private parties.

c) Ensure Plaintiff's removal regardless of legal authority, thereby barring his return and preventing future legal action.

4.    To achieve these ends, Defendants fabricated jurisdictional facts, misrepresented Plaintiff's conviction status, and misapplied Pennsylvania's stalking statute to the Immigration and Nationality Act ("INA"), despite its categorical inapplicability. Proceedings were initiated and maintained on the basis of a void Notice to Appear, lacking the statutory prerequisite of a final conviction under *8 U.S.C. § 1229(d)* and *8 C.F.R. §§ 1003.13–14*.

5.    ICE weaponized detention through detainers, even during periods of administrative closure, prolonging incarceration, obstructing access to counsel, and coercing concessions of removability. The adjudication process was corrupted: BIA members deemed jurisdictional challenges "waived;" Immigration Judges excluded exculpatory evidence, blocked subpoenas, and admitted undisclosed government witnesses; and evidence of a civilian

2

conspiracy to file false complaints was suppressed. This action does not arise from a challenge to a removal order. Rather, Plaintiff challenges ultra vires acts by EOIR and DHS officials in fabricating jurisdiction by misrepresenting conviction finality and intentionally obstructing appeal rights.

6.      Even after the Third Circuit's precedential ruling on August 24, 2022, which held Plaintiff's conviction was not a removable "crime of stalking" under *INA § 237(a)(2)(E)(i)*, ICE and OPLA officials refused to terminate ISAP supervision. The BIA dismissed proceedings "without prejudice," preserving ICE's ability to refile charges, an open defiance of binding judicial authority.

7.      Defendants systematically perverted civil immigration mechanisms into unlawful punitive measures, transforming administrative tools into instruments of criminal punishment never authorized by Congress. Plaintiff's 2.5-year sentence was extended by an additional 30 months of unlawful incarceration through void detainers while his conviction remained non-final. ICE and parole officials distorted parole determinations by treating these invalid detainers as evidence of dangerousness, coordinating with private parties to obstruct Plaintiff's access to justice.

8.      Most critically, Defendants converted ISAP supervision, a program designed for temporary monitoring into a regime of de facto punitive

sentencing, depriving Plaintiff of work authorization, liberty, and livelihood under perpetual surveillance.

9.    This conduct was not a mere exercise of immigration discretion or legal error. It was a deliberate and organized abuse of governmental power so pervasive that it rendered the immigration proceedings void ab initio. The veneer of legality provided Defendants with false cover, enabling them to invoke immunity and procedural defenses designed to protect lawful government action, not the ultra vires misconduct at issue here.

10.    Plaintiff brings this action to pierce that façade, expose and remedy the scope of Defendants coordinated misconduct, and obtain redress for violations of the Constitution, the Federal Tort Claims Act, the Rehabilitation Act, and the Racketeer Influenced and Corrupt Organizations Act ("RICO"). Over the course of more than a decade, including 26 months of unlawful post-order ICE detention, Plaintiff endured legal jeopardy driven by intentional, coordinated acts taken wholly outside the bounds of jurisdiction and statutory authority, and persisted even after controlling precedent foreclosed removability.

11.    As a direct result of this misconduct, Plaintiff's rights under the Fourth, Fifth, and Fourteenth Amendments, the Rehabilitation Act, and the FTCA were violated, causing severe and ongoing harms. Plaintiff was stripped of

4

property, including a 22-karat gold-framed prescription eyeglass set (45 grams), forced into foreclosure on his Philadelphia condominium, deprived of his career and business opportunities, and subjected to lasting emotional distress and reputational injury.

12.    Plaintiff seeks compensatory, punitive, and injunctive relief to redress these harms, deter similar future conduct against Lawful Permanent Residents and disabled detainees, and require DHS, ICE, DOJ, and EOIR to promulgate safeguards for:

    a) Verification of conviction finality before initiating removal proceedings.

    b) Categorical analysis of any state predicate offense to ensure alignment with federal equivalents.

    c) Disability accommodations for detainees with mental health impairments.

    d) Termination of proceedings with prejudice where jurisdiction was lacking.

## JURISDICTION AND VENUE

13.    This Court has jurisdiction over this action pursuant to *28 U.S.C. §§ 1331* and *1343(a)(3)*, as Plaintiff asserts claims arising under the *Constitution* and laws of the United States, including the *First*, *Fourth*, *Fifth*, and *Fourteenth Amendments*, the *Federal Tort Claims Act* (FTCA), the

5

*Rehabilitation Act*, and the *Racketeer Influenced and Corrupt Organizations Act* (RICO). Jurisdiction is also proper under *28 U.S.C. § 1346(b)* for tort claims against the United States, and under *28 U.S.C. § 1367(a)* for supplemental jurisdiction over related state-law claims. Declaratory and injunctive relief is sought pursuant to *28 U.S.C. §§ 2201* and *2202*, and the *All Writs Act*, *28 U.S.C. § 1651*, as necessary to prevent further harm and compel agency compliance with constitutional and statutory mandates.

14.    Venue is proper in the Western District of Texas under *28 U.S.C. § 1391(b)(2)*, as a substantial part of the events giving rise to the claims occurred within this District, and Plaintiff resides in Travis County, Texas. Multiple Defendants, including ICE Field Office Director Daniel Bible and ICE Officer Jose Correa, committed acts within this District that contributed to Plaintiff's unlawful supervision, obstruction of litigation, and deprivation of rights. Plaintiff was subjected to ISAP supervision in Austin, Texas, under the authority of ICE's San Antonio Field Office, and was forced to report to ICE facilities in this District for over nineteen months prior and ten months following the Third Circuit's vacatur of his removal order.

15.    Plaintiff's claims are not barred by 8 U.S.C. § 1252(g), which applies only to discretionary decisions to commence proceedings, adjudicate cases, or execute removal orders. As the Supreme Court clarified in *Reno v.*

6

*American-Arab Anti-Discrimination Committee*, 525 U.S. 471 (1999), *§ 1252(g)* must be construed narrowly to apply only to three discrete actions. Plaintiff does not challenge any discretionary enforcement decision, but rather ultra vires conduct taken in clear absence of jurisdiction, including the initiation of removal proceedings based on non-final convictions, the fabrication of jurisdictional facts, the suppression of exculpatory evidence, and the use of immigration tools to retaliate against protected speech and obstruct civil litigation.

16.    The Fifth Circuit has squarely held that *§ 1252(g)* does not bar judicial review of claims that the government acted outside its lawful authority. In *Huicochea-Gomez v. Holder*, 762 F.3d 477, 483 (5th Cir. 2014), the court emphasized that ultra vires conduct, including the initiation of proceedings without statutory authority remains subject to judicial review. Plaintiff's claims fall squarely within this exception.

17.    Additional circuits have reached the same conclusion. In *Accardi v. Shaughnessy*, 347 U.S. 260 (1954), the Supreme Court held that agencies must follow their own regulations, and failure to do so violates due process. ICE and EOIR officials disregarded binding regulations governing conviction finality under *8 U.S.C. § 1229(d)* and *8 C.F.R. §§ 1003.13–14*, rendering the proceedings void ab initio. In *McNary v. Haitian Refugee Center*, 498 U.S.

7

479 (1991), the Court held that general constitutional challenges to agency procedures are not barred by INA jurisdictional provisions. Plaintiff challenges systemic misconduct and procedural corruption, not the adjudication of any single removal order.

18.    In *Aguilar v. ICE*, 510 F.3d 1 (1st Cir. 2007), the First Circuit held that constitutional and ultra vires claims are not barred by § *1252(g)*, especially where plaintiffs challenge the manner in which ICE conducted enforcement. Similarly, in *Calderon v. Holder*, 639 F.3d 364 (7th Cir. 2011), the Seventh Circuit held that *§ 1252(g)* does not bar review of claims challenging the legal basis for removal proceedings, including those initiated without a final conviction. Cf. *Sissoko v. Rocha*, 440 F.3d 1145, 1156-57 (9th Cir. 2006) (suggesting that the broad jurisdiction-stripping provisions of *8 U.S.C. § 1252(g)* do not foreclose aliens' claims for money damages under the doctrine of *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971)).

19.    Plaintiff reiterates that he does not challenge the discretionary adjudication of any removal order or the merits of any immigration proceeding. Plaintiff's claims do not arise from his removal proceedings but from the Enterprise's pre-removal conspiracy to fabricate evidence, obstruct justice, and retaliate against his litigation. The INA does not bar independent

8

constitutional and tort claims. See *Demore v. Kim*, 538 U.S. 510 (2003); *Arar v. Ashcroft*, 585 F.3d 559 (2d Cir. 2009) (en banc). Rather, Plaintiff challenges the misuse of immigration court and BIA processes as retaliatory instruments to manufacture jurisdictional facts, suppress exculpatory evidence, and obstruct civil litigation. The conduct described herein was undertaken in clear absence of jurisdiction and outside the scope of lawful adjudication. EOIR and BIA officials acted not as neutral decision-makers, but as coordinated participants in a racketeering enterprise designed to inflict unlawful injury. Accordingly, Plaintiff's claims fall outside the scope of *8 U.S.C. § 1252(g)* and are not barred by *Egbert v. Boule*, 142 S. Ct. 1793 (2022). Plaintiff's Bivens claims do not present a "new context" because they allege clearly established violations of the Fourth, Fifth, and Fourteenth Amendments. Defendants' intentional misconduct of fabricating evidence, retaliating against litigation, exceeds the bounds of lawful authority and is not protected by immunity. See *Butz v. Economou*, 438 U.S. 478 (1978); *Albright v. Oliver*, 510 U.S. 266 (1994). Although Plaintiff's ISAP surveillance has formally ended, he continues to suffer the consequences of the Enterprise's actions, including the loss of real property in Philadelphia, retaliatory surveillance while residing in Texas, and obstruction of his civil litigation. These injuries are concrete, particularized, and traceable to Defendants'

9

conduct, and they support Plaintiff's standing to seek injunctive relief aimed at preventing further retaliation and safeguarding access to judicial remedies.

20.    Accordingly, this Court has jurisdiction to hear Plaintiff's claims, issue declaratory and injunctive relief, and award damages for the harms inflicted by Defendants acting under color of law but wholly outside the bounds of their lawful authority.

## PERSONAL JURISDICTION OVER OUT-OF-STATE DEFENDANTS

21.    Plaintiff asserts personal jurisdiction over all named Defendants, including those based in Pennsylvania and other jurisdictions, under *18 U.S.C. § 1965(b)* and applicable constitutional standards. The Philadelphia based Defendants initiated the racketeering scheme by fabricating ICE detainers and jurisdictional facts that directly led to Plaintiff's unlawful detention, retaliatory transfer, and ISAP surveillance in Texas. Their conduct was intentionally directed at Plaintiff with the foreseeable consequence of causing injury in this District.

22.    The racketeering enterprise operated across multiple jurisdictions, and the coordinated acts of Philadelphia-based Defendants materially advanced the Enterprise's objectives in Texas. Venue and jurisdiction are proper in this District because Plaintiff suffered injury here, and the ends of justice require

10

that all members of the Enterprise be subject to the same forum.

23.    Defendants Jose Correa, Cesar Espinoza, Veronica Ulloa each played a knowing and deliberate role in the Enterprise's retaliatory campaign against Plaintiff while he resided in Texas. Their coordinated actions including the initiation and continuation of ISAP surveillance, manipulation of immigration enforcement tools, and obstruction of Plaintiff's civil litigation were not incidental or peripheral. They were expressly aimed at Plaintiff in this District, with the intent to inflict harm, suppress protected activity, and extend unlawful control. These acts caused direct, foreseeable, and constitutionally cognizable injury in Texas and were central to the Enterprise's multi-jurisdictional scheme. Therefore, jurisdiction over all named Defendants, including those based in Pennsylvania and other jurisdictions is proper under the "effects test" articulated in *Calder v. Jones*, 465 U.S. 783 (1984), as their conduct was purposefully directed at Plaintiff and produced injury in this forum. Their participation in the Enterprise satisfies the minimum contacts requirement and comports with fair play and substantial justice under *International Shoe Co. v. Washington*, 326 U.S. 310 (1945). The retaliatory surveillance and obstruction they executed in Texas were not abstract policy decisions, they were targeted, operational acts that anchor personal jurisdiction in this District.

11

24.    Venue and jurisdiction are proper in this District under *18 U.S.C. § 1965(b)*, as the racketeering enterprise caused injury to Plaintiff in Texas, and the acts of out-of-state Defendants were integral to the scheme that culminated in retaliatory transfer and surveillance in this District.

25.    Plaintiff further avers that personal jurisdiction over all named Defendants is independently proper under *Fed. R. Civ. P. 4(k)(2)*, as the claims arise under federal law and no single state would otherwise have general jurisdiction over all Defendants. The coordinated conduct of federal officials and agency personnel including ICE, DOJ, EOIR, and OPLA employees was intentionally directed at Plaintiff in Texas, resulting in unlawful detention, retaliatory transfer, and surveillance. These acts satisfy the federal contacts requirement and comport with due process under *International Shoe*, 326 U.S. at 316. Accordingly, this Court possesses personal jurisdiction over all Defendants under *18 U.S.C. § 1965(b)*, *Rule 4(k)(2)*, and applicable constitutional standards

## STATUTE OF LIMITATIONS, CONTINUING VIOLATIONS, AND EQUITABLE TOLLING

26.    Plaintiff's claims are timely under applicable federal limitations periods. The RICO claims asserted under *18 U.S.C. § 1962(c)* and *(d)* are governed by a four-year statute of limitations, which accrues upon discovery of the

injury. Plaintiff discovered the full scope of Enterprise's racketeering activity and its impact on his business and property interests within four years of filing this complaint. The Enterprise's pattern of racketeering continued through 2023, including falsification of appellate records, retaliatory transfers, and ISAP surveillance, all of which caused ongoing injury.

27.    Plaintiff's FTCA claims are governed by a two-year limitations period under *28 U.S.C. § 2401(b)*. These claims are timely filed and subject to equitable tolling due to Defendants' concealment of material facts, obstruction of judicial review, and retaliatory conduct that impeded Plaintiff's access to legal remedies. Plaintiff was actively prevented from discovering the full extent of the misconduct due to falsified records, misdirected mailings, and deliberate suppression of exculpatory evidence.

28.    Plaintiff further invokes the continuing violations doctrine, as the Enterprise's coordinated misconduct constituted an ongoing scheme that inflicted cumulative and compounding harm. The racketeering acts were not isolated incidents but formed a continuous pattern of retaliation, obstruction, and procedural sabotage that persisted through Plaintiff's ISAP surveillance and litigation suppression in Texas. Each act reinforced the prior injury and extended the impact of the original fabrication.

29.    Accordingly, Plaintiff's claims asserted herein are timely and properly

13

pled under applicable federal law. The Enterprise's misconduct constituted a continuing and coordinated pattern of retaliation, obstruction, and racketeering, with injuries accruing through 2023. This pattern included retaliatory surveillance under the ISAP program, falsification of appellate records, obstruction of Plaintiff's civil litigation, and coordinated efforts to suppress judicial review. Plaintiff invokes the discovery rule and equitable tolling based on both concealment and psychological incapacity. Although many acts were not concealed in a literal sense, Plaintiff lacked the mental clarity to comprehend their systemic interconnection due to prolonged depression, retaliatory detention, and the destabilizing threat of deportation. Only after obtaining U.S. citizenship and experiencing relief from imminent removal did Plaintiff begin to recover and recognize the full scope of the Enterprise's misconduct. These circumstances justify delayed accrual and equitable tolling under *Lugo-Resendez v. Lynch*, 831 F.3d 337 (5th Cir. 2016), and are reviewable legal questions under *Guerrero-Lasprilla v. Barr*, 589 U.S. 221 (2020). Plaintiff reserves the right to assert additional tolling arguments should discovery reveal further concealment, fraud, obstruction, or psychological barriers that impeded timely filing.

30.    Plaintiff further avers that the claims asserted herein could not have accrued prior to the extinguishment of ICE's removal authority. The Board of

14

Immigration Appeals terminated proceedings without prejudice, leaving Plaintiff vulnerable to renewed enforcement. As such, any civil claim challenging the fraudulent I-213, retaliatory ICE detainer, or ISAP surveillance would have necessarily implied the invalidity of an unresolved removal posture, and been barred under *Heck v. Humphrey*, 512 U.S. 477 (1994).

31.    Plaintiff's strategic focus during the relevant period was on restoring lawful permanent resident status and securing naturalization. He filed three mandamus actions in this District to halt ISAP surveillance and compel USCIS to adjudicate his green card and citizenship applications. These filings demonstrate diligence and procedural engagement but also reflect the legal and tactical constraints that prevented Plaintiff from asserting the full scope of claims now presented.

32.    Plaintiff avers that only upon securing U.S. citizenship did he possess the legal standing and procedural safety to assert these claims without jeopardizing his immigration posture or triggering retaliatory enforcement. Citizenship extinguished ICE's jurisdiction to deport Plaintiff and removed the *Heck* bar, thereby enabling the timely filing of this complaint.

33.    Although Plaintiff actively accessed the courts, his capacity to investigate, understand, and assert these claims was materially impaired by

15

documented mental health infirmity, compounded by retaliatory surveillance, coercive detention, and obstruction of access to legal resources. These conditions justify equitable tolling under federal law. See *Canales v. United States*, 765 F.2d 264, 267 (1st Cir. 1985); *Holmberg v. Armbrecht*, 327 U.S. 392, 397 (1946).

34.    Plaintiff further avers that Defendants' coordinated concealment of exculpatory records, suppression of binding precedent, and procedural manipulation impeded Plaintiff's ability to discover the full scope of the racketeering enterprise and ultra vires agency conduct. These facts support tolling under the doctrines of fraudulent concealment and continuing violation. See *Rotella v. Wood*, 528 U.S. 549, 561–62 (2000).

35.    Accordingly, Plaintiff's claims are timely under applicable federal law and preserved through deferred accrual, equitable tolling, and continuing violation doctrine. Plaintiff reserves the right to assert additional tolling arguments should discovery reveal further concealment, fraud, obstruction, or psychological barriers that impeded timely filing.

## LEGAL BASIS FOR CLAIMS: IMMUNITY, CONTEXT, AND JURISDICTIONAL BARS

### I.    Absolute Immunity Does Not Apply to Ultra Vires Conduct

36.    Plaintiff's claims do not challenge the lawful adjudication of removal

proceedings. Instead, they focus on ultra vires conduct, acts taken outside the scope of Defendants' lawful authority, including the fabrication of evidence to manufacture jurisdictional facts, suppression of exculpatory evidence to obstruct due process, retaliation against Plaintiff for exercising his First Amendment rights, and the use of immigration processes as tools for unlawful retaliation and obstruction.

37. Absolute immunity does not protect such conduct. In *Butz v. Economou*, 438 U.S. 478 (1978), the Supreme Court held that federal officials are not entitled to absolute immunity for acts that exceed their statutory authority or violate clearly established constitutional rights. The Court emphasized that absolute immunity is reserved for acts that are "within the outer perimeter" of an official's lawful duties and does not extend to willful or knowing violations of constitutional rights. Id. at 495–96.

38. The Fifth Circuit and other courts have similarly held that absolute immunity does not apply to ultra vires acts. In *Stevens v. Osuna*, 877 F.3d 1293 (11th Cir. 2017), the court emphasized that immigration judges are not immune for acts taken in the "complete absence of all jurisdiction" or for conduct that is "not judicial in nature." See also *Maci v. Hable*, No. 1:19-CV-201, 2020 WL 4480869, at *4 (S.D. Tex. July 9, 2020) (holding that absolute immunity does not apply to ultra vires conduct by immigration officials).

17

39.    Fifth Circuit precedent supports this distinction. In *Davis v. Tarrant County*, 565 F.3d 214 (5th Cir. 2009), the court held that absolute immunity does not apply where officials act "in the complete absence of all jurisdiction" or engage in conduct that is "clearly outside their statutory authority." *Id*. at 221. Here Defendants, acting under color of law and in the complete absence of any jurisdiction following the Third Circuit's holding that Plaintiff's conviction was not a removable offense under the INA, knowingly and willfully continued removal proceedings. That said actions constituted administrative misconduct, not protected judicial or prosecutorial acts, as they were undertaken for the illegitimate purpose of retaliating against Plaintiff and effecting his unlawful detention. That in furtherance of this scheme, Defendants engaged in a pattern of unlawful conduct, including but not limited to: fabricating evidence; issuing falsified waiver findings; suppressing exculpatory material; and concealing critical appeal records. That by these actions, Defendants unlawfully usurped the sentencing authority of the state court and weaponized federal immigration processes to effectively extend Plaintiff's criminal punishment and obstruct his pursuit of civil litigation. Such conduct was undertaken in a clear absence of all jurisdiction and is not entitled to absolute immunity.

18

## II. Plaintiff's Claims Do Not Present a "New Context" Under Egbert v. Boule

40. Defendants may argue that *Egbert v. Boule*, 142 S. Ct. 1793 (2022), bars Plaintiff's Bivens claims because they present a "new context." However, Plaintiff's claims do not present a "new context" but instead allege clearly established violations of the Fourth, Fifth, and Fourteenth Amendments, including retaliation for exercising First Amendment rights (clearly established as unlawful since *Hartman v. Moore*, 547 U.S. 250 (2006)); obstruction of due process (clearly established as unlawful since *Mathews v. Eldridge*, 424 U.S. 319 (1976)); and false imprisonment and abuse of process (clearly established as unlawful since *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971)).

41. The Fifth Circuit has recognized Bivens claims in similar contexts. In *Carrasco-Aguirre v. Garland*, No. 23-60176, 2023 WL 621651 (5th Cir. Oct. 11, 2023), the court held that Bivens claims for due process violations in immigration proceedings are not barred where the conduct involves clearly established constitutional violations. The court emphasized that "Bivens remains a viable remedy for claims involving intentional misconduct and violations of clearly established rights." *Id.* at *1.

42. In *Okpala v. Whitaker*, 908 F.3d 965 (5th Cir. 2018), the Fifth Circuit reaffirmed that Bivens applies to claims involving "deliberate indifference" to

19

constitutional rights, including due process violations in immigration enforcement. The court held that "Bivens is available where the constitutional violation is clearly established, and the conduct is not a 'new context.'" Id. at 971.

43.    Plaintiff's claims arise under Bivens and fall squarely within the recognized contexts of *Carlson v. Green* and *Davis v. Passman*. Defendants acted far outside the lawful bounds of their authority, engaging in knowing misconduct that deprived Plaintiff of clearly established constitutional rights. This conduct was entirely unrelated to any legitimate policy discretion or authorized immigration enforcement function. As such, this case does not present a "new context" for *Bivens*, but a direct application of its core principles. Moreover, the holding in *Egbert v. Boule* does not bar these claims, as it is inapposite where officials commit patent constitutional violations that fall within the scope of traditional *Bivens* remedies, and because Congress has provided no alternative remedial scheme for claims of this egregious nature.

### III.    The Discretionary Function Exception Does Not Apply to Ultra Vires Conduct

44.    Defendants may argue that the discretionary function exception of the FTCA bars Plaintiff's claims. However, the exception does not apply to ultra

vires conduct. The FTCA's discretionary function exception only protects lawful exercises of judgment or choice, it does not shield acts that violate statutory or constitutional limits. See *Berkovitz v. United States*, 486 U.S. 531, 536–37 (1988).

45.    The Fifth Circuit has consistently held that the discretionary function exception does not apply to ultra vires conduct. In *Leleux v. United States*, 178 F.3d 750 (5th Cir. 1999), the court held that the exception does not apply where officials "fail to act in accordance with" governing statutes or regulations. Id. at 754.

46.    Here, Defendants' conduct was not discretionary but rather ultra vires. Fabricating evidence to create false jurisdictional facts is not a lawful exercise of discretion but a violation of due process. Suppressing exculpatory evidence to obstruct Plaintiff's defense is not a discretionary act but a violation of the Fifth Amendment. Retaliating against Plaintiff for exercising his First Amendment rights is not a discretionary act but a violation of clearly established law.

47.    In *Quezada v. United States*, No. 3:25-CV-564-L (BK), 2025 WL 747263 (N.D. Tex. Jan. 29, 2025), the court held that the discretionary function exception does not apply to claims involving "intentional misconduct" or "violations of statutory or constitutional limits." Id. at *6.

21

Plaintiff's claims fall squarely within this exception.

## IV. Plaintiff's Claims Are Independent of Removal Proceedings and Not Barred by 8 U.S.C. § 1252(g)

48.    Defendants argue that *8 U.S.C. § 1252(g)* bars Plaintiff's claims because they "arise from" removal proceedings. However, Plaintiff's claims are independent of the removal process and instead challenge ultra vires conduct (e.g., fabricating evidence, retaliating, obstructing litigation), constitutional violations (e.g., due process, equal protection, First Amendment retaliation), and tortious acts (e.g., false imprisonment, intentional infliction of emotional distress).

49.    Section 1252(g) does not bar such claims. In *Reno v. American-Arab Anti-Discrimination Committee ("AAADC")*, 525 U.S. 471 (1999), the Supreme Court held that *§ 1252(g)* applies only to claims challenging the Attorney General's discretionary decisions to commence, adjudicate, or execute removal orders. The Court emphasized that *§ 1252(g)* does not bar independent constitutional claims or claims involving ultra vires conduct.

50.    The Fifth Circuit has repeatedly held that *§ 1252(g)* does not bar claims alleging ultra vires conduct. In *Alvidres-Reyes v. Reno*, 180 F.3d 199 (5th Cir. 1999), the court held that *§ 1252(g)* does not apply to claims challenging "ultra vires conduct" or "systemic misconduct" outside the removal process.

22

The court reasoned that "ultra vires conduct is not a 'decision or action' to commence, adjudicate, or execute removal orders" and thus falls outside *§ 1252(g)*. Id. at 204.

51.    Similarly, in *Foster v. Townsley*, 243 F.3d 210 (5th Cir. 2001), the Fifth Circuit held that *§ 1252(g)* does not bar claims involving "constitutional violations independent of the removal process," such as false arrest or malicious prosecution. The court emphasized that "*§ 1252(g)* is not a bar to claims that do not challenge the removal order itself." Id. at 214.

54.    Plaintiff's claims do not challenge the removal order itself, but rather independent constitutional and tortious acts committed by Defendants. As such, *§ 1252(g)* does not apply.

**PARTIES**

### I.    Plaintiff

52.    Plaintiff Vamsidhar Vurimindi is a U.S. citizen and former Lawful Permanent Resident (LPR), originally from India and of Hindu faith. He is a statistical programmer, entrepreneur, and property owner whose liberty, property, and civil rights were systematically violated by federal officials acting under color of law but wholly outside the bounds of their lawful authority. Plaintiff currently resides in Travis County, Texas, and has standing to bring this action under *Article III of the U.S. Constitution*.

23

53. Plaintiff was a lawful property owner of condominium unit #607 in Hoopskirts Lofts Condominium, located at 309–313 Arch Street, Philadelphia, PA 19106. Plaintiff was the only male resident of Indian origin and Hindu faith to reside and own property in the Hoopskirts Lofts Condominium. His unique demographic status within the building was known to neighbors and became a focal point of targeted harassment, fabricated complaints, and coordinated efforts to provoke law enforcement and immigration involvement. This property was unlawfully foreclosed during Plaintiff's ICE detention, resulting in permanent loss of title and equity.

## II.    Defendant United States of America

54. Defendant United States of America is sued under the *Federal Tort Claims Act* (FTCA), *28 U.S.C. §§ 1346(b)*, *2671–2680*, for the tortious acts of its employees and agencies, including ICE, DHS, DOJ, EOIR, and BIA, committed within the scope of their employment. The United States is liable for false imprisonment, negligence, abuse of process, and intentional infliction of emotional distress arising from the conduct described herein.

## III.    Agency and Official-Capacity Defendants

55. Attorney General Pam Bondi (substituted for Merrick Garland) is the head of the DOJ, responsible for immigration litigation and supervision of the Executive Office for Immigration Review ("EOIR") and Office of Immigration

24

Litigation ("OIL"). Mrs. Bondi shares responsibility for implementation and enforcement of the immigration laws along with Defendant Kristi Noem. She is sued in her official capacity for injunctive and declaratory relief.

56.   Secretary of Homeland Security Kristi Noem (substituted for Alejandro Mayorkas) is the head of the DHS, responsible for enforcing immigration laws through ICE and related components and has ultimate responsibility for the administration and enforcement of the immigration laws. She is sued in her official capacity.

57.   Defendant Sirce E. Owen (substituted for David Owen) is Director of EOIR, an agency within DOJ responsible for adjudicating immigration cases, including Immigration Courts and the BIA, exercises authority over nationwide immigration courts and BIA related to prompt adjudication of removal proceedings. He is sued in his official capacity.

58.   Defendant Todd Lyons (substituted for Patrick Lechleitner) is the Director of ICE, an agency within DHS charged with detention, removal, and enforcement of immigration laws, including Enforcement and Removal Operations ("ERO") and the OPLA, charged with detaining and removing aliens pursuant to federal immigration law. He is sued in his official capacity.

59.   Defendant Anna C. Little (substituted for SHEILA McNulty and Daniel Weiss) Chief Immigration Judge exercises authority over BIA prompt

adjudication of removal proceedings. She is sued in her official capacity.

60.    Defendant Garry D. Malphrus (substituted for David Wetmore), Chief Appellate Immigration Judge, exercises authority over BIA prompt adjudication of removal proceedings. He is sued in his official capacity.

61.    Defendant Marcos Charles (substituted for Russell Hott for official capacity claims) is the Director of Office of Detention and Removal, which is the primary enforcement arm within ICE for the identification, apprehension, and removal of non-citizens unlawfully in the United States. He is sued in his supervisory capacity.

62.    These Defendants are responsible for promulgating and enforcing policies that led to Plaintiff's unlawful detention, supervision, and removal, and are sued for injunctive relief requiring institutional safeguards and policy reforms. Plaintiff seeks injunctive and declaratory relief against these Defendants in their official capacities to compel institutional reforms, disability accommodations, and constitutional compliance within immigration enforcement and adjudication systems.

## IV.    Individual-Capacity Defendants

### 1. ICE Supervisory and Field Office Directors
(Russell Hott Thomas Decker, Jennifer Ritchey, Sean Ervin, William Joyce, Diane Witte, Daniel Bible, Jose Correa)

63.    Defendant Russell Hott was the Director of Office of Detention and

26

Removal, which is the primary enforcement arm within ICE for the identification, apprehension, and removal of non-citizens unlawfully in the United States. He is sued in his supervisory individual capacity.

64. Defendant Thomas Decker, at all relevant times mentioned herein, was the Field Office Director for the Philadelphia Field Office of ICE, which is the Field Office responsible for the enforcement of the immigration laws within Commonwealth of Pennsylvania. He is sued in his supervisory and individual capacity.

65. Defendant Jennifer Ritchey, at all relevant times mentioned herein, was the Acting Field Office Director for the Philadelphia Field Office of ICE, which is the Field Office responsible for the enforcement of the immigration laws within Commonwealth of Pennsylvania. She is sued in her supervisory and individual capacity.

66. Defendant Sean Ervin, at all relevant times mentioned herein, was the Field Office Director for the Philadelphia Field Office of ICE, which is the Field Office responsible for the enforcement of the immigration laws within Commonwealth of Pennsylvania. He is sued in his supervisory and individual capacity.

67. Defendant William Joyce, at all relevant times mentioned herein, was the Field Office Director for the Jackson Field Office of ICE, which is the Field

27

Office responsible for the enforcement of the immigration laws within Mississippi. He is sued in his supervisory and individual capacity.

68.   Defendant Diane Witte, at all relevant times mentioned herein, was the Field Office Director for the Jackson Field Office of ICE, which is the Field Office responsible for the enforcement of the immigration laws within Mississippi. She is sued in his supervisory and individual capacity.

69.   Defendant Daniel Bible, at all relevant times mentioned herein was the Field Office Director for the Huston Field Office of ICE, which is the Field Office responsible for the enforcement of the immigration laws within Texas. He is sued in his supervisory and individual capacity.

70.   Defendant Jose Correa, at all relevant times mentioned herein, was the Field Office Director for the San Antonio Field Office of ICE, which is the Field Office responsible for the enforcement of the immigration laws within Texas. He is sued in his supervisory and individual capacity.

### 2. ICE Deportation and Enforcement Officers
(Andrew Kwiatowski, Chris Hoffman, Josh Reid, Robert Wright, John Rife, Cesar Espinoza, Veronica Ulloa)

71.   Defendant Andrew Kwiatowski, at all relevant times mentioned herein, was the Supervisory Detention and Deportation Officer with ICE. He is sued in his official and individual capacity.

72.   Defendant Chris Hoffman, at all times mentioned herein, was an

28

Immigration Enforcement Agent with ICE. He is sued in his official and individual capacity.

73.    Defendant Josh Reid, at all times mentioned herein, was an Immigration Enforcement Agent with ICE. He is sued in his official and individual capacity.

74.    Defendant Robert Wright, at all relevant times mentioned herein, was an Immigration Enforcement Agent with ICE. He is sued in his official and individual capacity.

75.    Defendant John Rife, at all relevant times mentioned herein, was an Immigration Enforcement Agent with ICE. He is sued in his official and individual capacity.

76.    Defendant Cesar Espinoza, at all relevant times mentioned herein, was an Immigration Enforcement Agent with ICE. He is sued in his official and individual capacity.

77.    Defendant Veronica Ulloa, at all relevant times mentioned herein, was an Immigration Enforcement Agent with ICE. She is sued in her official and individual capacity.

### 3.  OPLA Attorneys and DOJ Trial Attorneys

(Jo Ann McLane, Kerry Doyle, Victoria Santora a/k/a Victoria Braga, Jeffrey Bubier, McDonnell, Maureen Gaffney, Mary Withrow)

78.    Defendant Jo Ann McLane is or was at all times mentioned herein is

29

the Chief Counsel for OPLA, ICE San Antonio Field Office and exercises authority over enforcement of INA through DHS and ICE-ERO operations within District of San Antonio. She is sued in her official and individual capacity.

79.    Defendant Kerry Doyle, at all relevant times mentioned herein is the Principal Legal Advisor, OPLA, and exercises authority over enforcement of INA through DHS and ICE-ERO operations across United States. She is sued in her supervisory and individual capacity.

80.    Defendant Brian G. McDonnell, at all relevant times mentioned herein is Assistant Chief Counsel with ICE, represented the U.S. government in removal proceedings. He is sued in his official and individual capacity.

81.    Defendant Jeffrey Bubier, at all relevant times mentioned herein is Assistant Chief Counsel with ICE, represented the U.S. government in removal proceedings. He is sued in his official and individual capacity.

82.    Defendant Maureen Gaffney, at all relevant times mentioned herein is Assistant Chief Counsel with ICE, represented the U.S. government in removal proceedings. She is sued in her official and individual capacity.

83.    Defendant Mary Withrow, at all relevant times mentioned herein is Assistant Chief Counsel with ICE, represented the U.S. government in removal proceedings and prepared briefs and other pleadings filed before

the BIA. She is sued in her official and individual capacity.

84.    Defendant Victoria Santora a/k/a Victoria Braga at all relevant times mentioned herein is trial attorney with DOJ represented the U.S. government in U.S Court of Appeals for the Third Circuit. She is sued in her official and individual capacity.

85.    Defendant Matthew H. Doll, at all relevant times mentioned herein is Assistant Chief Counsel with ICE, represented the U.S. government in removal proceedings and prepared briefs and other pleadings filed before the BIA. He is sued in her official and individual capacity.

### 4. Immigration Judges and BIA Members
(Walter Durling, Roger Pauley, John Guendelsberger, Marcos Gemoets, Blair O'Connor)

86.    Defendant Walter Durling, at all relevant times mentioned herein, was Judge in Immigration Court, York, PA and decided Plaintiff's case by without exercising independent judgment and abused discretion that is necessary or appropriate for termination of proceedings. He is sued in his official and individual capacity.

87.    Defendant Roger Pauley, at all relevant times mentioned herein is member of Board of Immigration Appeals and presided over Plaintiff's appeal from Defendant Durling's removal order and failed to exercise independent judgment and abused discretion that is necessary or appropriate for

31

termination of proceedings. He is sued in his official and individual capacity.

88.    Defendant John Guendelsberger at all relevant times mentioned herein is member of BIA and presided over Plaintiff's appeal from Defendant Durling's removal order and failed to exercise independent judgment and abused discretion that is necessary or appropriate for termination of proceedings. He is sued in his official and individual capacity.

89.    Defendant Marcos Gemoets at all relevant times mentioned herein is member of BIA and presided over Plaintiff's appeal from Defendant Durling's removal order and failed to exercise independent judgment and abused discretion that is necessary or appropriate for termination of proceedings. He is sued in his official and individual capacity.

90.    Defendant Blair O'Connor at all relevant times mentioned herein is member of BIA and presided over Plaintiff's appeal from Defendant Durling's removal order and failed to exercise independent judgment and abused discretion that is necessary or appropriate for termination of proceedings. He is sued in his official and individual capacity.

### 5. Private Individual Defendants

91.    Defendant Allison Borowski is an individual and private citizen residing in Philadelphia, Pennsylvania. At all relevant times, she was the plaintiff in the underlying criminal complaint, Commonwealth ex rel. Borowski v.

32

Vurimindi, and a neighboring resident of Plaintiff at the Hoopskirts Lofts Condominium. She is sued in her individual capacity for her role as a complaining witness and her alleged coordination with government officials.

92.    Defendant Rajani Pattinson is an individual and private citizen residing in Philadelphia, Pennsylvania. At all relevant times, she was a neighboring resident of Plaintiff at the Hoopskirts Lofts Condominium and a complaining witness in the underlying criminal proceedings against Plaintiff. She is sued in her individual capacity for her role as a complaining witness and her alleged coordination with government officials.

93.    Defendant Leonidas Addimando is an individual and private citizen and was, at all relevant times, the developer and manager of the Hoopskirts Lofts Condominium in Philadelphia, Pennsylvania. He is sued in his individual capacity for his alleged role in coordinating a campaign of harassment and false complaints against Plaintiff.

94.    These Defendants participated in the enterprise described herein, including the fabrication of jurisdictional facts, suppression of exculpatory evidence, obstruction of civil litigation, and retaliatory supervision and removal.

95.    In addition to the foregoing ICE agents and officials, unknown named ICE agents and officials are sued herein in their individual capacities and

33

official capacities under fictitious names as "ICE Does 1-10" because their true names, titles, capacities, and/or degree of responsibility for the acts alleged herein are unknown to Plaintiff at this time. These individuals participated in the lodging of void detainers, manipulation of parole determinations, transportation, and coordination of ISAP supervision. When Plaintiff ascertains this information, he will amend this Complaint accordingly. ICE Does 1-10 include, but are not limited to, ICE Officials and Supervisors, ICE Officers, and/or Immigration Enforcement Agents with ICE (collectively, the "ICE Doe Defendants"). Plaintiff is informed and believes, and thereon alleges, that the ICE Doe Defendants are legally liable to Plaintiff in some part for the wrongful acts and omissions of which Plaintiff complains herein.

96.    Defendants include current and former ICE field office directors, deportation officers, OPLA attorneys, Immigration Judges, and BIA appellate adjudicators whose acts, under color of federal authority, directly and proximately caused Plaintiff's injuries.

97.    Each individual Defendant is sued in his or her personal capacity for damages under *Bivens v. Six Unknown Named Agents* and in his or her official capacity for injunctive/declaratory relief, unless otherwise specified.

98.    At all relevant times, each Defendant acted under color of federal law

34

and within the scope of their authority, but in a manner that violated clearly established constitutional, statutory, or common law rights.

## LEGAL FRAMEWORK

I.   **Finality of Conviction as a Jurisdictional Prerequisite to Removal and Determination of Finality of Non-Citizen's Conviction**

99.   Immigration Judges derive their adjudicatory authority solely from the *Immigration and Nationality Act* (INA), *8 U.S.C. § 1229a(a)(1)*, which vests jurisdiction in the immigration court only upon the filing of a valid Notice to Appear (NTA). A valid NTA must allege a legally sufficient ground of removability, and where removability is predicated on a criminal conviction, that conviction must be final at the time of filing. See *8 U.S.C. § 1229(d)*; *8 C.F.R. §§ 1003.13–1003.14*. The INA's statutory scheme prohibits the initiation of removal proceedings based on non-final convictions, and absent such finality, immigration courts lack subject-matter jurisdiction to adjudicate removability under *INA § 237(a)(2)*. Where the statutory prerequisites are not satisfied, such as when a conviction is pending direct appeal, the Immigration Court acts in clear absence of jurisdiction. See *Orabi v. Att'y Gen.*, 738 F.3d 535 (3d Cir. 2014); *Matter of Roldan*, 22 I&N Dec. 512 (BIA 1999).

100.  In Pennsylvania, a criminal defendant has ten days from the date of sentencing to file an optional post-sentence motion. See *Pa. R. Crim. P.*

35

*720(A)*. *Rule 720* is explicit: a trial judge must decide a timely filed post-sentence motion or grant a motion to extend the 120-day decision period by no more than 30 days. See *Pa. R. Crim. P. 720(B)(3)(a)*. The rule does not permit sua sponte extensions. If an extension is properly sought and granted, the motion must be decided within the extended period, but in no event more than 150 days from the date of filing. If the judge fails to decide the motion within the applicable time, the rule mandates that "the motion shall be deemed denied by operation of law." See *Pa. R. Crim. P. 720(B)(3)(a), (b)*.

101.   Once a post-sentence motion is deemed denied by operation of law, the clerk of courts is required, again in mandatory terms to "forthwith enter an order on behalf of the court" and serve a copy of that order on the Commonwealth, the defendant, and defense counsel. See *Pa. R. Crim. P. 720(B)(3)(c)*. This order is the jurisdictional trigger for appeal. Until it is entered, the defendant is procedurally barred from initiating appellate review. See *Commonwealth v. Bentley*, 831 A.2d 668 (Pa. Super. 2003).

102.   If no post-sentence motion is filed, the notice of appeal must be filed within 30 days of sentencing. See *Commonwealth v. Bilger*, 803 A.2d 199 (Pa. Super. 2002), appeal denied, 572 Pa. 695, 813 A.2d 835 (Pa. 2002). When a post-sentence motion is filed, the appellant has 30 days from its denial to file a notice of appeal. However, under *Pa. R. Crim. P. 720(A)(2)*,

36

this 30-day window is contingent upon the timely filing of the post-sentence motion. See *Bilger*, 803 A.2d at 201.

103. Under *Pa. R.A.P. 903(a)*, a notice of appeal must be filed within 30 days after entry of the order being appealed. Upon receipt, the clerk must immediately stamp the notice with the date of receipt, which constitutes the date the appeal was taken. See *Pa. R.A.P. 905(a)(3)*. The clerk must then transmit the notice and attachments to the prothonotary of the designated appellate court. See *Pa. R.A.P. 905(b)*. Importantly, Pennsylvania clerks and prothonotaries lack discretion to reject a timely notice of appeal. See *Commonwealth v. Williams*, 106 A.3d 583 (Pa. 2014) (citing *In re Administrative Order No. 1–MD–2003*, 936 A.2d 1, 9 (Pa. 2007); *Brown v. Levy*, 73 A.3d 514, 519 (Pa. 2013)).

104. Whether a conviction exists for immigration purposes is a question of federal law. See *Matter of Roldan*, 22 I&N Dec. 512 (BIA 1999) (citing *Matter of Ozkok*, 19 I&N Dec. 546, n.6 (BIA 1988)). A conviction cannot support removability until it has "attained a substantial degree of finality," which does not occur until direct appellate review is exhausted or waived. See *Orabi v. Att'y Gen.*, 738 F.3d 535 (3d Cir. 2014) (citing *Pino v. Landon*, 349 U.S. 901 (1955)). See also *Will v. INS*, 447 F.2d 529 (7th Cir. 1971); *Aguilera-Enriquez v. INS*, 516 F.2d 565 (6th Cir. 1975); *Marino v. INS*, 537 F.2d 686 (2d Cir.

37

1976).

105.  For purposes of determining when a conviction becomes final, federal courts look to state law. See *Fahy v. Horn*, 240 F.3d 239, 244 (3d Cir. 2000) ("As a matter of federal law we must look to state law governing the finality of conviction."). In Pennsylvania, a judgment is deemed final for purposes of the Post Conviction Relief Act (PCRA) upon expiration of the time for seeking direct review. See *Commonwealth v. Callahan*, 101 A.3d 118, 122 (Pa. Super. Ct. 2014). "Direct review" includes appeal as of right to the Pennsylvania Superior Court, discretionary review by the Pennsylvania Supreme Court and the U.S. Supreme Court, or expiration of the time to seek such review. See *Commonwealth v. Liebensperger*, 904 A.2d 40, 45 (Pa. Super. Ct. 2006); see also *42 Pa. C.S.A. § 9545(b)(3)*.

## II.   U.S. Supreme Court Mandated Formal Categorical Approach to Impose Immigration Consequences for Criminal Conviction

106. The U.S. Supreme Court has repeatedly held that immigration consequences based on criminal convictions must be assessed using the formal categorical approach. This approach requires adjudicators to compare the elements of the state offense to the generic federal definition of the removable offense, without reference to the underlying facts of the individual case. See *Taylor v. United States*, 495 U.S. 575 (1990); *Moncrieffe*

38

*v. Holder*, 569 U.S. 184 (2013); *Descamps v. United States*, 570 U.S. 254 (2013); *Mathis v. United States*, 579 U.S. 500 (2016).

107.  Under this framework, a state statute may only serve as a predicate for removability if its elements are the same as, or narrower than, the generic federal offense. If the statute is broader, i.e., it criminalizes conduct that the federal definition does not, then it cannot support removability under the INA. The categorical approach is not discretionary; it is a jurisdictional gatekeeping function that must be satisfied before removal proceedings may lawfully proceed.

108.  In Plaintiff's case, ICE charged removability under *INA § 237(a)(2)(E)(i)* (crime of stalking) and *§ 237(a)(2)(A)(iii)* (aggravated felony: crime of violence), based on a conviction under *18 Pa. Cons. Stat. § 2709.1*. However, the Pennsylvania stalking statute is categorically overbroad and cannot serve as a predicate offense under either provision.

109.  Specifically:

a) The statute does not require the use or threatened use of physical force, which is an essential element of a "crime of violence" under *18 U.S.C. § 16(a)*. See *Johnson v. United States*, 559 U.S. 133 (2010).

39

b) The statute includes a mens rea of "intent or knowledge," which is broader than the federal definition requiring "specific intent." See *Matter of Silva-Trevino*, 26 I&N Dec. 826 (BIA 2016).

c) Statute criminals conduct such as repeated communications or surveillance that do not involve any physical threat or harm and therefore fall outside the scope of the generic federal definition of stalking. See *Matter of Sanchez-Lopez*, 26 I&N Dec. 71 (BIA 2012).

110. Despite these categorical mismatches, ICE and EOIR officials proceeded with removal proceedings, relying on a fabricated *Form I-213* and ignoring binding precedent. Immigration Judges failed to conduct the required categorical analysis and instead relied on the underlying facts of Plaintiff's conviction, in direct violation of Supreme Court doctrine. BIA members affirmed removal orders without addressing the categorical deficiencies, and DOJ attorneys defended those orders in federal court using arguments expressly foreclosed by Moncrieffe, Descamps, and Mathis.

111. The failure to apply the categorical approach rendered the proceedings ultra vires and constitutionally defective. Because the Pennsylvania statute is categorically overbroad, Plaintiff's conviction could not lawfully support removability under the INA. The initiation and maintenance of removal proceedings on this basis violated the jurisdictional prerequisites of the INA

40

and deprived Plaintiff of due process under the Fifth Amendment.

## III.    Racketeer Influenced and Corrupt Organizations Act (RICO)

112.  RICO, codified at *18 U.S.C. §§ 1961–1968*, provides a civil cause of action for individuals injured by acts performed as part of an ongoing criminal enterprise. The enterprise described herein satisfies the statutory definition of a RICO enterprise under *18 U.S.C. § 1961(4)*, as it consisted of a group of associated individuals such as federal officials, agency personnel, and private collaborators, functioning as a continuing unit with a shared purpose and coordinated structure.

113.  The enterprise engaged in a pattern of racketeering activity as defined in *18 U.S.C. § 1961(1)*, including but not limited to:

   a) Obstruction of justice, in violation of *18 U.S.C. §§ 1503, 1512*, and *1513*.

   b) Mail and wire fraud, in violation of *18 U.S.C. §§ 1341* and *1343*.

   c) Deprivation of rights under color of law, in violation of *18 U.S.C. § 242*.

   d) Travel Act violations, in violation of *18 U.S.C. § 1952*.

   e) Witness tampering, in violation of *18 U.S.C. § 1512*.

114. These predicate acts were committed by enterprise members in furtherance of three unlawful objectives:

41

a) To unlawfully extend Plaintiff's criminal sentence through immigration detention and supervision, thereby converting a 2.5-year state court sentence into more than a decade of federal punishment.

b) To obstruct Plaintiff's civil litigation against enterprise members and coordinating private parties, including through suppression of evidence, manipulation of judicial processes, and retaliatory supervision.

c) To ensure Plaintiff's removal from the United States regardless of legal authority, thereby barring his return and preventing future legal action against those responsible.

115.  The racketeering acts were not isolated or incidental. They formed a coordinated pattern of conduct executed across multiple federal agencies and jurisdictions, with shared personnel, synchronized objectives, and deliberate concealment of jurisdictional defects. The enterprise operated under color of law but outside the bounds of lawful authority, using immigration enforcement tools to inflict extrajudicial punishment and obstruct judicial review.

116.  Plaintiff was directly injured in his person and property because of these violations, including unlawful detention, loss of real property, foreclosure of his condominium, deprivation of income and employment,

42

reputational harm, and obstruction of access to the courts. Plaintiff seeks treble damages, costs, and equitable relief under *18 U.S.C. § 1964(c)*.

## IV.    Disability Protections

117.  Section 504 of the Rehabilitation Act, codified at *29 U.S.C. § 794*, prohibits discrimination on the basis of disability in any program or activity receiving federal financial assistance. This includes all detention, supervision, and adjudication functions administered by the DHS and DOJ, including ICE, EOIR, and BIA. Covered entities are required to provide reasonable accommodations to qualified individuals with disabilities to ensure meaningful access to proceedings and services.

118.  In the immigration context, the Rehabilitation Act applies to both custodial conditions and adjudicatory procedures. Detained individuals with mental health impairments are entitled to accommodations that enable them to understand, participate in, and respond to the proceedings against them. This includes access to counsel, competency evaluations, modified hearing procedures, and other supports necessary to ensure due process.

119. *INA*, at *8 U.S.C. § 1229a(b)(4)(B)*, independently requires that respondents in removal proceedings be afforded a "reasonable opportunity to examine the evidence against [them], to present evidence on [their] own behalf, and to cross-examine witnesses presented by the Government."

43

Where a respondent's mental impairments materially affect their ability to exercise these rights, the statutory guarantee intersects with the *Rehabilitation Act*'s mandate for accommodation.

120. In Plaintiff's case, ICE and EOIR officials were aware of his documented mental health impairments, including diagnoses reflected in detention records and prior proceedings. Despite this knowledge, Plaintiff was denied access to counsel, refused competency screening, and subjected to standard adversarial procedures without modification. Immigration Judges failed to apply the standards set forth in *Matter of M-A-M-*, 25 I&N Dec. 474 (BIA 2011), which requires adjudicators to assess competency and provide accommodations where necessary.

121. The failure to provide reasonable accommodations violated both *Section 504* and the INA's procedural guarantees, resulting in a fundamentally unfair proceeding. Plaintiff was unable to meaningfully participate in his removal hearings, respond to fabricated allegations, or challenge adverse witnesses. These violations contributed to the unlawful entry of removal orders and prolonged ICE supervision, causing lasting harm to Plaintiff's liberty, livelihood, and legal standing.

**PRELIMINARY STATEMENT: CRIMINAL ENTERPRISE NATURE**

## I.  Nature of Enterprise Conduct

122. This action challenges a coordinated criminal law enforcement enterprise that systematically abused immigration enforcement tools to extend criminal punishment beyond lawful authority. The enterprise operated through a network of federal officials within ICE, DHS, DOJ (including EOIR, BIA, and OPLA), state parole officials, and private parties who conspired to usurp state court sentencing authority and convert immigration enforcement mechanisms into instruments of criminal punishment.

## II.  Criminal Enterprise Objectives Distinguished from Immigration Enforcement

123. The enterprise's conduct was not immigration enforcement within the meaning of *Egbert v. Boule*, 142 S. Ct. 1862 (2022), but rather criminal law enforcement operations conducted under false pretense of immigration authority. The enterprise's primary objective was unlawfully extending Plaintiff's 2.5-year state sentence into over a decade of federal punishment through void detainers, prolonged detention, and intensive supervision, conduct wholly outside any immigration enforcement purpose.

## III.  Ultra Vires Conduct Piercing All Immunity Claims

124. The Enterprise's conduct was undertaken in clear and indisputable

45

absence of lawful jurisdiction. Defendants initiated removal proceedings based on convictions that were not final under federal law, in direct violation of *8 U.S.C. § 1229(d)*. They charged removability under statutes that categorically could not apply to Plaintiff's conviction, manipulated administrative processes to suppress exculpatory evidence, and coordinated with private actors to achieve retaliatory and unlawful objectives. These acts were not discretionary enforcement decisions. They were deliberate violations of binding law, procedural safeguards, and constitutional rights. No form of immunity—judicial, prosecutorial, or qualified, can shield conduct so far removed from lawful immigration enforcement. The Defendants conspired to fabricate jurisdictional facts, obstruct justice, retaliate against protected litigation, and sabotage Plaintiff's access to judicial review. These actions were not incidental to adjudication or prosecution; they were ultra vires, retaliatory, and administrative in nature, executed outside the scope of lawful authority and in direct contravention of statutory and constitutional limits.

## IV.    Pattern of Racketeering Activity

125.  The enterprise engaged in a systematic pattern of racketeering activity, as defined by *18 U.S.C. § 1961(1), (5)*, including but not limited to mail and wire fraud through falsified *Form I-213* and court filings; obstruction of justice

through evidence suppression, witness tampering, and the destruction of official records; Travel Act violations through the interstate transport of Plaintiff to deprive him of legal access; and deprivation of civil rights under color of federal law through the use of immigration tools for criminal punishment purposes. This pattern spans over a decade and involved dozens of enterprise members across multiple federal agencies and state institutions.

## FACTUAL ALLEGATIONS

### I.   The Coordinated Criminal Enterprise Structure

#### 1. Enterprise Formation and Coordination (Pre-Conviction Targeting)

##### a) Discriminatory Targeting and Intelligence Gathering Phase

126. Beginning in June 2010, the enterprise initiated a coordinated campaign of intelligence gathering and discriminatory profiling targeting Plaintiff based on his national origin and perceived immigration vulnerabilities. Surveillance operations were conducted by enterprise members and their civilian operatives using DHS/ICE vehicles positioned directly outside Plaintiff's condominium. The Philadelphia ICE Field Office's proximity, located within six blocks of Plaintiff's residence, enabled sustained surveillance, and facilitated a direct operational nexus between federal immigration enforcement and local civilian actors engaged in targeting and

harassment.

127.  In June 2010, while Plaintiff stood outside his condominium building awaiting a delivery, Jeffrey Engels, a tenant in the building, approached Plaintiff and remarked that he had recently "rescued a Mexican immigrant who had been arrested by immigration enforcement." Engels then asked Plaintiff, "Do you have any issues with immigration?" When Plaintiff questioned the basis for the inquiry, Engels replied, "Because you are an immigrant." Plaintiff responded that being an immigrant does not justify such questioning, ended the conversation, and returned to his work. (See Civil Courts Records, pp. 41.)

128. Around the same time, enterprise's civilian operative Defendant Leonidas Addimando, the condominium developer, monitored Plaintiff through his staff while enterprise's other civilian operatives Defendants Allison Borowski, and Rajani Pattinson, acting through intermediaries including condominium residents Kendra Brill, Lauren Westfield, and Nicole Beden, Elliot Hodgson, Daniel Segal, Nicholas Palmer, Jason Tiefenback, Thomas McCracken, Jeffrey Engels, Joseph Vitella, and Adam Stanley, initiated a pattern of intimidation and coordinated harassment. (See Civil Courts Records, pp. 137.)

129. Around that time, while Leonidas Addimando (condominium

48

developer) monitored Plaintiff through his staff, Defendants Borowski, Pattinson, Brill, Westfield, and Biden, acting through intermediaries including condominium residents Elliot Hodgson, Daniel Segal, Nicholas Palmer, Jason Tiefenback, Thomas McCracken, Jeffrey Engel, Joseph Vitella, and Adam Stanley, began a pattern of intimidation. (See Civil Courts Records, pp.137)

130. Civilian operatives including Engels, Hodgson, Segal, Palmer, Tiefenback, McCracken, Vitella, and Stanley engaged in psychological warfare tactics by approaching Plaintiff alongside individuals displaying law enforcement insignia (ATF, FBI, DHS), disseminating disinformation about alleged militant affiliations, and constructing a false intelligence dossier portraying Plaintiff as a security threat. These operations were designed to fabricate a pretext for future immigration enforcement actions. (See Civil Courts Records, pp. 147.)

131. As part of this campaign, individuals speculated aloud in Plaintiff's presence that he belonged to a "Tamil" or "Muslim" militant group. For example, in May 2010, during a civil court conference in an unrelated contract dispute, one attorney stated they had "heard" Plaintiff was affiliated with such a group. The presiding judge casually asked Plaintiff about the claim, and Plaintiff immediately clarified that he was neither Tamil nor

49

Muslim. (See Civil Courts Records, pp. 194–195.)

132.  Plaintiff observed two to three DHS/ICE vehicles maintaining a regular presence outside his residence during key phases of the harassment campaign led by Allison Borowski and others, as well as during critical junctures in Plaintiff's civil litigation and the escalation of false police complaints. The Philadelphia ICE Field Office's proximity, within six blocks of Plaintiff's residence, enabled long-term surveillance and facilitated coordination between ICE officials and local civilian actors to ensure Plaintiff's eventual arrest and detention.

133. These incidents demonstrate that, well before any criminal proceedings were initiated, Plaintiff was improperly profiled, targeted, and defamed based on his national origin, religion, and perceived immigration status. This discriminatory foundation laid the groundwork for the unlawful detention, supervision, and removal actions challenged in this complaint.

## 2.  Criminal Prosecution Manipulation Phase (2010-2014)
### a) State Court Process Corruption

134. Allison Borowski and Rajani Pattinson were Plaintiff's immediate neighbors in the Hoopskirts Lofts Condominium. Plaintiff had longstanding disagreements with condominium developer Leonidas Addimando, which were further complicated by Plaintiff's repeated noise complaints against

Borowski. Beginning in 2009, Plaintiff's relationships with neighbors and local merchants became strained. In response to escalating harassment and property interference, Plaintiff installed a security camera system to deter and document criminal behavior occurring near his residence.

135. 103. On August 28, 2010, Allison Borowski filed a false police complaint alleging that Plaintiff was "continually and constantly harassing her in person by screaming, yelling that he wanted to marry her." (See Criminal Court Record, pp. 1.) Borowski initially claimed that Plaintiff was romantically pursuing her, even asserting that he used his wife to broker a marriage proposal. This narrative formed the basis of her September 5, 2010, private criminal complaint.[1]

136. On September 5, 2010, Allison Borowski filed a private criminal complaint against Plaintiff, alleging harassment based on innocuous communications with her and other neighbors, and objecting to Plaintiff's

---

1. However, by the time Borowski testified in *Commonwealth v. Vurimindi*, No. CP-51-CR-0008022-2012, and circulated defamatory statements throughout the neighborhood, her narrative had shifted entirely. She now alleged that Plaintiff was calling her a "New York prostitute." (See Criminal Court Record, pp. 84.) These two depictions are mutually exclusive and irreconcilable. One alleges unwanted romantic pursuit; the other, misogynistic slander. Yet Borowski swore under oath to both versions, depending on which narrative served her litigation interests at the time.

51

lawful installation of a security camera system. On September 15, 2010, the Philadelphia District Attorney's Office (DAO) indicted Plaintiff under Harassment (*18 Pa. C.S.A. § 2709*) and Stalking (*18 Pa. C.S.A. § 2709.1*) in *Commonwealth ex rel. Borowski v. Vurimindi*, No. CR-10-09-15-9559, Philadelphia Municipal Court ("Case-1"). (See Criminal Court Record, pp. 2.)

137.  September 15, 2010, indictment under Pennsylvania's stalking statute was the direct result of unlawful coordination between federal defendants (ICE), who provided input and direction to the DAO to include stalking charges; private co-conspirators (including Allison Borowski), who filed false complaints and exerted pressure on the DAO; and state actors (DAO prosecutors), who complied with ICE's recommendations despite the absence of a legal basis for such charges. This coordination violated Plaintiff's rights and circumvented Pennsylvania's prosecutorial standards.

138.  This premeditated and unlawful coordination was executed with the intent to trigger future immigration consequences, including detention, removal proceedings, and deportation. It constituted a deliberate manipulation of Pennsylvania's criminal justice system to create a predicate conviction that could be exploited by federal immigration authorities. The indictment laid the groundwork for subsequent retaliatory actions, including the September 23, 2015, *Form I-213*, which falsely stated that Plaintiff's

conviction was "final" and served as the jurisdictional basis for his unlawful detention and removal proceedings.

139.  On October 8, 2010, Plaintiff filed a writ of summons initiating a civil action in *Vurimindi v. 806 Capital LLC et al.*, No. 101001073, Court of Common Pleas, against Allison Borowski and others for invasion of privacy, conspiracy to commit defamation, conspiracy to malicious prosecution, and intentional infliction of emotional distress. (Id., pp. 31–32.) Plaintiff subsequently filed a formal complaint (See Civil Courts Record, pp. 1–46), which was withdrawn without prejudice to allow for the filing of a more comprehensive complaint at a later date.

140.  On October 18, 2010, Plaintiff demanded a jury trial in response to the criminal charges filed by Allison Borowski. However, Borowski, through her counsel Diane Gray (now a sitting judge in the Philadelphia Court of Common Pleas), invoked *Phila. M.C.R. Crim. Rule 850(A)(2)* to compel binding arbitration, a maneuver designed to prevent public exposure of the underlying conspiracy. The Trial Commissioner threatened Plaintiff with arrest and coerced him into signing an agreement to submit to binding arbitration. (See Criminal Court Record, pp. 7–9.) At the conclusion of arbitration, the Philadelphia Municipal Court arbitrator dismissed both the harassment and stalking charges and issued a mutual stay-away order

53

between Plaintiff and Borowski. The arbitrator also affirmed Plaintiff's right to continue installation of the security camera system. (Id., pp. 10.)

141.  Following the dismissal of charges and issuance of the stay-away order, Allison Borowski, along with other neighbors, violated the order by continuing to harass Plaintiff and pressuring him to vacate his condominium unit in Hoopskirts Lofts. In response, on January 18, 2011, Plaintiff filed a civil complaint in *Vurimindi v. Borowski et al.*, No. 11012212, Philadelphia Court of Common Pleas, asserting claims for harassment, conspiracy, and retaliatory conduct. Plaintiff effectuated service of the complaint upon Allison Borowski, Rajani Pattinson, Leonidas Addimando, and other named defendants. (See Civil Courts Record, pp. 47–159.)

### b) False Evidence Generation

142.  On January 24, 2011, civilian operatives Allison Borowski, Rajani Pattinson, Leonidas Addimando, and their co-defendants entered into an unlawful agreement to file a series of false police complaints with the express goal of securing Plaintiff's arrest and incarceration. (See Criminal Court Record, pp. 11.) Direct email evidence from Leonidas Addimando confirms coordination of this campaign, including a message stating the objective to "lock him up."

143.  Beginning January 24, 2011, Borowski and Pattinson filed fabricated

54

police complaints in furtherance of the enterprise's objectives. (Id., pp. 13–17; 19–26.) These complaints included inflammatory and baseless allegations, such as characterizing Plaintiff's speech as "anti-government." (Id., pp. 15.) On the same day, Addimando sent another email urging all involved parties to appear in court and testify against Plaintiff, further evidencing coordinated intent to manipulate judicial outcomes. (Id., pp. 18.)

144.  On March 29, 2011, Borowski filed a complaint alleging that Plaintiff violated the mutual stay-away order. (Id., pp. 27–33.) In that complaint, Borowski admitted that "the majority of the times police were called, Rajani listed herself as the complainant to help her get a stay-away order." (Id., pp. 12, ¶ 4.) This admission reveals that the complaints were not filed out of genuine fear or grievance, but as a tactical maneuver to escalate Plaintiff's criminal exposure. Borowski's statement is not a stray remark, it is a direct admission of intent to abuse legal process. The complaints filed by Borowski and Pattinson were knowingly false and strategically deployed to manufacture criminal liability. Addimando's "lock him up" email further confirms that the enterprise's goal was punitive, not protective.

145. On April 11, 2011, the Philadelphia Municipal Court commenced *Commonwealth v. Vurimindi*, No. MC-51-CR-9000095-2011 (Case-2"), to determine whether Plaintiff had violated the mutual stay-away order issued

55

in Case-1. (Id., pp. 34–39.) On May 20, 2011, the court modified the stay-away order to a "no negative contact" directive after Borowski filed a police complaint alleging that Plaintiff had said "good morning" to her. (Id., pp. 20.) This escalation illustrates the enterprise's continued misuse of judicial mechanisms to criminalize benign conduct and sustain retaliatory pressure on Plaintiff.[2]

### c) Prosecutorial Misconduct

146. The Philadelphia District Attorney's Office engaged in a sustained pattern of prosecutorial misconduct, including coercive plea negotiations tied to civil litigation withdrawal, suppression of exculpatory video evidence, and repeated violations of procedural safeguards.

147. In December 2011, the District Attorney proposed a plea bargain offering to withdraw Case-2 if Plaintiff agreed to withdraw his civil complaint

---

2. Philadelphia Municipal Court never adjudicated whether Plaintiff violated the mutual stay-away order issued in *Case-1*. Despite multiple police complaints filed by Allison Borowski and Rajani Pattinson alleging violations, the court did not issue a finding of guilt or enter any judgment on the alleged infractions. Instead, the proceedings were used by enterprise members to generate a paper trail of accusations and escalate Plaintiff's exposure to criminal liability, without ever securing a judicial determination on the merits. This procedural void further underscores the enterprise's abuse of process and reliance on fabricated allegations to sustain federal immigration enforcement objectives.

in *Vurimindi v. Borowski et al*. Upon recommendation from defense counsel, Plaintiff accepted the proposed terms. However, within ten minutes, the District Attorney unilaterally modified the agreement to require Plaintiff to undergo a psychological evaluation. Plaintiff declined the revised terms, demanded a speedy trial, and began soliciting favorable witnesses.

148.  On January 15, 2012, Allison Borowski filed a retaliatory complaint alleging violation of the stay-away order based solely on Plaintiff's efforts to solicit favorable witnesses. On January 30, 2012, the Philadelphia Municipal Court dismissed the complaint but ordered Plaintiff to submit to a psychological evaluation and barred him from contacting potential witnesses.

149.  On January 27, 2012, prior to any court order, Plaintiff served 250 subpoenas for production of documents upon federal agencies including the FBI, ATF, DHS, ICE, and upon Allison Borowski and other civilian operatives. On February 4, 2012, Borowski and others received the subpoenas. Immediately thereafter, Borowski filed a false police complaint alleging that Plaintiff had yelled "Fuck you." Philadelphia Police arrested Plaintiff and charged him with Disorderly Conduct in *Commonwealth v. Vurimindi*, No. MC-51-CR-0005022-2012 ("Case-3").

150.  On February 10, 2012, the District Attorney suppressed condominium security-camera footage that would have exonerated Plaintiff and exposed

57

Borowski's fabrication. The DA then attempted to coerce Plaintiff into withdrawing his civil complaint in *Vurimindi v. Borowski et al*., threatening that Borowski would testify against him if he refused. Plaintiff declined to withdraw the complaint and demanded a speedy trial. In retaliation, the Municipal Court declared Plaintiff incompetent to stand trial based on a court-appointed psychiatrist's report and involuntarily committed him for psychiatric medication, without holding a *Sells* hearing and without establishing any violation of the stay-away order or a prima facie case in *Case-2* or *Case-3*.

151.  On March 14, 2012, all named defendants in *Vurimindi v. Borowski et al*, appeared in court and created a mob-like atmosphere opposing Plaintiff's bail. The Municipal Court, under pressure, released Plaintiff from involuntary commitment but imposed restrictive conditions requiring him to reside with his sister in Virginia Beach, VA, and barring him from returning to the Hoopskirts Lofts Condominium.

152.  On April 11, 2012, the Municipal Court permitted Plaintiff to return to Pennsylvania but ordered him to remain at least two blocks away from the condominium. Immediately thereafter, the District Attorney entered into a new agreement to withdraw *Case-2* and *Case-3* in exchange for Plaintiff selling his real estate properties and vacating the condominium. Plaintiff

complied by entering into distress sale agreements and submitting them to the court.

153. On May 6, 2012, the District Attorney unilaterally rescinded the agreement, citing Plaintiff's filing of opposition to Borowski's preliminary objections in *Vurimindi v. Borowski*. The DA claimed that withdrawal of the civil complaint had been an implied condition of the agreement, despite no such term being formally included.[3]

154. On July 9, 2012, the District Attorney initiated *Commonwealth v. Vurimindi*, No. CP-51-CR-0008022-2012 ("Case-4"), in the Court of Common Pleas. Although the stated purpose was to prosecute Plaintiff for conduct allegedly distinct from *Case-1*, the charges were duplicative. The DA brought two counts of stalking, one based on Borowski's allegations, and one based

---

3. As a direct consequence of the coercive plea negotiations and retaliatory conditions imposed by the Philadelphia District Attorney's Office, Plaintiff was unable to rescind the distress sale agreement for his property located at 657 N. 11th Street, Philadelphia, PA 19123. The buyer initiated a specific performance action in *Green Lots v. Victor Land*, Case No. 120501630, Philadelphia Court of Common Pleas (2012). Presiding Judge Idee Fox granted the buyer's request and transferred title of the property, resulting in the permanent loss of ownership and approximately $150,000 in unrealized market value for Plaintiff. This judicial outcome was precipitated by the DA's unlawful conditioning of criminal case withdrawal on Plaintiff's forced divestment of real property, and further compounded by the rescission of the agreement after Plaintiff complied

on Pattinson's both of which stemmed from conduct that had already been litigated or could have been addressed in *Case-1*. (See Criminal Court Record, pp. 40–52.)

155. On August 17, 2012, the Commonwealth filed formal charges against Plaintiff under two counts of *18 Pa. C.S.A. § 2709.1(a)(1)* (Stalking)[4] and one count of *18 Pa. C.S.A. § 5503(a)(4)* (Disorderly Conduct).[5] (See Immigration Court Record, pp. 105.)

156. Following the rescission of the plea agreement, the Philadelphia District Attorney's Office escalated its harassment of Plaintiff by requiring him to undergo psychological evaluations every fifteen days, repeatedly declaring him incompetent to stand trial, despite Plaintiff's continued employment as a statistical programmer. (See Criminal Court Record,

---

4. Engaged in course of conduct or repeatedly committed acts towards another person, including following person without proper authority, under the circumstances which demonstrated either an intent to place such other person in reasonable fear of bodily injury or to cause substantial emotional distress such other person.

5. With intent to cause public inconvenience, annoyance or alarm or recklessly creating a risk thereof. Created a hazardous or physically offensive condition by an act which served no legitimate purpose of the actors, and the intent of the actor was to cause a substantial harm or serious inconvenience, or the actor persisted in disorderly conduct after reasonable warning or request to desist.

pp. 53–75.) In response to this pattern of retaliatory conduct, Plaintiff filed a federal civil rights complaint on January 4, 2013, in *Vurimindi v. HSFLB Condo. Owners Ass'n*, No. 13-39 (E.D. Pa. 2013), and served the complaint upon Allison Borowski and other named defendants. (See Civil Courts Record, pp. 160–323.)

157.  Immediately thereafter, the District Attorney filed a criminal complaint alleging violation of the stay-away order based solely on Plaintiff's service of the civil complaint. On March 14, 2013, the Philadelphia Court of Common Pleas conducted a hearing to procure Plaintiff's testimony regarding service. The court concluded that Plaintiff had not violated the stay-away order. Nonetheless, in June 2013, the District Attorney filed another complaint alleging that Plaintiff contacted Borowski via LinkedIn® and Twitter®. At August 13, 2013, hearing, Plaintiff testified that he did not possess a Twitter® account until September 2018 and expressed his belief that Borowski and her associates had spoofed social media accounts using his image. Plaintiff further alleged that Borowski engaged in electronic eavesdropping across the party wall and conspired to file false police complaints. Despite these assertions, the Court revoked Plaintiff's bail, stating that his mindset "reflect[s] deep obsession and paranoia."

158. On August 29, 2013, the Philadelphia Court of Common Pleas

61

conducted a hearing and issued a de facto deportation order, directing Plaintiff to return to India for mental health treatment from his family and not return to the United States. This order was issued despite the fact that, just one day earlier, on August 28, 2013, a court-appointed psychiatrist had found Plaintiff competent to stand trial.

159.  On September 23, 2013, Plaintiff submitted fifty-one video clips to the Philadelphia Court of Common Pleas, establishing that Allison Borowski and Rajani Pattinson had fabricated allegations against him. Despite the evidentiary significance of these clips, the court failed to docket, preserve, or conduct any in-camera review of the submitted material, further obstructing Plaintiff's ability to defend himself and exposing systemic bias in the adjudication process.[6]

160.  On October 3, 2013, the Philadelphia Court of Common Pleas revoked

---

6. As further corroboration of the fabricated allegations orchestrated by Allison Borowski and Rajani Pattinson, Plaintiff submitted video evidence in support of his Petition for a Writ of Habeas Corpus in *Vurimindi v. Morgan et al.*, Case No. 2:23-cv-00882-KNS (E.D. Pa. 2023). The video clips presented therein directly contradicted the claims made by Borowski and Pattinson and established a pattern of false reporting, retaliatory conduct, and coordinated abuse of process. This evidentiary submission reinforces Plaintiff's assertion that the criminal proceedings were initiated and sustained through fabricated evidence and unlawful coordination between private actors and federal officials.

Plaintiff's bail on the grounds that he failed to self-deport to India, as previously directed by the court. Despite Plaintiff's compliance with all other conditions and the absence of any new criminal conduct, the court denied reinstatement of bail. On October 20, 2013, while incarcerated, Plaintiff was assaulted by fellow inmates who targeted him for refusing to withdraw his civil suit against Allison Borowski and other named defendants. The assault resulted in spinal cord injury and long-term physical impairment. The court's refusal to reinstate bail, despite knowledge of the retaliatory violence and Plaintiff's deteriorating health, further evidences the punitive and extrajudicial nature of the proceedings.[7]

### d) Judicial Manipulation

161.  On February 7, 2014, after commencement of trial, the Commonwealth

---

7. While incarcerated, Plaintiff was administered Neurontin® (gabapentin) at dosages ranging from 2,400 to 3,600 mg per day by the Philadelphia Prison System, ostensibly to alleviate nerve pain resulting from spinal cord injury. These dosages far exceeded standard therapeutic levels and produced severe neurological and cognitive side effects, including abnormal thinking, loss of coordination, memory impairment, diminished hearing and vision, hallucinations, dizziness, drowsiness, and generalized weakness. The cumulative effect of this pharmacological regimen materially undermined Plaintiff's competency to knowingly waive his right to a jury trial and to stand trial. The administration of high-dose Neurontin® in this context constituted a form of chemical coercion that further compromised Plaintiff's ability to defend himself and participate meaningfully in the proceedings.

of Pennsylvania constructively amended the two stalking charges against Plaintiff, originally brought under *18 Pa. C.S.A. § 2709.1(a)(1)*, to include *§ 2709.1(a)(2)* in each count. This amendment introduced alternative mens rea elements: "intent to place such other person in reasonable fear of bodily injury" or "to cause substantial emotional distress." The amendment was made without notice to Plaintiff and violated procedural due process and materially altering the charges mid-trial. (See Criminal Court Record, pp. 77–78.)

162. On February 7, 2014, Judge Diana Anhalt presided over the trial in substitution for the empaneled jury, which had consisted entirely of white female jurors. Judge Anhalt openly identified with complainant Allison Borowski, admitted inadmissible and prejudicial evidence, and eroded the presumption of Plaintiff's innocence prior to his testimony. Plaintiff was precluded from fully testifying in his own defense. At the conclusion of trial, Judge Anhalt found Plaintiff guilty of four charges across two counts of stalking, based on conduct for which Plaintiff had already been acquitted in *Case-1*, conduct that should have been prosecuted in Case-1 if at all, and conduct that was constitutionally protected, including:

a) Religious prayer.

64

b) Pre-complaint investigation and service of civil complaints and subpoenas.

c) Peaceful protest of illegal eavesdropping by displaying a poster.

d) Alleged conduct that never occurred.

163.   Judge Anhalt failed to specify under which mens rea element Plaintiff was convicted, stating only: "I find you guilty of four charges that the Commonwealth has charged against beyond reasonable doubt." Commonwealth Prosecutor Rouse clarified: "No disorderly conduct, I agree to that." NT/2/7/14, pp. 100.[8] (See Criminal Court Record, pp. 101).[9]

---

8. Defense counsel Alfonso Gambone knowingly withheld 220 hours of exculpatory video footage that would have disproven the allegations made by Allison Borowski, Rajani Pattinson, and other civilian operatives. This footage, which documented Plaintiff's lawful conduct and contradicted the complainants' claims, was never introduced at trial. Counsel's omission facilitated the prosecution's reliance on fabricated testimony and deprived Plaintiff of a fair opportunity to present a complete defense. The suppression of this material evidence constituted a violation of Plaintiff's Sixth Amendment right to effective assistance of counsel and materially contributed to the wrongful conviction.

9.  On February 10, 2014, despite Plaintiff's was in protective custody within the Philadelphia Prison System, Plaintiff was violently assaulted by inmate Brandon Cuff. The attack resulted in multiple facial injuries, including a fractured nose, broken jawbone, and the loss of several teeth. The assault occurred in the context of repeated threats from inmates demanding that Plaintiff withdraw his civil suit against Allison Borowski and other named defendants. Despite the severity of the injuries and the clear retaliatory motive, the Philadelphia Prison System failed to investigate the source of

65

164. Beginning February 8, 2014, Plaintiff initiated a sustained post-verdict motion campaign, filing over two dozen pro se motions and letter pleadings to challenge the unlawful conviction, preserve appellate rights, and seek judicial redress. These filings included: Pro Se Letter Motion(Id. pp.104), February 09, 2014, Pro Se Letter Motion (Id. pp.124), February 13, 2014, Pro Se Letter Motion, (Id. pp.133), Pro Se Letter Motion, (Id. pp.145), Pro Se Letter Motion, (Id. pp.150), February 21, 2014, Pro Se Motion for Judgment for Acquittal, (Id. pp.161), Pro Se Motion for New Trial, (Id. pp.189), Pro Se Motion for Reconsideration, (Id. pp.202), Pro Se Motion to Declare Mistrial, (Id. pp. 221), March 05, 2014, Pro Se Motion for Recusal, (Id. pp.230), March 07, 2014, Pro Se Motion to Proceed as Pro Se, (Id. pp.244), Pro Se Motion to Remove Counsel, (Id. pp.246), March 12, 2014, Pro Se Letter Motion, (Id. pp.252), March 13, 2014, Pro Se Letter Motion, (Id. pp.281), March 18, 2014, Pro Se Letter Motion, (Id. pp.312), March 21, 2014, Pro Se Letter Motion, (Id. pp.314), March 22, 2014, Pro Se Letter Motion, (Id. pp.321), March 23,

---

these coordinated attacks or identify whether they were carried out on behalf of enterprise members. Plaintiff filed a private criminal complaint against Mr. Cuff, which was summarily denied by the District Attorney's Office. Plaintiff then submitted a review petition challenging the denial, but clerks of the Philadelphia Municipal and Common Pleas Courts discarded the petition without docketing or review, further obstructing Plaintiff's access to judicial remedy and enabling continued retaliatory violence.

2014, Pro se Letter Motion (Id. pp.331), March 25, 2014, Pro Se Letter Motion, (Id. pp.337), March 27, 2014, Pro Se Motion to Modify Existing Bail Order, (Id. pp.341), March 29, 2014, Pro Se Letter Motion, (Id. pp.350), April, 04, 2014, Pro Se Letter Motion, (Id. pp.352), April 12, 2014, Pro Se Letter Motion, (Id. pp.358), April 15, 2014, Pro Se Motion to Appoint Experts, (Id. pp.378), Pro Se Motion to Bar Borowski et al Testimony, (Id. pp.380), Pro Se Motion to Bar Prosecutor, (Id. pp.385), April 18, 2014, Pro Se Motion to Compel DAO to Produce Documents, (Id. pp.391). Plaintiff's filings were timely, legally grounded, and reflected a coherent effort to assert procedural and constitutional rights despite ongoing retaliation, physical injury, and chemical impairment. The volume and substance of these motions demonstrate Plaintiff's continued competency, legal awareness, and refusal to capitulate to coercive pressure from the enterprise and its judicial enablers.

165. On April 25, 2014, at the sentencing hearing, Judge Diana Anhalt denied Plaintiff's motion to proceed pro se but failed to adjudicate any of the other post-verdict motions filed by Plaintiff. The court denied Plaintiff's allocution rights and refused to admit 220 hours of exculpatory video evidence that directly contradicted the allegations made by Allison Borowski, Rajani Pattinson, and others. This evidence would have undermined the

67

guilty verdict and negated Plaintiff's culpability. Instead, Judge Anhalt imposed a sentence forty times greater than the standard guideline range of three months' probation, sentencing Plaintiff to 2.5 to 5 years of incarceration followed by five years of special mental health probation, without stating any reasons in open court for the extreme departure from the sentencing guidelines.

166.  At the same hearing, Judge Anhalt failed to comply with the mandatory advisement procedures under *Pa. R. Crim. P. 704(C)(3)* and *(4)*, which require the court to inform the defendant of the right to file a post-sentence motion and appeal, the time limits for exercising those rights, the right to counsel in pursuing those remedies, and the right to bail. The court also failed to preserve the sentencing hearing transcript and did not rule on Plaintiff's pro se motion to approve a transcript reconstructed from memory pursuant to *Pa. R.A.P. 1923*.

167.  On April 25, 2014, trial counsel Alfonso Gambone abandoned Plaintiff without filing any of the requested post-sentence motions or a notice of appeal. Counsel failed to seek leave of court to withdraw, leaving Plaintiff unrepresented at a critical stage of proceedings and depriving him of effective assistance of counsel in violation of the Sixth Amendment and Pennsylvania procedural rules.

168. Beginning April 25, 2014, Plaintiff initiated an extensive post-sentencing motion campaign, filing over forty pro se pleadings to preserve appellate rights, compel discovery, challenge the judgment of sentence, and seek judicial accountability. These filings included: Pro Se Motion to Compel DAO to Preserve Discoverable Evidence, (Id. pp.405), Pro Se Motion to Proceed In Forma Pauperius, (Id. pp.407), Pro Se Motion to Reconsider Judgment of Sentence, (Id. pp.409), Pro Se Notice of Appeal, (Id. pp.411), on April 26, 2014, Pro Se Notice of Appeal, (Id. pp. 414), Pro Se PCRA Petition, (Id. pp.419), Pro Se Motion to Modify Sentence and Guilty Verdict, (Id. pp.450), on May 19 2014, Pro Se Motion to Appoint Counsel, (Id. pp.461), on May 28, 2014, Pro Se Motion to Appoint Counsel, (Id. pp.465), on June 09, 2014, Pro Se Motion to Compel DAO to Provide Discovery Packet, (Id. pp.485), on June 26, 2014, Pro Se Motion to Compel Clerk or DAO to Provide PSI Report, (Id. pp.488), August 12, 2014, Pro Se Motion to Compel Judges Anhalt and Wood-Skipper to Docket Pro Se Correspondence, (Id. pp.491), on August 18, 2014, Pro Se Motion to Appoint Custodian to Safekeep 220 Hours Exculpatory Video Evidence, (Id. pp.495), Pro Se Writ of Mandamus, (Id. pp.498), on October 11, 2014, Pro Se Motion to Change Venue, (Id. pp.501), Pro Se Motion to Credit Time Served, (Id. pp.507), Pro Se Motion to Expedite Disposition of Motions, (Id. pp.509), Pro

69

se Motion to Issue Copy of SGS Report, (Id. pp.511), on October 25, 2014, Pro Se Motion to Compel Clerk to Enter Adverse Order, (Id. pp.513), Pro Se Praecipe to Enter Adverse Orders, (Id. pp.514), on December 22, 2014, Pro Se Notice of Appeal, (Id. pp.516), Pro Se Praecipe to Enter Adverse Orders, (Id. pp.517), on December 26, 2014, Pro Se Motion to Compel Clerk to Enter Adverse Orders, (Id. pp.518), on January 18, 2015, Pro Se Praecipe to Enter Adverse Orders, (Id. pp.523), on January 22, 2015, Pro Se Motion to Change Venue, (Id. pp.526), on January 23, 2015, Pro Se Praecipe to Enter Adverse Orders, (Id. pp.537), on January 29, 2015, Pro Se Motion to Remove Counsel Gambone, (Id. pp.538), on February 15, 2015, Pro Se Application to Compel Recusal of Judge Anhalt, (Id. pp.548), on February 18, 2015, Pro Se Motion to Proceed as Pro Se During Post-Sentencing, (Id. pp.598), on March 26, 2015, Pro se 2nd Motion to Proceed as Pro Se, (Id. pp.614), Pro Se 3rd Motion to Proceed as Pro Se, (Id. pp.615), Pro Se 3rd Motion to Remove Counsel Gambone, (Id. pp.616), Pro Se Praecipe to Enter Adverse Orders (Id. pp. 617, 619 620, 622, 625), on March 31, 2015, Pro Se Notice of Appeal, (Id. pp.627), on April 10, 2015, Pro Se Writ of Habeas Corpus, (Id. pp.628), on June 09, 2015, Pro Se Motion for Transcripts, (Id. pp.635), March 04, 2016, Pro Se Motion to Appeal Nun Pro Tunc, (Id. pp.638), on March 29, 2016, Pro Se Letter to Clerk Regarding Docketing Notice of Appeal, (Id.

70

pp.640), Pro Se Motion to Issue Subpoena, (Id. pp.641), on May 07, 2016, Pro Se Letter to Clerk Regarding Docketing Notice of Appeal, (Id. pp.644).

169.  Despite the legal sufficiency and procedural timeliness of these filings, the Philadelphia Court of Common Pleas failed to docket, rule upon, or acknowledge the majority of Plaintiff's motions. Judges Anhalt and Wood-Skipper disregarded Plaintiff's correspondence and failed to preserve the integrity of the post-sentencing record. Plaintiff's persistent efforts to assert his rights, while facing retaliatory incarceration, physical injury, and abandonment by counsel, demonstrate a clear pattern of judicial obstruction and systemic denial of access to remedy.

170.  On May 7, 2014, Judge Diana Anhalt submitted a Guideline Sentence Form to the Pennsylvania Commission on Sentencing, listing Plaintiff's conviction under *18 Pa. C.S.A. § 2709.1(a)(1)* with an Offense Gravity Score ("OGS") of [3].[10] (See Criminal Court Record, pp. 456.) This designation

---

10.    Under *204 Pa. Code § 303.15*, the Pennsylvania Commission on Sentencing assigns an Offense Gravity Score ("OGS") of [4] to violations of *18 Pa. C.S.A. § 2709.1(a)(1)* where the mens rea involves "an intent to place such other person in reasonable fear of bodily injury." In contrast, offenses not otherwise listed, including first-degree misdemeanors are assigned an OGS of [3]. The Commission's categorical distinction between these mens rea elements confirms that an OGS of [3] reflects a lesser offense involving "intent to cause substantial emotional distress," while an OGS of [4] reflects a heightened offense involving fear of bodily injury. Judge Anhalt's

71

carries significant interpretive implications. At best, an OGS of [3] reflects a conviction under *§ 2709.1(a)(1)* with the mens rea of "intent to cause substantial emotional distress to such other person." At worst, it implies conviction under § 2709.1(a)(1), encompasses either "intent to place such other person in reasonable fear of bodily injury" or "intent to cause substantial emotional distress." The ambiguity in the sentencing form, combined with the trial court's failure to specify the applicable mens rea at verdict, renders the conviction legally indeterminate and categorically overbroad when compared to the "crime of stalking" under the INA. See *8 U.S.C. § 1227(a)(2)(E)(i)*; *Matter of Sanchez-Lopez*, 26 I&N Dec. 71 (BIA 2012). Because the Pennsylvania statute encompasses conduct beyond the generic federal definition, it cannot serve as a valid predicate for removability under the categorical approach mandated by the U.S. Supreme Court.

### e) Appeal Process Sabotage

171. Plaintiff's appellate rights were systematically sabotaged through deliberate administrative manipulation by court personnel and enterprise

---

submission of an OGS [3] on the Guideline Sentence Form (see Criminal Court Record, pp. 456) further supports Plaintiff's contention that the conviction was based on the lesser mens rea. This distinction is legally significant, as the "substantial emotional distress" prong is categorically broader than the generic federal definition of stalking under the INA, and therefore cannot support removability under *8 U.S.C. § 1227(a)(2)(E)(i)*.

affiliates. This sabotage included: (1) intentional misdocketing of post-sentence motions as "pro se correspondence" rather than formal pleadings; and (2) repeated mishandling, loss, or misclassification of multiple pro se notices of appeal. These actions obstructed Plaintiff's access to appellate review and undermined the integrity of the judicial process.

172.  On February 16, 2014, Plaintiff mailed a pro se Notice of Appeal from the Philadelphia Prison System.[11] The filing was stamped "Received Accepted for Review Only" on April 20, 2014 (Id., pp. 414) and subsequently returned to Plaintiff without docketing. On April 26, 2014, Plaintiff re-mailed the same Notice of Appeal, overwriting the original date with April 26, 2014. This version was stamped "Received" on May 16, 2014, by the Clerk of the

---

11.    Under the prison mailbox rule, Plaintiff's notice of appeal is deemed filed with the clerk of court at the moment it is delivered to prison mail authorities for forwarding. See *Houston v. Lack*, 487 U.S. 266, 268 (1988). Pennsylvania law incorporates this principle through *Pa. R.A.P. 905(a)(5)*, which provides: "A notice of appeal filed after the announcement of a determination but before the entry of an appealable order shall be treated as filed after such entry and on the day thereof." (emphasis added). Plaintiff's February 16, 2014, notice of appeal, mailed from the Philadelphia Prison System, satisfied both federal and state filing requirements. The court's refusal to docket the appeal, misclassification of the filing, and subsequent administrative obstruction violated Plaintiff's Pennsylvania Constitutional right to appellate review and further evidences the enterprise's coordinated sabotage of post-conviction remedies.

Court (Id., pp. 414), but was incorrectly docketed in Case-3 instead of Case-4, despite the fact that Case-2 and Case-3 had been merged and transferred to the Court of Common Pleas under Case-4. The misdocketing rendered the appeal jurisdictionally defective and obstructed appellate review.

173.  On April 25, 2014, Plaintiff mailed a separate pro se Notice of Appeal and Transcript Order Form from the Philadelphia Prison System. This filing was stamped "Received" on May 1, 2014, by the court clerk (Id., pp. 414), but was never docketed. The failure to enter this filing into the record deprived Plaintiff of his right to appeal and further evidences the enterprise's coordinated effort to sabotage post-conviction remedies through procedural obstruction and administrative misconduct.

### f)  Plaintiff's Post-Sentence Motion

174. On April 25, 2014, Plaintiff mailed a pro se Motion to Reconsider Judgment from the Philadelphia Prison System. The filing was stamped "Received" on May 1, 2014, by the Clerk of the Court. (See Criminal Court Record, pp. 409.) However, rather than docketing the motion as a formal post-sentence pleading, court staff misclassified it as "pro se correspondence," thereby depriving it of procedural recognition and judicial review. This deliberate misdocketing was part of the enterprise's broader strategy to keep Plaintiff in legal limbo, obstruct appellate relief, and preserve

74

his vulnerability to immigration enforcement. The suppression of valid post-sentence filings ensured that Plaintiff's conviction remained artificially intact and available for exploitation by ICE and DHS in subsequent removal proceedings.

## II.    Federal Immigration Enforcement As Criminal Law Enforcement

### 1.  Unlawful Detainer and Extended Punishment Phase

#### a) Criminal Sentence Extension Through Immigration Detainers

175.  On April 6, 2015, the Philadelphia Court of Common Pleas issued a show cause notice in *Vurimindi v. Borowski et al.*, No. 110102212, directing Plaintiff to explain why the case should not be removed from deferred status and returned to active inventory. (See Civil Courts Record, pp. 478–479.)

176.  On May 14, 2015, Plaintiff appeared via telephone hearing and opposed reactivating the civil rights case, citing his ongoing direct appellate review of the conviction in *Case-4*. Plaintiff detailed the post-verdict and post-sentence pleadings filed in that case, as well as writs of mandamus submitted to the Supreme Court of Pennsylvania seeking orders compelling the trial court to adjudicate his motions or enter adverse rulings by operation of law. (Id., pp. 479.)

177.  Immediately following the hearing, Plaintiff mailed a motion to stay the civil proceedings pending resolution of his direct appeal and PCRA review,

75

which functionally served as a direct appellate challenge to ineffective assistance of counsel. Although filed under the prison mailbox rule, the Prothonotary delayed docketing the motion until September 17, 2015. (Id., pp. 483.)

178. On October 23, 2015, Judge Allen conducted a hearing and, on October 26, 2015, ordered that the civil case remain in deferred-prisoner status pending Plaintiff's anticipated release from incarceration in February 2016. (Id., pp. 324–332, 485–486.)

179.  During this period, government's informant inmates at SCI–Pine Grove warned Plaintiff that "you must leave them [Borowski et al.] alone, else they will sit on the keys to your freedom." Plaintiff, having fulfilled all parole eligibility requirements, reasonably expected release at the expiration of his minimum 2.5-year sentence. He notified Judge Allen of his anticipated release and intent to resume prosecution of the civil case.

180.  In parallel, Defendants Decker, Kwiatowski, Ried, Hoffman, and ICE DOES 1–10 coordinated with Allison Borowski and/or her representatives through email, telephone, and in-person meetings regarding Plaintiff's pending civil litigation. This coordination occurred outside any lawful immigration enforcement purpose and was intended to obstruct Plaintiff's access to judicial remedy and extend his criminal punishment through

76

immigration detainers and supervision mechanisms.

### i.    Intelligence Fabrication

181. On September 23, 2015, ICE supervisors Defendants Decker, Kwiatkowski, Ried, and Hoffman executed a criminal law enforcement scheme by fabricating intelligence and generating a knowingly false Form I-213 (Record of Deportable/Inadmissible Alien). This document contained fabricated interview statements, false claims regarding conviction finality, and manufactured deportability charges. Notably, the I-213 introduced a new and baseless allegation of "child abuse," which had never been charged, litigated, or adjudicated in any forum. The fabricated I-213 served as the foundational fraud for unlawfully extending Plaintiff's criminal punishment through immigration enforcement mechanisms. Key excerpts include:

a) Encounter: Alleged encounter on July 31, 2014, at SCI–Camp Hill by Immigration Enforcement Agent Chris Hoffman, with Plaintiff purportedly admitting Indian citizenship and making no claim to U.S. citizenship.

b) Criminal History: Mischaracterization of Plaintiff's April 25, 2014, conviction as final and deportable, despite unresolved post-verdict and post-sentence motions on the Case-4 docket.

c) Derivative Citizenship: Fabricated denial of derivative citizenship based solely on parental nationality.

d) Consular Notification: Admission that Plaintiff was not advised of his consular rights, in violation of 8 C.F.R. § 236.1(e).

e) Gang Affiliation / Military Service / Fear Claim / Health: Generic denials inserted to create a sanitized deportation profile, while omitting Plaintiff's documented mental health history and ongoing litigation.

f) Disposition: Falsely asserted deportability under *INA § 237(a)(2)(E)(1)* for crimes of domestic violence, stalking, and child abuse, and under *INA § 237(a)(2)(A)(iii)* for an aggravated felony under *18 U.S.C. § 16*, despite Plaintiff's conviction not meeting the categorical definition of either offense. Plaintiff was designated as a Priority 1(e)[12] and 2(b)[13] case, triggering immediate detention and removal proceedings. (See Immigration Court Record, pp. 20–22.)

---

12.    Priority 1(e), classified as an "aggravated felony" as defined in *section 101(a)(43)* of the Immigration and Nationality Act.

13.    Priority 2(b), classified as a "significant misdemeanor", such as domestic violence; sexual abuse; burglary; unlawful possession or use of a firearm; drug distribution or trafficking; or driving under the influence; or another conviction resulting in a sentence of 90 days or more time to be served in custody, not included suspended sentences; or When, in the judgment of an ICE Field Office Director, the alien otherwise poses a danger to national security.

182.  ICE policy authorized lodging detainers against individuals who: (1) fell within Priority 1(a), (c), (d), or (e), or Priority 2(a) and (b); and (2) had either a final order of removal or sufficient probable cause of removability. Probable cause could be established through pending removal proceedings, biometric confirmation, federal database checks, or voluntary statements. In Plaintiff's case, none of these criteria were lawfully satisfied. The fabricated I-213 was used to simulate probable cause and justify extended detention, despite the absence of a final conviction, lawful removal order, or admissible evidence of removability. This conduct violated ICE's own enforcement standards and constituted ultra vires action under color of immigration authority.

183. Defendants Decker, Ried, and Kwiatowski knew that Defendant Hoffman never interviewed Plaintiff at SCI–Camp Hill. Defendants Decker and Kwiatowski further knew that no other ICE agent conducted any interview of Plaintiff during his incarceration in the Pennsylvania Department of Corrections.

184.  Defendants Decker, Ried, and Kwiatowski knew that Hoffman's claim stating Plaintiff expressed no fear of persecution or torture if returned to India on July 31, 2014, was fabricated and unsupported by any documented

interview or transcript.[14]

185. As of July 31, 2014, Defendants Decker, Ried, Kwiatowski, and Hoffman knew that the docket in Case-4 reflected multiple pending pro se post-verdict motions and a timely post-sentence motion improperly docketed as "pro se correspondence."

186. As of September 23, 2015, these same defendants knew that Judge Anhalt had failed to adjudicate Plaintiff's post-verdict and post-sentence motions, and that the Clerk had failed to enter adverse orders after 120 days, as required by operation of law.

187. Defendants also knew that Plaintiff had filed multiple praecipes requesting the Clerk to enter adverse orders on the pending motions, in an effort to escape legal limbo and preserve appellate rights.

188. As of both July 31, 2014, and September 23, 2015, Defendants knew that Plaintiff had filed several writs of mandamus in the Superior Court and Supreme Court of Pennsylvania, seeking orders compelling the Clerk to docket his timely notice of appeal and rule on post-verdict and post-sentence

---

14.   The remaining information in I-213 is Defendant Hoffman's monologue compiled from Plaintiff's U.S. Citizenship and Immigration Services ("USCIS") records; and I-94 (DHS Arrival/Departure Record); and Philadelphia Court of Common Pleas Docket in Case-4.

80

motions. These filings were cross-referenced on the first page of the Case-4 docket.

189. Defendants Decker, Kwiatowski, and Hoffman knew that Plaintiff's convictions under *18 Pa. C.S.A. § 2709.1(a)(1)* (Stalking) and *§ 5503(a)(4)* (Disorderly Conduct) were not final as of July 31, 2014, or September 23, 2015.

190. Defendants knew or should have known that *8 U.S.C. § 1101(a)(43)(F)* cross-references *18 U.S.C. § 16*, which defines a "crime of violence" as:

  a) an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another; or

  b) any other felony offense that, by its nature, involves a substantial risk that physical force may be used in the course of committing the offense.

191. Defendants knew or should have known that Pennsylvania's stalking statute, *18 Pa. C.S.A. § 2709.1(a)*, criminalizes conduct based on either:

  a) intent to place another person in reasonable fear of bodily injury; or

  b) intent to cause substantial emotional distress, neither of which requires the use, attempted use, or threatened use of physical force.

192. Therefore, Defendants knew or should have known that a conviction

under *§ 2709.1(a)* does not qualify as a "crime of violence" under *18 U.S.C. § 16(a)*.

193. Defendants Decker, Kwiatowski, and Hoffman knew or should have known that on June 26, 2015, the U.S. Supreme Court in *Johnson v. United States*, 576 U.S. 591 (2015), held the residual clause of the *Armed Career Criminal Act* (ACCA) unconstitutionally vague.[15] Because *18 U.S.C. § 16(b)* mirrors the ACCA residual clause and is incorporated into *8 U.S.C. § 1101(a)(43)(F)*, it too is unconstitutionally vague. Thus, Plaintiff's conviction under *§ 2709.1(a)* cannot be classified as a "crime of violence" under *§ 16(b)*.

194. Defendants knew or should have known that in *Matter of Sanchez-*

---

15.    On October 19, 2015, in *Dimaya v. Lynch*, 803 F.3d 1110 (9th Cir. 2015), and on August 5, 2016, in *United States v. Gonzalez-Longoria*, 815 F.3d 189 (5th Cir. 2016), the Ninth and Fifth Circuit Courts of Appeals held that the "residual clause" of *18 U.S.C. § 16(b)*, which defines a "crime of violence" for immigration and sentencing purposes is unconstitutionally vague. These decisions reinforced the holding in *Johnson v. United States*, 576 U.S. 591 (2015), and confirmed that *§ 16(b)*, as incorporated into *8 U.S.C. § 1101(a)(43)(F)*, cannot serve as a valid basis for classifying Plaintiff's conviction under *18 Pa. C.S.A. § 2709.1(a)* as an aggravated felony. ICE officials, including Defendants Decker, Ried, Kwiatowski, and Hoffman, acted in disregard of binding precedent and knowingly relied on an invalid statutory provision to lodge a detainer and initiate removal proceedings against Plaintiff

*Lopez*, 26 I&N Dec. 71 (BIA 2012), the BIA defined the generic federal "crime of stalking" under *INA § 237(a)(2)(E)(i)* as requiring:

a) conduct on more than one occasion.

b) directed at a specific individual; and

c) intended to place the victim in fear of bodily injury or death.[16]

195.   A comparison of the mens rea elements in *Sanchez-Lopez* with those in *§ 2709.1(a)(1)–(2)* reveals only partial overlap. The federal definition requires intent to cause fear of bodily injury or death, whereas the Pennsylvania statute includes an alternative mens rea of intent to cause substantial emotional distress, rendering it categorically broader.

196.   Under *Mathis v. United States*, 579 U.S. 500 (2016), the indivisibility of *§ 2709.1(a)(1)* and *(a)(2)* means that the statute encompasses conduct falling outside the generic definition of stalking under *INA § 237(a)(2)(E)(i)*. Therefore, it cannot serve as a predicate offense under the categorical approach.

197.   On September 23, 2015, while Plaintiff was serving his state sentence, ICE officers, acting under the supervision of Field Office Director Thomas

---

16.   *Commonwealth v. Schierscher*, 668 A.2d 164 (Pa. Super.1995) (applying former subsection *2709(b)(2)* with intent to cause substantial emotional distress to the person).

Decker and Defendants Ried, Kwiatowski, and Hoffman, lodged an immigration detainer against Plaintiff. They classified his stalking conviction as both a "crime of stalking" and an "aggravated felony" (crime of violence) under the INA.

198.  Plaintiff alleges that ICE's classification was legally baseless for the following reasons:

a) The conviction was not final.

b) The Pennsylvania stalking statute lacks any element requiring use, attempted use, or threatened use of physical force.

c) Judicial precedent had already invalidated the residual clause and narrowed the definition of "crime of violence."

d) Only one mens rea alternative in the statute arguably aligns with the federal stalking definition.

e) Judge Anhalt's Guideline Sentence Form assigned an Offense Gravity Score ("OGS") of 3. (See Criminal Court Record, pp. 456.)

f) An OGS of 3 corresponds to a conviction under *§ 2709.1(a)(1)* with either: (1) intent to place another person in reasonable fear of bodily injury; or (2) intent to cause substantial emotional distress. At minimum, this reflects a conviction for conduct not categorically matching the federal definition of stalking. At worst, it reflects a

84

conviction under an overbroad statute that encompasses non-deportable conduct.

### ii.    Coordination with State Parole System

199.    The enterprise weaponized the Pennsylvania Board of Probation and Parole by submitting false and misleading "dangerousness" assessments derived from void immigration detainers. These assessments were based on fabricated intelligence and legally non-final convictions and were used to justify repeated denials of parole. As a result, Plaintiff's incarceration was extended by thirty (30) months beyond the statutory minimum sentence of 2.5 years, despite Plaintiff's full compliance with parole eligibility requirements.

200.    On September 23, 2015, Defendants Decker, Kwiatowski, Ried, and Hoffman acting in bad faith and in direct contravention of constitutional and statutory law used Plaintiff's non-final conviction to impose immigration consequences. They prepared a fraudulent *Form I-213* and lodged an immigration detainer against Plaintiff's release on parole. This action was taken despite clear knowledge that Plaintiff's conviction was under active appellate and PCRA review, and that no lawful basis existed to classify the conviction as final or deportable. The detainer functioned as an extrajudicial extension of Plaintiff's criminal sentence and obstructed his access to parole

85

and civil litigation.

### iii.   Criminal Punishment Extension

201.  The enterprise repurposed immigration detention as a tool of criminal law enforcement, effectively converting Plaintiff's 2.5-year state sentence into a decade-long federal punishment through continuous detention, supervision, and procedural obstruction. This extrajudicial extension of punishment was achieved without lawful conviction finality, and in violation of constitutional safeguards governing sentencing and immigration enforcement.

202. The Pennsylvania Board of Probation and Parole (PBPP) received direct input from ICE officials regarding the immigration detainer's purported "public safety" justification and fabricated claims of Plaintiff's "dangerousness." PBPP members knowingly relied on the void detainer, despite Plaintiff's conviction being non-final as the primary basis for their "danger assessment." At Plaintiff's first parole hearing, held prior to completion of the 2.5-year minimum sentence, PBPP denied parole without conducting the independent evaluation required under *61 Pa. Code § 6132(a)(3)*. Instead, the Board rubber-stamped ICE's unlawful classification, thereby extending Plaintiff's incarceration through administrative collusion.

203.  The bad faith of Defendants Decker, Kwiatowski, Ried, and Hoffman is evident in their deliberate classification of Plaintiff's non-final conviction as an "aggravated felony." This designation triggered expedited removal procedures under *INA § 238(b)*, rendered Plaintiff permanently inadmissible under *INA § 212(a)(2)(A)(i)*, and strategically limited the jurisdiction of federal courts to review and correct their misconduct. The classification was made with full knowledge of the conviction's unresolved status and the statutory overbreadth of the underlying offense, confirming the enterprise's intent to weaponize immigration enforcement to prolong Plaintiff's punishment and obstruct judicial oversight.

### 2.  Void Legal Proceedings Phase
#### a) Jurisdictional Fraud and Process Abuse

204. On September 23, 2015, enterprise members Defendants Decker, Kwiatowski, and Ried knew or should have known that Plaintiff's conviction under *18 Pa. C.S.A. § 2709.1(a)(1)* was not final, did not qualify as an "aggravated felony" (crime of violence), and did not meet the federal definition of a "crime of stalking" under *INA § 237(a)(2)(E)(i)*.

205.  Nevertheless, on that date, Defendants Decker, Kwiatowski, and Ried issued a Notice to Appear ("NTA") charging Plaintiff as removable under two provisions of the Immigration and Nationality Act:

87

a) *INA § 237(a)(2)(E)(i)*, alleging conviction for a crime of domestic violence, stalking, or child abuse; and

b) *INA § 237(a)(2)(A)(iii)*, alleging conviction of an aggravated felony under *INA § 101(a)(43)(F)*, defined as a crime of violence under *8 U.S.C. § 16*. (See Immigration Court Record, pp. 1–4.)

206. These charges were predicated on legal theories that categorically could not apply to Plaintiff's conviction. The Pennsylvania stalking statute is overbroad relative to the federal definitions, and Plaintiff's conviction lacked finality, rendering the NTA jurisdictionally defective.

207. Defendants initiated removal proceedings without satisfying the statutory prerequisite of a final conviction, as required by *8 U.S.C. § 1229(d)*. The absence of finality deprived the Immigration Court of jurisdiction and rendered the proceedings void ab initio.

208. The NTA and subsequent proceedings were not designed to effectuate lawful immigration enforcement but to prolong Plaintiff's punishment through administrative coercion. The enterprise used immigration process as a punitive extension of criminal sentencing, in violation of constitutional and statutory limits.

209. Plaintiff immediately contested the charges in Immigration Court, citing *Orabi v. Att'y Gen.*, 738 F.3d 535 (3d Cir. 2014), which held that a conviction

under direct appellate review is not final for immigration removal purposes. Plaintiff also cited additional precedents confirming that removal jurisdiction cannot be predicated on non-final convictions.

### 3. Coercive Detention Scheme

210. On June 27, 2017, in Case-4, after more than 3.5 years of judicial inaction, Judge Diana Anhalt entered an adverse order denying Plaintiff's post-sentence motion by operation of law. This ruling formally released Plaintiff from legal limbo and enabled him to pursue direct appellate review of the April 25, 2014, sentence.

211. On October 10, 2017, the Board of Immigration Appeals (BIA) reopened and administratively closed Plaintiff's removal proceedings pending resolution of his direct appeal from April 25, 2014, conviction in Case-4. Plaintiff immediately requested that ICE lift the immigration detainer lodged against his release on parole, citing that the prior removal order was predicated on a non-final conviction and was therefore jurisdictionally void.[17]

---

17.    On November 2, 2017, Plaintiff filed a mandamus action in the Western District of Pennsylvania against the Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), and the U.S. Attorney General, seeking an order compelling DHS to lift the immigration detainer unlawfully issued against him. See *Vurimindi v. Sec'y, Dep't of Homeland Sec.*, No. 2:17-cv-1425 (W.D. Pa. Aug. 7, 2018). On November 13, 2017, Plaintiff also filed a Writ of Mandamus in the U.S. Court of Appeals for the Third Circuit, Case No. 17-3483, requesting identical relief. The Third Circuit

212. Defendants Decker, Hoffman, Kwiatowski, and Ried knew or should have known that Plaintiff's conviction could not be deemed final for immigration purposes until the U.S. Supreme Court denied a petition for writ of certiorari. Despite the administrative closure of removal proceedings, these defendants refused to lift the detainer, thereby obstructing Plaintiff's parole eligibility and continuing punitive detention without lawful basis.

213. Defendants Decker, Hoffman, Kwiatowski, and Ried issued and maintained the detainer against Plaintiff's release on parole after completion of his 2.5-year minimum sentence. Their actions were taken in bad faith, with the intent to drag Plaintiff into oppressive removal proceedings and psychologically wear him down to secure a coerced concession of removability, an outcome desired by civilian operatives Allison Borowski and Rajani Pattinson.

214. Even after the BIA administratively closed the removal proceedings in October 2017, Defendants Decker, Hoffman, Kwiatowski, and Ried refused

---

transferred the matter to the Western District of Pennsylvania for consolidation with Case No. 2:17-cv-1425. Ultimately, the District Court dismissed the consolidated action for lack of subject matter jurisdiction, despite Plaintiff's compelling argument that the immigration detainer was predicated on a non-final conviction and issued without lawful authority. The dismissal left Plaintiff without judicial remedy and further entrenched the coercive detention scheme orchestrated by the enterprise.

to lift the detainer. As a result, Plaintiff was forced to serve the full five-year maximum state sentence. This extended incarceration was used as a coercive mechanism to compel Plaintiff's voluntary acceptance of unlawful deportation. Only after Plaintiff's sentence was fully served did ICE lift the detainer, confirming the retaliatory and extrajudicial nature of the detention scheme.

### 4. Extended Criminal Law Enforcement Operations
#### a) Unlawful Federal Detention and Transport Operations

215.  On December 14, 2018 (Friday evening), a three-judge panel of the Superior Court of Pennsylvania, composed entirely of Caucasian female judges, erroneously dismissed Plaintiff's meritorious direct appeal challenging the February 7, 2014, wrongful conviction and the April 25, 2014, illegal sentence in Case-4. (See Board of Immigration Appeals Record, pp. 302–324.)

216. Defendant Withrow, maintaining close coordination with civilian operatives and state actors including the District Attorney's Office (DAO), acted swiftly following the dismissal. On December 17, 2018 (Monday morning), Withrow prepared and mailed a Motion to Recalendar and Reinstate Removal Order to the Board of Immigration Appeals (BIA) via UPS Next-Day Air. (See Board of Immigration Appeals Record, pp. 289–325.)

217. Defendant Withrow was fully aware based on Plaintiff's pleadings in Immigration Court and before the BIA that under Pennsylvania law, a conviction is not final until either the U.S. Supreme Court denies a petition for writ of certiorari or the time to file such a petition expires. Plaintiff had not waived his right to seek discretionary review. Withrow also knew that the prior removal order had been entered while Plaintiff's conviction was non-final, and that the conviction under *18 Pa. C.S.A. § 2709.1(a)(1)* did not qualify as a "crime of stalking" under *INA § 237(a)(2)(E)(i)* or a "crime of violence" under *8 U.S.C. § 16*."

218. Despite this knowledge, Defendant Withrow disregarded the non-finality of the conviction and the categorical mismatch between the Pennsylvania statute and the federal definitions. On December 18, 2018, Withrow directed Defendants Wright and Rife to arrest and detain Plaintiff, initiating unlawful federal detention based on void legal premises and in furtherance of the enterprise's extended criminal law enforcement scheme.

### b) Warrantless Arrest and Property Seizure

219. On December 18, 2018, Defendants Wright and Rife conducted a warrantless raid of Plaintiff's residence in Philadelphia, Pennsylvania. Plaintiff was arrested and removed from his home without being permitted to pack essential items, including pleadings, clothing, medications, laptop, and

prescription eyeglasses. After removing Plaintiff, one of the ICE agents unlawfully reentered the residence and seized Plaintiff's laptop, mobile phone, and solid gold framed eyeglasses weighing over 1.5 ounces. While the laptop and phone were recorded as seized property, the eyeglasses were neither documented nor returned to Plaintiff for use in detention. Plaintiff was transported to 114 North 8th Street, Philadelphia, PA 19107, and subsequently to Pike County Correctional Facility, where he was denied access to his legal pleadings, obstructing his ability to file discretionary appeals in Pennsylvania and U.S. Supreme Courts.

220. Plaintiff immediately requested the return of his solid gold framed eyeglasses, citing impaired vision, and demanded release from unlawful detention.

221. On January 2, 2019, Plaintiff filed a Petition for a Writ of Habeas Corpus in the U.S. District Court for the Middle District of Pennsylvania, seeking release from illegal detention on the grounds that removal proceedings were administratively closed and the time to file discretionary appeals had not expired or been waived. See *Vurimindi v. Lowe*, Case No. 3:19-cv-00007-MEM-DB (M.D. Pa.).[18]

---

18.   On February 13, 2020, the U.S. District Court for the Middle District of Pennsylvania denied Plaintiff's Petition for a Writ of Habeas Corpus, holding

222.  On July 2, 2019, Defendants Decker, Ritchey, Ervin, and ICE Does 1–10 denied Plaintiff's request for release, asserting that he posed a danger to the community and a flight risk. They continued detention pending resolution of Plaintiff's Petition for Review in Case No. 19-1848 before the U.S. Court of Appeals for the Third Circuit, despite the court's issuance of a stay of removal. ICE claimed it expected to obtain a travel document for expedited removal once the stay was lifted and stated that if removal was not executed within one year, a new Post-Order Custody Review would be scheduled.

223.  Plaintiff immediately contested ICE's determination of dangerousness

---

that 400 days of immigration detention was not arbitrary or unreasonable. The court segmented the detention period into three phases: (1) December 18, 2018, through April 8, 2019 (80 days) as pre-final order detention under *8 U.S.C. § 1226(c)*; (2) April 9, 2019, through June 20, 2019 (72 days) as post-final order detention under *8 U.S.C. § 1231*; and (3) June 21, 2019, through January 23, 2020 (216 days) again as pre-final order detention under *§ 1226(c)*. This fragmented analysis ignored the administrative closure of removal proceedings and the unresolved finality of Plaintiff's conviction, thereby legitimizing prolonged detention without lawful basis.

On April 6, 2020, Plaintiff filed a new Petition for a Writ of Habeas Corpus challenging continued illegal detention. On December 8, 2020, the District Court transferred the case to the U.S. District Court for the Southern District of Texas, where it was docketed as *Vurimindi v. Lowe*, Case No. 4:20-cv-04182. (See *Vurimindi v. Lowe*, Case No. 3:20-cv-00561-MEM-DB, M.D. Pa.) The transfer further delayed adjudication and prolonged Plaintiff's unlawful confinement, reinforcing the enterprise's strategy of procedural exhaustion and coercive incapacitation..

94

and flight risk, citing his professional background as a statistical programmer and statistician, his MBA from Duke University, and his business and property ownership in Philadelphia. Plaintiff affirmed his intent to comply with all conditions of release and reminded ICE of his cooperation in obtaining travel documents. He further argued that ICE's expectation of removal was unrealistic given the legal and factual deficiencies in the removal order.

224. On August 6, 2019, Plaintiff notified ICE's Headquarters Post-Detention Unit (HQPDU) that removal was not reasonably foreseeable due to the erroneous removal order and the absence of a qualifying conviction under *INA § 237(a)(2)(E)(i)*.

225. Defendant Hott, acting from ICE Headquarters, denied Plaintiff's release after 90 days of detention, citing the Third Circuit's stay of removal and stating that post-custody review would occur only after one year. This determination violated *8 U.S.C. § 1231(a)(6)*, which requires timely review of detention status.

226. On August 12, 2019, Plaintiff mailed a Notice of FTCA Claim for illegal issuance of the NTA and detainer (FTCA Record, pp. 1), malicious prosecution (Id., pp. 4), and loss of eyeglasses (Id., pp. 6). On August 13, 2019, Plaintiff mailed a separate FTCA Claim against Immigration Judges (IJ), BIA members, and DOJ counsel for ultra vires conduct (Id., pp. 8). On

95

September 4, 2019, Plaintiff submitted an additional FTCA Claim expanding upon the ultra vires conduct of IJ, BIA members, and DOJ counsel (Id., pp. 11).

### c) Interstate Transport and Detention

227. On September 18, 2019, without prior notice, Defendants Decker, Ritchey, Ervin, and ICE Does 1–10 transferred Plaintiff from Pike County Correctional Facility to York County Prison in York, Pennsylvania (ZIP 17402). Plaintiff was denied access to a law library. On October 2, 2019, again without notice, ICE transferred Plaintiff from York County Prison to Adams County Detention Center in Natchez, Mississippi (ZIP 39190), in retaliation for Plaintiff's filing of a writ of habeas corpus and mailing of multiple FTCA claims.

228. Adams County Detention Center's law library did not subscribe to Pennsylvania case law and maintained only one computer for over 300 immigration detainees. The limited access rendered it impossible for detainees, including Plaintiff, to prepare and file pleadings. Plaintiff filed grievances with ICE, York County Prison, and Adams County Detention Center regarding the lack of access to Pennsylvania legal materials. Adams County officials responded that ICE did not require them to provide such resources.

229.  Defendants Joyce, Witte, and ICE Does 1–10 transported Plaintiff on three separate occasions from Adams County Detention Center to GEO Group's "72-hour staging facility" near the airport in Alexandria, Louisiana. These transfers were intended to place Plaintiff on a large-frame charter removal flight to India, despite an active judicial stay of removal. ICE falsely asserted that Plaintiff had failed to establish a legal basis to remain in the United States.

230.  On October 18, 2019, Plaintiff filed a Petition for a Writ of Habeas Corpus in *Vurimindi v. Gillis et al.*, Case No. 5:19-cv-00106-DCB-MTP (S.D. Miss.), seeking release from unlawful detention. On December 20, 2019, Plaintiff mailed a Notice of FTCA Claim for ultra vires conduct by DOJ counsel. (See FTCA Record, pp. 14.)

231.  Defendants Joyce, Witte, and ICE Does 1–10 defended the illegal detention and, on March 12, 2020, transferred Plaintiff from Adams County Detention Center to Montgomery Processing Center in Texas, further obstructing access to legal resources and judicial remedy.

232.  On March 23, 2021, USDC for SDMS denied the writ in *Vurimindi v. Gillis et al*, stating twenty-four (24) months detention is not unreasonable.

233.  Defendants Daniel Bible and ICE Does 1–10 refused to release Plaintiff from detention despite his contraction of COVID-19 and ongoing

97

symptoms of long COVID. The denial of release under these conditions constituted deliberate indifference to Plaintiff's medical needs and prolonged unlawful confinement.

234.  On June 11, 2020, Plaintiff mailed a Second Notice of FTCA Claim alleging: (1) illegal issuance of the NTA and detainer (FTCA Record, pp. 17); (2) malicious prosecution (Id., pp. 19); (3) loss of eyeglasses (Id., pp. 21); (4) ultra vires conduct by Immigration Judges, BIA members, and DOJ counsel (Id., pp. 23); and (5) additional ultra vires conduct by DOJ counsel (Id., pp. 27).

235.  On September 22, 2020, Plaintiff filed a new Petition for a Writ of Habeas Corpus in *Vurimindi v. Tate et al*., Case No. 4:20-cv-03357 (S.D. Tex.), again seeking release from detention. Defendants Daniel Bible and ICE Does 1–10 defended the continued detention. On March 11, 2021, the court dismissed the petition as moot, despite Plaintiff's ongoing confinement and unresolved legal claims.

### d) Extended Supervision Scheme

236.  On January 15, 2021, following twenty-six (26) months of oppressive detention, Defendants Daniel Bible and ICE Does 1–10 released Plaintiff under the Intensive Supervision Appearance Program (ISAP) and Electronic Monitoring Device (EMD) Program administered by BI Incorporated in

Texas. ICE agents affixed an ankle monitor to Plaintiff and dropped him at the Houston, TX bus station wearing detention-issued clothing. Plaintiff's original street clothes, worn at the time of his December 18, 2018, arrest, had been destroyed by ICE.

237. On the same day, Defendants Daniel Bible and ICE Does 1–10 directed Plaintiff to report to the ICE Philadelphia Field Office but denied him the opportunity to apply for employment authorization. Plaintiff was unable to secure private housing in Philadelphia due to a Family Court order awarding full ownership of his home to his ex-wife. Consequently, Plaintiff sought shelter at Casa Marianella, an emergency facility for displaced immigrants in Austin, TX, and requested permission from Defendants Decker, Ritchey, Ervin, and ICE Does 1–10 to report instead to the ICE San Antonio Field Office.

238. In April 2021, Plaintiff requested Defendants Jose Correa, Espinoza, and ICE Does 1–10 to remove the ankle monitor and enroll him in the less stigmatizing BI SmartLINK® mobile application program. Despite documented swelling and pain caused by the device, Defendants refused to remove it and continued to enforce its use.

239. After months of repeated requests to terminate supervision, Defendant Espinoza denied relief and instead transferred Plaintiff to intrusive telephone

99

monitoring, without any demonstrated necessity or individualized assessment.

240. In July 2021, Defendants Jose Correa, Espinoza, Decker, Ritchey, Ervin, and ICE Does 1–10 modified Plaintiff's release conditions to permit application for employment authorization. USCIS issued the authorization in November 2021, which expired in November 2022.

241. Defendants Decker, Jose Correa, Espinoza, and ICE Does 1–10 imposed over two years of intensive supervision with electronic monitoring, effectively converting Plaintiff's release into a de facto life sentence. Immigration supervision tools were repurposed as mechanisms of criminal punishment, extending the reach of detention through surveillance, mobility restrictions, and economic incapacitation. These acts were not isolated errors but part of a coordinated scheme to deprive Plaintiff of liberty and property through fraud, obstruction, and abuse of process, in violation of his Fifth Amendment right to due process.

## III.    Litigation Success and Continued Supervision

242. On August 24, 2022, the United States Court of Appeals for the Third Circuit vacated Defendant Pauley's July 7, 2017, order and Defendant Guendelsberger's April 9, 2019, order, both of which had affirmed Defendant Durling's February 7, 2017, removal order. The Third Circuit held that

100

Plaintiff's conviction under *18 Pa. C.S.A. § 2709.1(a)(1)* does not qualify as a "crime of stalking" under *8 U.S.C. § 1227(a)(2)(E)(i)*, as defined by the Board of Immigration Appeals (BIA). (See Board of Immigration Appeals Record, pp.664-673.)

243. Immediately following the Third Circuit's ruling, Plaintiff notified Defendants Jose Correa, Espinoza, and ICE Does 1–10 of the vacatur and demanded termination of the Intensive Supervision Appearance Program (ISAP) reporting requirements.

244. In response, Defendants Jose Correa, Espinoza, and ICE Does 1–10 directed Plaintiff to report to Defendant Ulloa at the ICE Austin Field Office. Defendant Ulloa continued Plaintiff's supervision under the BI SmartLINK® mobile application and required weekly reporting.

245. Despite the Third Circuit's vacatur and remand to the BIA, Defendants Jose Correa, Espinoza, Ulloa, and ICE Does 1–10 refused to terminate ISAP weekly reporting. They continued monitoring Plaintiff for an additional nine months beyond any lawful necessity.

246. Defendants further harassed Plaintiff by requiring in-person reporting at the ICE San Antonio Field Office. On March 8, 2023, Plaintiff complied and again requested termination of reporting requirements. Defendants denied the request and ordered Plaintiff to reappear on September 6, 2023,

101

at 10:00 AM.

247. On April 20, 2023, the BIA formally terminated removal proceedings against Plaintiff. Plaintiff immediately notified Defendants Jose Correa, Espinoza, Ulloa, and ICE Does 1–10 that continued ISAP reporting was unlawful and constituted harassment.

248. On May 18, 2023, nearly one month after the BIA's termination order, Defendants Jose Correa, Espinoza, Ulloa, and ICE Does 1–10 finally terminated ISAP reporting requirements. The delay in termination further evidences the enterprise's pattern of punitive supervision beyond lawful authority.

## IV.  OPLA Leaders' Unlawful Continuation of Supervision

249. Despite the Third Circuit's precedential vacatur of removal charges with prejudice, Chief Counsel JoAnn McLane (OPLA San Antonio) and Principal Legal Advisor Kerry Doyle (OPLA Headquarters) willfully maintained unlawful supervision over Plaintiff through a series of coordinated bad-faith actions:

a) Directed ICE San Antonio field officers to continue enforcing ISAP reporting requirements for nine months following the Third Circuit's vacatur and one month after the BIA formally terminated proceedings.

This enforcement persisted despite receipt of Plaintiff's January 1, 2023, email, which:

1) cited the dismissal of all removal charges with prejudice.

2) referenced DOJ attorney Victoria Braga's confirmation of termination; and

3) demonstrated the legal impossibility of reactivating removal proceedings under principles of res judicata.

b) Knowingly violated binding precedent, including the Third Circuit's holding that *18 Pa. C.S.A. § 2709.1(a)(1)* does not constitute a "crime of stalking" under *INA § 237(a)(2)(E)(i)*, and the categorical approach requirements articulated in *Matter of Sanchez-Lopez*, 26 I&N Dec. 71 (BIA 2012).

c) Exceeded statutory authority by demanding Plaintiff's appearance at ICE's San Antonio Field Office on March 8, 2023, without any jurisdictional basis under *8 C.F.R. § 1239.2(c)* or *8 U.S.C. § 1231(a)(6)*, as no removal proceedings were pending and no lawful supervision order remained in effect.

d) Flouted ICE's own Policy Manual (PB 11072.1), which mandates termination of supervision upon case closure. The continued

103

enforcement of ISAP reporting requirements constituted ultra vires agency action.

250. These acts collectively violated the Administrative Procedure Act (5 U.S.C. § 706), amounted to retaliatory harassment of a prevailing party in violation of the First Amendment, and inflicted intentional emotional distress under Texas state law. Plaintiff's prolonged supervision, despite judicial exoneration, reflects a pattern of institutional retaliation and disregard for constitutional and statutory limits.

## V.  Judicial Process Corruption Phase

### 1.  Immigration Court and BIA Manipulation

#### a) Enterprise Members Corrupted Administrative Adjudication:

##### i.  Jurisdictional Denial:

251. On April 6, 2016, Plaintiff appeared before Immigration Judge Walter Durling and stated that he had not received the Notice to Appear (NTA), was unaware of the specific charges against him, and asserted that his conviction was neither final nor deportable. (See Immigration Court Record, pp. 9–10.)

252. On the same day, DHS attorney Defendant Gaffney filed a Notice of Intent to Offer Evidence (Id., pp. 14), a Notice of Readiness and Objection to Continuances (Id., pp. 18), and threatened that any continuance granted would prolong Plaintiff's detention. Gaffney submitted a fabricated *Form I-*

*213* (Id., pp. 20–22) and criminal docket records (Id., pp. 24–45) that, on their face, showed pending post-verdict motions (Id., pp. 40–41), post-sentence motions (Id., pp. 42–43), and praecipes requesting entry of adverse orders (Id., pp. 44), unequivocally establishing that the conviction was not final.

253.  On April 30, 2016, after receiving the NTA, Plaintiff filed an Application to Dismiss Charges, attaching copies of pending post-verdict and post-sentence motions from Case-4. (Id., pp. 54–82.) Plaintiff denied the assertions in the I-213, stating no encounter occurred with Agent Hoffman at SCI–Camp Hill on July 31, 2014, and that he made no statements regarding entry, gang affiliation, health, or fear of persecution. (Id., pp. 55.) Plaintiff also informed Judge Durling that SCI–Pine Grove's law library lacked immigration case law and that he was unable to retain private counsel or secure pro bono representation. (Id., pp. 54.)

254. On May 11, 2016, Plaintiff reiterated these concerns before Judge Durling. In response, Durling stated: "Nor will they. You will not get a response from them, or if you do, you'll get a rejection. I'm obligated to give you the list, but since you're serving prison term none of the organizations on the list is willing to represent prisoners, so if that's the way you're going to try to get an attorney, forget it. It's not going to happen. Like I said, I'm obligated to give you the list, but it's basically worthless for you." (Id. pp. 87).

105

255. On the same day, Defendant Bubier deliberately misrepresented the criminal docket, concealing pending post-sentence motions and falsely stating that the docket showed only a May 1, 2014, PCRA petition, with no notice of appeal. (Id., pp. 89.)

256. Judge Durling refused to continue removal proceedings despite overwhelming evidence that Plaintiff's conviction was not final. He stated: "No need to hear it. Mr. Vurimindi, with respect, I don't need to hear that anymore. You've made it quite plain. It's in your written motion. It is stated by you verbally on the record. You don't need to beat me over the head six times with it. I get it. I'm just ruling against you on that. So, we'll meet again on June 22, and we'll proceed at that point. Good day. (Id. pp. 96).

257. On May 12, 2016, Defendant Bubier filed a Notice of Intent to Offer Evidence (Id., pp. 99), attaching selective excerpts of the judgment and indictment (Id., pp. 101–108), while concealing over 100 pages of pending motions and praecipes commanding the Clerk to enter adverse orders and docket Plaintiff's timely notice of appeal.

258. On June 1, 2016, Plaintiff filed multiple motions:

   a) Motion to Dismiss Charges or Stay Removal and Lift Detainer (Id., pp. 109–125).

106

b) Motion to Dismiss Charges based on non-final conviction and lack of qualifying offense under INA (Id., pp. 126–141).

c) Memorandum of Law supporting dismissal (Id., pp. 142–171).

d) Memorandum supporting stay and detainer lift (Id., pp. 172–195).

259. Defendant McDonnell independently reviewed Plaintiff's criminal docket, confirming the existence of pending post-verdict and post-sentence motions and praecipes demanding adverse rulings by operation of law.

260. On June 21, 2016, McDonnell filed DHS's opposition to Plaintiff's motion, fraudulently misrepresenting the record by stating only a PCRA petition was pending and suppressing Plaintiff's arguments regarding the non-finality and categorical mismatch of the conviction. McDonnell advised Judge Durling to find Plaintiff removable for "crime of violence" and "crime of stalking." (Id., pp. 199–200.)

261. On July 7, 2016, Plaintiff filed a new Motion to Dismiss Charges, arguing that his non-final conviction did not constitute a "crime involving moral turpitude." (Id., pp. 226–231), supported by a memorandum of law (Id., pp. 232–259), to preempt DHS from initiating future removal proceedings based on the same nucleus of operative fact.

262. On July 13, 2016, Immigration Judge Walter Durling summarily affirmed DHS's charge, wrongfully finding Plaintiff removable for a "crime of

107

stalking" under INA § 237(a)(2)(E)(i), despite the categorical overbreadth of 18 Pa. C.S.A. § 2709.1(a)(1). Judge Durling dismissed the "crime of violence" charge and declined to rule on removability under "crime involving moral turpitude," thereby leaving the issue open for future proceedings. Following the hearing, Judge Durling directed the court reporter to remove the entire deliberative segment from the transcript, including his findings on removability and Plaintiff's eligibility for cancellation of removal. (See Immigration Court Record, pp. 196–197.).

263. On August 8, 2016, Plaintiff filed Form EOIR-42A, Application for Cancellation of Removal for Certain Permanent Residents, along with a supporting Memorandum of Law. (Id., pp. 260–275; 276–284.)

264. On September 14, 2016, Defendants Durling and Gaffney conducted an ex parte hearing and debated whether to retroactively render Plaintiff ineligible for cancellation of removal by classifying his conviction as both a "crime of stalking" and a "crime of violence." They ultimately abandoned the strategy upon realizing that Plaintiff had already filed his cancellation application, which foreclosed retroactive disqualification. Had Plaintiff not filed the application, Defendants intended to manufacture a record establishing dual removability grounds to foreclose discretionary relief. (Id., pp. 285–287.)

108

265. Defendants Durling, Bubier, Gaffney, and McDonnell knowingly proceeded without jurisdiction, repeatedly mischaracterizing Plaintiff's non-final conviction as final in direct violation of binding Third Circuit precedent, including *Orabi v. Att'y Gen*., 738 F.3d 535 (3d Cir. 2014). Their actions constituted jurisdictional fraud and procedural abuse, undermining the integrity of administrative adjudication and depriving Plaintiff of lawful process.

### ii. Evidence Suppression and Witness Coordination
#### a. *Refused Subpoenas For Relevant Evidence While Admitting Prejudicial Rebuttal Testimony*

266. Immediately after filing his Application for Cancellation of Removal for Certain Permanent Residents (Id., pp. 260–275) and supporting Memorandum of Law (Id., pp. 276–284), Plaintiff began submitting documentary evidence to establish statutory eligibility and discretionary equities.

267. On September 8, 2016, Plaintiff submitted available copies of Numoda Corporation's corporate tax returns for 2005–2010, projected growth for 2012, his individual tax return for 2008, and W-2 wage statements for 2007 and 2009. He also provided proof of ownership of two real properties. Plaintiff notified Defendant Durling that he was actively attempting to obtain corporate tax returns for 2011–2015 and personal tax records stored by his

estranged wife outside Philadelphia, PA. (Id., pp. 292.)

268. On October 4, 2016, Plaintiff filed a Motion to Compel the IRS to produce tax records essential to establishing continuous residence and good moral character under *INA § 240A(a)*. Despite Plaintiff's documented efforts and third-party obstruction, Defendant Durling summarily denied the motion and refused to invoke the Immigration Court's subpoena power. (See Immigration Court Record, pp. 293–295.)

269. This refusal occurred in the context of Plaintiff's pending Application for Cancellation of Removal and after Plaintiff had already submitted partial financial documentation and explained his inability to access remaining records due to his wife's removal and storage of personal belongings.

270. Defendant Durling's denial lacked any factual inquiry or legal justification and directly undermined Plaintiff's ability to meet the evidentiary burden for discretionary relief. The suppression of relevant financial documentation, coupled with the court's admission of hostile rebuttal testimony and misleading government exhibits, demonstrates a predetermined intent to deny relief irrespective of the merits.

271. This conduct, taken in totality, constitutes an administrative predisposition to deny cancellation of removal and reflects arbitrary and capricious adjudication in violation of the *Administrative Procedure Act, 5*

*U.S.C. § 706(2)(A)*, and procedural due process under the Fifth Amendment.

272. On November 14, 2016, DHS attorney Defendant Mary Ellen Withrow knowingly introduced false and materially misleading evidence regarding Plaintiff's marital status, a key element of his application, by misrepresenting a non-binding observation from a civil foreclosure docket as a definitive finding of fact. (Id., pp. 304–306.)

273. On the same day, Defendant Withrow orchestrated the ambush appearance of a hostile witness, Plaintiff's brother-in-law, who had coordinated with Plaintiff's estranged wife. No prior notice was given to Plaintiff, depriving him of any opportunity to prepare a defense or challenge the witness's credibility. This deliberate maneuver, taken in concert with other suppression tactics, constituted a bad-faith effort to secure a removal order through fundamentally unfair means and violated the Department of Justice's duty to seek justice. (Id., pp. 308–318.)

274. During the hearing, Plaintiff objected to the testimony of Mr. Boris, stating that he had not called him as a witness. Defendant Withrow responded, "Your Honor, the Government would like to call him as a witness… I would like to call him as a witness at a later date." (Id., pp. 319.) Defendant Durling overruled Plaintiff's objection and permitted DHS to use Mr. Boris as a rebuttal witness at the next hearing. (Id., pp. 320.)

### *b. The Government-Created "Hobson's Choice"*

275. On November 14, 2016, at the outset of the merits hearing, DHS attorney Defendant Withrow intentionally and gratuitously injected the issue of Plaintiff's mental competency into the record, despite the absence of any contemporaneous evidence or good-faith basis for doing so. This maneuver was not grounded in clinical observation or procedural necessity but was instead a tactical device designed to manufacture a coercive dilemma, what amounts to a government-sponsored "Hobson's choice," intended to trap Plaintiff and prejudice the adjudication. (See Immigration Court Record, pp. 301–303.)

276. Plaintiff was forced to choose between two constitutionally impermissible outcomes:

a) Acknowledging his documented mental health history, which DHS would then weaponize to argue that Plaintiff posed a danger to the community, thereby ensuring denial of discretionary relief, obstructing parole eligibility, and risking further involuntary commitment; or

b) Denying any current impairment to avoid those punitive consequences, thereby forfeiting his right to reasonable accommodations under federal disability law, including the appointment of counsel and procedural modifications necessary to meaningfully present his case.

112

277.  This coercive dilemma violated the principles of fundamental fairness and procedural due process under the Fifth Amendment. The government may not ethically or lawfully create a scenario in which a respondent is punished either for exercising a protected right or for exhibiting symptoms of a disability. Defendant Withrow's conduct, taken in concert with the broader adjudicative manipulation, reflects retaliatory intent and a deliberate effort to undermine Plaintiff's access to justice.

### c. Judicial Abdication of Duty to Safeguard Competency and Fairness

278.  Despite being presented with multiple trigger warnings, including Defendant Withrow's prejudicial interjection regarding Plaintiff's mental competency and Plaintiff's own well-documented history of court-ordered psychological evaluation and involuntary commitment, Defendant Durling abdicated his independent, non-delegable duty to ensure the fundamental fairness of the proceedings and Plaintiff's competence to represent himself. Defendant Durling failed to initiate any inquiry into Plaintiff's capacity to proceed pro se, despite clear indicators of vulnerability and procedural risk.

279.  On November 14, 2016, Judge Durling conducted a perfunctory and inadequate colloquy, accepting Plaintiff's coerced denial of impairment at face value without any meaningful inquiry. He failed to order a renewed competency evaluation sua sponte, despite his affirmative duty to do so

113

when bona fide doubt exists. Judge Durling also failed to recognize that Plaintiff's mental health history, the complexity of the proceedings, and his pro se status constituted a compelling circumstance mandating the appointment of counsel as a reasonable accommodation under Section 504 of the Rehabilitation Act. This failure to exercise independent judgment amounted to judicial rubber-stamping of the government's adversarial strategy and deprived Plaintiff of a meaningful opportunity to be heard.

280.  The accommodation of counsel was not merely necessary for Plaintiff to answer basic questions posed by the court on November 14, 2016. It was essential for the full spectrum of legal tasks required in adversarial proceedings, including trial preparation, legal research, evidence gathering, and cross-examination. Plaintiff's disability rendered him incapable of performing these tasks effectively, regardless of his ability to state his name or acknowledge the nature of the hearing. Judge Durling's refusal to appoint counsel or suspend proceedings pending competency review constituted a structural due process violation and a failure to provide reasonable accommodation under federal disability law.

### d. Blocked Plaintiff's Access to 220 Hours of Exculpatory Video Evidence

281.  On December 14, 2016, Plaintiff filed an Application for Withholding of Removal. (See Immigration Court Record, pp. 386–397.) On December 23,

114

2016, Defendant Withrow filed a Notice of Intent to Offer Evidence, submitting the 2015 Department of State Country Conditions Report for India and the 2015 CIA World Factbook–India to oppose Plaintiff's application. (Id., pp. 398–446.)

282. On December 27, 2016, Plaintiff mailed a Motion to Continue the Merits Hearing, citing two critical needs: (1) time to secure legal representation, and (2) time to obtain and present 220 hours of exculpatory video evidence that would directly rebut the fabricated testimony of Allison Borowski and Rajani Pattinson at Plaintiff's criminal trial. (Id., pp. 447–448.)

283. On December 28, 2016, Defendant Withrow filed a late Notice of Intent to Offer Evidence, naming Allison Borowski, Rajani Pattinson, and John Boris as rebuttal witnesses to challenge Plaintiff's November 14, 2016, testimony regarding the nature of his conviction. (Id., pp. 449–453.)

284. In addition, Defendant Withrow submitted an affidavit from Ann Boris, signed on December 14, 2016, two days prior to the Family Court's entry of a divorce decree on December 16, 2016. She also submitted excerpts from the trial testimony in Case-4 and police complaints filed by Borowski and Pattinson between January and March 2011. These submissions were designed to reinforce the government's narrative while suppressing Plaintiff's ability to present rebuttal evidence.

115

285. On January 9, 2017, Immigration Judge Durling received Plaintiff's Motion to Continue the Merits Hearing. Despite the gravity of the proceeding and the presence of four hostile witnesses: Borowski, Pattinson, John Boris, and Ann Boris, Judge Durling denied the motion. He refused to grant Plaintiff time to secure counsel or obtain the exculpatory video evidence, thereby depriving Plaintiff of a meaningful opportunity to rebut the government's case and defend his eligibility for cancellation of removal.

### e. *Coordinated With Private Witnesses (Borowski, Pattinson) Before Testimony*

286. Defendant Withrow engaged in improper pre-testimony coordination with private witnesses Allison Borowski, Rajani Pattinson, John Boris, and Ann Boris. Prior to their scheduled appearances, Defendant Withrow met with each witness, discussed the substance of their statements, and directed them to emphasize Plaintiff's alleged militant affiliations and purported security risk status. These allegations were known to be baseless and unsupported by any admissible evidence. The coordination was not disclosed to Plaintiff and occurred outside the bounds of lawful witness preparation, constituting prosecutorial misconduct and a deliberate effort to prejudice the adjudication. Defendant Withrow's orchestration of witness narratives, designed to inflame the record and circumvent evidentiary scrutiny, violated Plaintiff's right to a fair hearing, and reflected retaliatory

116

intent rather than a good-faith pursuit of justice.

### f. Prosecutorial Misconduct in Ambushing a Pro Se Litigant

287. On January 11, 2017, Defendant Withrow engaged in willful prosecutorial misconduct calculated to deny Plaintiff a fair hearing. Despite the complex and substantive nature of the testimony she intended to elicit from private witnesses Allison Borowski and Rajani Pattinson, testimony that directly targeted the core of Plaintiff's application for cancellation of removal, Defendant Withrow provided Plaintiff with less than three days' notice of their identities and no notice whatsoever of the substance of their intended testimony. She misleadingly characterized their appearance as "rebuttal," thereby circumventing disclosure obligations and depriving Plaintiff of any meaningful opportunity to prepare.

288. This tactic constituted a deliberate ambush of a pro se, incarcerated litigant. Plaintiff was denied the ability to secure exculpatory evidence, prepare cross-examination, or subpoena contradictory witnesses. Defendant Withrow's maneuver ensured that Plaintiff would be unable to challenge the credibility of the witnesses or present his documented evidence of their retaliatory motives. The calculated timing and concealment of witness content reflect an intent to engineer Plaintiff's defeat through procedural sabotage rather than lawful adjudication. This conduct violated Plaintiff's

117

Fifth Amendment right to due process and contravened DOJ's ethical obligation to seek justice rather than victory.

### g. Judicial Failure to Ensure Fundamental Fairness

289.  On January 11, 2017, Defendant Durling was presented with Plaintiff's detailed objection to the government's ambush tactic, including a specific plea that he was "blindsided" and required time to present "piles of paperwork" and "video evidence" to rebut the testimony of hostile witnesses. Despite the gravity of the objection and the procedural irregularities surrounding DHS's late disclosure, Defendant Durling denied Plaintiff's motion for a continuance.

290.  Defendant Durling justified his denial by stating he was "obligated by the Attorney General… to complete these cases" and that "most individuals… appear by themselves." These statements reflect a prejudicial bias toward administrative expediency over substantive justice and a refusal to acknowledge the unique complexities of Plaintiff's case, including his pro se status, incarceration, and disability-related barriers to preparation. (See Immigration Court Record, pp. 495.)

291. By forcing Plaintiff to proceed under these conditions, Defendant Durling knowingly ratified the government's misconduct and became a complicit actor in depriving Plaintiff of a meaningful opportunity to present a

defense. The hearing, stripped of procedural safeguards and adversarial balance, became a fundamentally unfair sham in violation of Plaintiff's Fifth Amendment right to due process and the Immigration Court's duty to ensure impartial adjudication.

### h. Judicial Prejudgment and Denial of Due Process

292. On January 11, 2017, Defendant Durling prejudged material evidence before it was ever presented. He explicitly instructed Plaintiff, "I don't want to hear anything about the prosecution was in retaliation for your filing a civil suit. You have the conviction. It's a valid conviction." (See Immigration Court Record, pp. 499.) This directive unlawfully foreclosed Plaintiff's ability to present a central defense: that his conviction was the product of malicious prosecution, orchestrated in retaliation for protected civil litigation. The retaliatory nature of the prosecution bore directly on the discretionary equities relevant to Plaintiff's application for cancellation of removal under *INA § 240A(a)*.

293. By forbidding this line of inquiry, Defendant Durling demonstrated a closed mind and a refusal to consider facts material to the adjudication. His conduct violated the foundational due process principle that a litigant must be heard on the issues central to his case. The exclusion of retaliatory motive evidence, despite its relevance to both credibility and discretionary relief,

rendered the hearing structurally unfair and deprived Plaintiff of a meaningful opportunity to be heard.

### i. Defendant Withrow Knowing Use of Inadmissible Evidence

294. On January 11, 2017, Defendant Withrow engaged in egregious prosecutorial misconduct by submitting the "Affidavit of Ann S. Boris" into evidence. As a licensed attorney, Defendant Withrow knew or was obligated to know that the affidavit constituted inadmissible hearsay under established evidentiary standards governing removal proceedings. The affidavit also violated spousal communication privileges and contained inflammatory, prejudicial allegations designed not to inform the adjudication, but to inflame the Court and poison the proceedings.

295. By choosing to submit a written affidavit rather than producing the witness for live testimony, Defendant Withrow willfully denied Plaintiff his fundamental constitutional right to confront and cross-examine his accuser, an essential safeguard of procedural due process in immigration court. This was not a mere legal error or oversight; it was a calculated, bad-faith tactic intended to secure a removal order through prejudice rather than admissible evidence. The submission of the affidavit, in conjunction with other coordinated misconduct, reflects a pattern of adversarial abuse and institutional retaliation against a pro se litigant.

### j.   Judicial Abdication of the Gatekeeping Function

296.  On January 11, 2017, Defendant Durling denied Plaintiff a fair hearing by admitting the "Affidavit of Ann S. Boris" into evidence either over Plaintiff's objection or by failing to exclude it sua sponte. The affidavit constituted inadmissible hearsay, contained privileged marital communications, and was saturated with inflammatory character allegations designed to prejudice the adjudication. Defendant Durling abdicated his core judicial function as gatekeeper of evidence by allowing the government to introduce a paper witness immune from cross-examination, thereby depriving Plaintiff of his constitutional right to confront adverse testimony.

297. This evidentiary failure was not a neutral oversight but a judicial ratification of prosecutorial misconduct. By permitting the affidavit to enter the record without scrutiny, Defendant Durling demonstrated bias in favor of the prosecution and undermined the integrity of the proceeding. The admission of such evidence, absent reliability, cross-examination, or procedural safeguards, violated foundational principles of due process and rendered the hearing structurally defective.

### k.  Prejudicial Impact and Lack of Probative Value

298.  The "Affidavit of Ann S. Boris" served no legitimate evidentiary purpose in the removal proceedings other than to portray Plaintiff as a monstrous figure in the eyes of the Court. Its contents included salacious, degrading,

121

and unverifiable personal attacks that bore no relevance to the dispositive legal questions namely, whether Plaintiff's conviction was (a) final and (b) categorically a "crime of stalking" under *INA § 237(a)(2)(E)(i)*. The affidavit's sole effect was to inflame passion and prejudice, appealing to the fears and emotions of the fact-finder rather than offering reasoned legal argument. Its admission fundamentally corrupted the fact-finding process and transformed the courtroom into a venue for character assassination rather than lawful adjudication.

299. On January 11, 2017, over Plaintiff's objections, Defendant Durling permitted Allison Borowski and Rajani Pattinson to testify falsely and manipulated the video feed to freeze their images, thereby preventing Plaintiff from visually assessing their non-verbal gestures and body language. Plaintiff was denied the opportunity to conduct meaningful cross-examination, particularly in light of his lack of access to 220 hours of exculpatory video evidence that would have exposed Borowski and Pattinson's fabrications. (See Immigration Court Record, pp. 494–579.)

300. Following the testimony of Borowski and Pattinson, Plaintiff promptly submitted voluminous documentary evidence to the Immigration Court, which irrefutably demonstrated that the witnesses had conspired to file false police complaints against him in retaliation for his filing of the civil rights

lawsuit *Vurimindi v. Borowski et al*. (Id., pp. 463.) This evidence directly impeached the credibility of the government's witnesses and established that the underlying criminal charges, used as the basis for removal were the product of a malicious and retaliatory conspiracy. Defendant Durling's willful failure to consider this exculpatory evidence, or to afford it any meaningful weight, constituted a fundamental denial of due process and a refusal to acknowledge that the government's case rested on a corrupted foundation. (Id., pp. 454–487.)

### I. Ultra Vires Relitigation of Criminal Conviction

301. On January 18, 2017, Defendant Durling issued a decision denying Plaintiff's application for cancellation of removal. (See Immigration Court Record, pp. 580–586.) In doing so, Judge Durling exceeded the scope of his legal authority by conducting a de facto retrial of Plaintiff's underlying state criminal case. Rather than limiting his review to the categorical fact of conviction, as required under controlling precedent, Defendant Durling improperly relied on the testimonial narratives of Allison Borowski and Rajani Pattinson to reassess the factual circumstances and severity of the alleged conduct.

302. This prejudicial re-litigation formed the primary basis for denying discretionary relief and constituted an ultra vires act. Immigration courts are

123

expressly prohibited from going behind the record of conviction to reweigh facts or infer criminal culpability beyond the statutory elements. Defendant Durling's reliance on untested testimonial allegations, rather than the legal character of the conviction, violated the categorical approach mandated by *Matter of Silva-Trevino*, *Matter of Velasquez*, and Third Circuit precedent. The decision reflects a clear bias and procedural overreach that infected the integrity of the entire proceeding and deprived Plaintiff of a lawful adjudication.

### m. Ultra Vires Adjudication and Immunity Evasion

303. On January 18, 2017, Defendant Durling issued a decision denying Plaintiff's application for cancellation of removal. In doing so, Defendant Durling acted outside the scope of his lawful authority and engaged in ultra vires conduct by refusing to apply the categorical approach mandated by binding precedent. Rather than performing a judicial function grounded in statutory interpretation, Defendant Durling substituted a conclusory and factually prejudicial narrative by declaring Plaintiff's case "prototypical" without conducting the required element-by-element comparison between the Pennsylvania stalking statute and the generic federal definition under *INA § 237(a)(2)(E)(i)*.

304. This refusal to apply controlling law was not a mere legal error but a

nonjudicial act that exceeded the bounds of adjudicative discretion. Defendant Durling abandoned his role as a neutral arbiter and instead operated as an administrative agent of removal, advancing a predetermined outcome unsupported by statutory analysis. His conduct violated the separation of adjudicative and prosecutorial functions and constituted an ultra vires act outside the scope of judicial immunity. The resulting removal order was not the product of lawful adjudication but of institutional bias and procedural sabotage.

### n. Punishing Constitutional Rights

305. On January 18, 2017, Defendant Durling issued a decision denying Plaintiff's application for cancellation of removal, in which he explicitly cited Plaintiff's history of civil litigation as a negative discretionary factor. Defendant Durling stated that Plaintiff's lawsuits demonstrated he was "self-centered," thereby penalizing Plaintiff for exercising his First Amendment right to petition the government for redress of grievances. This retaliatory use of constitutionally protected activity as a basis for denying relief is not a judicial act but a punitive administrative reprisal, undertaken in concert with DHS to discredit Plaintiff's character and suppress dissent.

306. The decision reflects an unconstitutional bias and transforms the Immigration Court from a neutral adjudicator into an instrument of

125

punishment. Defendant Durling's conduct violated the Fifth Amendment guarantee of due process and the First Amendment's protection against viewpoint discrimination. Because the denial was rooted in retaliation for protected speech rather than lawful adjudication of statutory criteria, it constitutes an ultra vires act outside the scope of judicial immunity. The use of civil rights litigation as evidence of moral defect is impermissible under constitutional doctrine and renders the proceeding structurally invalid.

### o. Prejudgment and Bias

307. The language of Defendant Durling's January 18, 2017, decision denying cancellation of removal demonstrates a profound lack of impartiality and confirms that Plaintiff was denied a fair hearing before a neutral tribunal. Defendant Durling adopted the government's narrative wholesale, declaring its witnesses "thoroughly credible in all respects" while dismissing Plaintiff's defense in overtly derogatory terms describing his account as "torturous" and his behavior as "bizarre." This vitriolic and dismissive tone exceeds the bounds of judicial temperament and reflects personal animus rather than objective adjudication.

308. Such language is not merely indicative of bias; it constitutes a nonjudicial act of retaliatory disparagement. Defendant Durling's decision was not based on a reasoned weighing of statutory factors under *INA*

126

*§ 240A(a)*, but on a prejudged narrative designed to discredit Plaintiff's character and suppress his constitutional defenses. The abandonment of neutrality and the injection of personal hostility into the adjudicative record strip the decision of its judicial character and place it outside the protection of judicial immunity. The proceeding, tainted by bias and animus, violated Plaintiff's Fifth Amendment right to due process and rendered the outcome legally void.

### p. Judicial Admission of Disability and Failure to Act

309. In his January 18, 2017, written decision, Defendant Durling made a judicial admission that directly triggered Plaintiff's entitlement to accommodations under the Rehabilitation Act. Specifically, Defendant Durling found that Plaintiff "persists in his delusions," a clinical term denoting a serious mental health impairment that affects rational thought and perception of reality. This finding stands in direct contradiction to Defendant Durling's prior assertion that Plaintiff was "fully competent" to represent himself and imposes an affirmative duty under federal disability law to provide reasonable accommodation.

310. Rather than appointing counsel or suspending proceedings to mitigate the effects of Plaintiff's impairment, Defendant Durling used the symptom itself as a basis to deny discretionary relief. This constituted deliberate

127

indifference to Plaintiff's disability and transformed the hearing into a punitive exercise, where Plaintiff was condemned for manifesting the very condition that required accommodation. The failure to act upon a judicially acknowledged disability violated *Section 504 of the Rehabilitation Act* and deprived Plaintiff of meaningful access to the adjudicative process.

311. Defendant Durling's own words are the most compelling evidence of discrimination. He diagnosed the impairment ("delusions") and then, instead of responding with accommodation, weaponized the diagnosis to justify denial of relief. This conduct satisfies the definition of discrimination under the Rehabilitation Act: denying a qualified individual the benefit of a public program based on the manifestation of a disability. Because the failure to accommodate occurred in the face of actual knowledge and judicial acknowledgment, it constitutes a nonjudicial administrative omission and falls outside the protection of judicial immunity.

### q. Defendant Withrow's Frivolous Misstatement of Binding Law

312. On February 6, 2017, following Defendant Durling's correct legal ruling that Plaintiff's Pennsylvania stalking conviction did not qualify as an aggravated felony "crime of violence" under 18 U.S.C. § 16, DHS attorney Defendant Withrow engaged in sanctionable misconduct by filing a Motion to Pretermit. (See Immigration Court Record, pp. 588–591.) The motion was

128

facially frivolous and legally untenable, arguing that the same conviction constituted a "particularly serious crime" (PSC) barring withholding of removal.

313. This argument directly contravened binding Third Circuit precedent in *Alaka v. Att'y Gen*., 456 F.3d 88 (3d Cir. 2006), which holds that a PSC designation is categorically unavailable unless the conviction is first found to be a "crime of violence." Defendant Withrow's motion ignored the Court's prior ruling and attempted to relitigate a resolved issue under a different label, in willful disregard of controlling law and judicial findings.

314. This conduct was not a mere legal error, but a calculated, bad-faith tactic designed to circumvent the categorical approach and secure a removal order through harassment and procedural attrition. Defendant Withrow's filing constituted an ultra vires act of advocacy, undertaken without legal foundation and in violation of her ethical duty to uphold the rule of law. The motion's timing, content, and intent reflect retaliatory litigation abuse and a deliberate effort to undermine Plaintiff's statutory eligibility through frivolous argumentation.

### r. Knowingly Creating a Test Case to Overturn Precedent

315. The government's filing of a legally frivolous Motion to Pretermit, based on a "particularly serious crime" (PSC) theory, after Defendant Durling had

129

already correctly ruled that Plaintiff's Pennsylvania stalking conviction was not a "crime of violence" under *18 U.S.C. § 16*, was not a legal error but a deliberate, strategic maneuver. Defendants Withrow and her supervising attorneys at ICE and DOJ knowingly advanced an argument that directly contravened binding Third Circuit precedent in *Alaka v. Att'y Gen.*, 456 F.3d 88 (3d Cir. 2006), with the specific intent to manufacture a false appellate issue.

316.  The government's objective was not to adjudicate Plaintiff's case on its merits, but to weaponize his removal proceedings as a test vehicle to invite the Third Circuit to overturn *Alaka*, thereby eliminating a critical legal protection for thousands of similarly situated immigrants. Plaintiff was treated not as an individual entitled to fair process, but as a disposable instrument in a broader policy war. This litigation strategy constituted a profound abuse of the judicial process and a violation of Plaintiff's Fifth Amendment right to due process.

317.  By deliberately manufacturing error to advance an institutional agenda, Defendants engaged in ultra vires conduct outside the bounds of lawful advocacy. Their actions reflect retaliatory intent, disregard for binding precedent, and a systemic effort to erode judicial safeguards through procedural manipulation. The use of Plaintiff's case as a jurisprudential

wedge, rather than a forum for individualized justice, renders the proceeding structurally invalid and constitutionally infirm.

### s. Defendant Durling Refusal to Protect Plaintiff's Safety and Facilitate Evidence

318. On February 7, 2017, during the hearing on Plaintiff's application for withholding of removal, Plaintiff expressed a reasonable and well-founded fear that his testimony, if made public, could endanger both himself and his family. Defendant Durling violated Plaintiff's right to a fair hearing by falsely assuring him that the record was not public and denying his request to seal the proceedings. This refusal created a chilling effect, impeding Plaintiff's ability to testify fully and freely, and undermining the integrity of the adjudicative process. (See Immigration Court Record, pp. 604–605.)

319. Furthermore, when Plaintiff explained that his ex-wife had unlawfully withheld critical documentary evidence necessary to support his claim, Defendant Durling abdicated his judicial duty by refusing to exercise the court's subpoena authority to secure the evidence. Instead of taking steps to ensure a complete and fair record, Defendant Durling blamed Plaintiff for the opposing party's misconduct. In verbatim, Defendant Durling stated: "I'm sure you have lot of paper work, Mr. Vurimindi but if you have not been able to access it for a very long time and the individuals who have, potentially who have, or I should say ostensibly who have access to your documents or

131

individuals you have sued before, they probably are not too interested in your best interest, so I can't do anything about it". (Id. pp.608).

320. This statement reflects a refusal to exercise judicial discretion in service of fairness and instead reveals a prejudicial bias against Plaintiff based on his litigation history. Defendant Durling's failure to protect Plaintiff's safety and facilitate access to exculpatory evidence constituted deliberate indifference, violated Plaintiff's Fifth Amendment right to due process, and rendered the hearing structurally defective. Because these omissions involved administrative discretion and refusal to act upon known risks, they fall outside the scope of judicial immunity and support a claim of ultra vires adjudication.

### t. Willful Ignorance and Refusal to Consider Exculpatory Evidence

321. In a final and critical act of bad faith, Plaintiff presented Immigration Judge Walter Durling with newly obtained, definitive exculpatory evidence: 47 video clips from his federal case that conclusively demonstrated perjury by the government's key witnesses at Plaintiff's criminal trial. The evidence was directly relevant to Plaintiff's claim that he was targeted by a corrupt prosecutorial enterprise and that the underlying conviction was the product of retaliatory fabrication. Rather than accepting or reviewing this material, Defendant Durling willfully and knowingly refused to even examine it, stating:

132

"I'm not going to go into anything... I've ruled on the case," (Id. pp.608)…."I do not have apparatus or the infrastructure to review such media." (Id. pp.648).

322. This deliberate refusal to consider evidence of innocence, offered in good faith and directly relevant to the integrity of the removal proceedings, demonstrates a profound bias and a commitment to upholding the removal order at all costs, even in the face of proof that the foundation of the case was fraudulent. Defendant Durling's conduct constituted a willful exclusion of exculpatory evidence and violated Plaintiff's Fifth Amendment right to due process.

323. On February 7, 2017, Plaintiff appeared before Defendant Durling and offered a DVD containing video evidence that exposed the fabrications of Allison Borowski and Rajani Pattinson. Defendant Durling again refused to review the evidence, reiterating his claim of lacking the infrastructure to do so. He simultaneously granted ICE's Motion to Pretermit and refused to seal Plaintiff's testimony regarding his fear of persecution. Defendant Durling further obstructed Plaintiff's ability to testify fully, thereby denying deferral of removal without a complete evidentiary record.

324. These actions reflect a pattern of deliberate evidentiary exclusion, procedural sabotage, and retaliatory adjudication. Defendant Durling's

133

refusal to consider exculpatory media, while accepting inflammatory hearsay and hostile witness testimony, constitutes ultra vires conduct outside the scope of judicial immunity and renders the proceeding structurally defective.

### u. Contradiction of Binding Precedent (Alaka v. Attorney General)

325. On February 7, 2017, Immigration Judge Walter Durling issued a final order of removal that contained a jurisdictionally void contradiction of binding Third Circuit precedent. In the same decision, Defendant Durling correctly found that Plaintiff's Pennsylvania stalking conviction was not an aggravated felony "crime of violence" under *18 U.S.C. § 16* yet simultaneously designated the identical conviction as a "particularly serious crime" (PSC) to bar withholding of removal. This dual finding is legally irreconcilable.

326. Under the unequivocal two-step framework mandated by the Third Circuit in *Alaka v. Att'y Gen.*, 456 F.3d 88 (3d Cir. 2006), a PSC designation under *INA § 241(b)(3)(B)* is categorically unavailable unless the conviction is first found to be a "crime of violence" under *18 U.S.C. § 16*. Defendant Durling's contradictory findings violated clearly established law and rendered the removal order void as a matter of law.

327. This was not a mere error in judgment but an ultra vires act. Having correctly dismissed the "crime of violence" charge, Defendant Durling lacked all legal authority to proceed to the second step of the Alaka analysis. His

PSC finding was entered in clear absence of jurisdiction and constituted a failure to apply the correct legal standard, thereby violating Plaintiff's Fifth Amendment right to due process.

328. The legal defect was compounded by Defendant Durling's reliance on prejudicial, non-record testimony from private witnesses testimony admitted in violation of evidentiary standards and procedural fairness. Rather than applying the categorical approach to the statutory elements of the conviction, Defendant Durling relied on inflammatory narratives to justify a PSC designation, demonstrating a willful disregard for binding legal doctrine and a predetermined intent to remove.

329. On or about January 18, 2017, and again on February 7, 2017, Defendant Durling mailed his orders to an incorrect address, as reflected in the record. (See Immigration Court Record, p. 669.) Plaintiff did not receive the orders within the statutory 30-day period to file a Notice of Appeal and was forced to write to Defendant Durling to obtain copies. The misdirection of mail obstructed Plaintiff's ability to timely exercise his appellate rights and, on information and belief, was intended to engineer a forfeiture of appeal.

330. Defendants Bubier, Gaffney, McDonnell, and Withrow knowingly prosecuted removal despite actual knowledge that Plaintiff's conviction was pending on direct appeal, rendering it non-final under *Orabi v. Att'y Gen*.,

135

738 F.3d 535 (3d Cir. 2014), and *Pino v. Landon*, 349 U.S. 901 (1955). These Defendants directed ICE to maintain detainers and oppose release, in violation of binding precedent and with retaliatory intent. Their actions reflect a coordinated effort to circumvent judicial safeguards and enforce removal through jurisdictional fraud. Their actions were not isolated errors but part of a coordinated scheme to deprive Plaintiff of liberty and property through fraud, obstruction, and abuse of process, in violation of his Fifth Amendment right to due process.

## VI.    ICE, BIA and EOIR Defendants Administrative Fraud

331.  On February 13, 2017, Plaintiff filed a Notice of Appeal to the Board of Immigration Appeals (BIA) from the February 7, 2017, final removal order. Because the Immigration Court failed to serve the final order, Plaintiff submitted a typewritten appeal on plain paper, accompanied by a Fee Waiver Request Form and a statement explaining the absence of the final order. (See Board of Immigration Appeals Record, pp. 1, 4–5.) Plaintiff's appeal raised multiple legal errors, including that his conviction under *18 Pa. C.S.A. § 2709.1(a)(1)* was not final, and that it did not qualify as a "crime of stalking" under *INA § 237(a)(2)(E)(i)* under either the categorical or modified categorical approach. (Id., pp. 6–12.)

332.  On March 3, 2017, BIA rejected the appeal on purely formalistic

136

grounds: the Notice of Appeal was not submitted on the BIA's preprinted form and lacked the final order and opinion. (Id., pp. 13.) Plaintiff promptly refiled the appeal using the required format (Id., pp. 14–16), along with a renewed fee waiver request (Id., pp. 31), a detailed statement of errors (Id., pp. 17–21), the final removal order (Id., pp. 22–23), the January 18, 2017, interim order (Id., pp. 24–30), and a cover letter explaining the prior timely filing and rejection. (Id., pp. 34–36.) On March 7, 2017, one day before the expiration of the 30-day deadline, BIA docketed the appeal. (Id., pp. 37.)

333.  On March 28, 2017, BIA directed Plaintiff to file his appellate brief by April 18, 2017. (Id., pp. 38–39.) On April 5 and April 10, 2017, Plaintiff requested a 90-day extension, citing imminent transfers between correctional facilities, lack of access to legal mail, absence of immigration case law and transcripts, and pending responses to FOIA and RTKL requests for exculpatory evidence. (Id., pp. 40–142, 144–148.)

334.  On April 9, 2017, BIA granted only a 21-day extension, setting a new deadline of May 9, 2017. (Id., pp. 149–150.) On May 3 and June 7, 2017, Plaintiff again requested extensions, explaining that between April 5 and July 1, 2017, he had been repeatedly transferred between SCI-Pine Grove, SCI-Graterford, and the Philadelphia Prison System, severely limiting his access to legal mail, transcripts, and immigration pleadings. (Id., pp. 158–215, 224–

137

234.) BIA denied both requests, stating that Plaintiff had not demonstrated "extraordinary circumstances." (Id., pp. 218–219, 235–236.)

335. Plaintiff avers that Defendants ICE, BIA, and EOIR engaged in a coordinated pattern of administrative sabotage designed to obstruct his access to appellate review and insulate unlawful removal orders from judicial scrutiny.

336. Defendants rejected Plaintiff's timely Notice of Appeal on purely formalistic grounds, despite actual knowledge that the Immigration Court had failed to serve the final order, and despite Plaintiff's good-faith efforts to preserve his appellate rights.

337. Defendants refused to accommodate Plaintiff's documented incarceration-related barriers, including repeated transfers between correctional facilities, lack of access to legal mail, and absence of immigration case law and transcripts, despite receiving multiple extension requests supported by detailed factual affidavits.

338. Defendants denied Plaintiff's requests for additional time to file his appellate brief, citing an absence of "extraordinary circumstances," while simultaneously ignoring the extraordinary logistical and legal obstacles imposed by his custodial status.

339. These actions were not neutral administrative decisions, but retaliatory

138

maneuvers undertaken with the intent to engineer procedural default, suppress exculpatory evidence, and prevent judicial review of a removal order tainted by jurisdictional fraud and due process violations.

340. The deliberate indifference shown by Defendants ICE, BIA, and EOIR violated Plaintiff's Fifth Amendment right to due process and constituted ultra vires conduct outside the scope of lawful administrative discretion. Plaintiff was treated not as a litigant entitled to fair process, but as a target of institutional retaliation designed to foreclose appellate relief.

### 1. Defendant Withrow Deliberate Omission of Jurisdictional Arguments in Bad Faith

341. Plaintiff avers that Defendant Mary Ellen Withrow engaged in deliberate and bad-faith misconduct by knowingly omitting jurisdictional arguments from her Motion for Summary Affirmance before the Board of Immigration Appeals (BIA), thereby committing fraud on the tribunal, and subverting the appellate process.

342. Defendant Withrow intentionally ignored the two central jurisdictional claims raised in Plaintiff's Notice of Appeal: (1) that Plaintiff's conviction under *18 Pa. C.S.A. § 2709.1(a)(1)* was not final for immigration purposes, and (2) that the conviction did not categorically qualify as a "crime of stalking" under *INA § 237(a)(2)(E)(i)*. (See BIA Record, pp. 153–155.)

343. This omission was not inadvertent but a calculated strategic choice.

139

Defendant Withrow knew that engaging with these arguments would expose fatal legal defects in the removal proceedings and mandate reversal. Instead, she deliberately reframed the appeal around discretionary findings and fact-intensive "particularly serious crime" (PSC) analysis, knowing that such issues receive deferential review and are less likely to be overturned.

344. By submitting a motion that pretended these jurisdictional defects did not exist, Defendant Withrow violated her duty of candor under *8 C.F.R. § 1003.102(c)* and created a false and misleading narrative for the BIA. Her representation implied that the appeal was limited to equitable discretion and fact-finding, thereby concealing the true scope and substance of the legal challenge.

345. This conduct was not zealous advocacy but unethical gamesmanship, designed to mislead an overburdened appellate body and secure affirmance through omission rather than merit. Defendant Withrow's actions reflect a coordinated enterprise to remove Plaintiff by any means necessary, including the willful suppression of dispositive legal arguments.

346. Plaintiff asserts that this tactic constitutes fraud on the tribunal, retaliatory obstruction of appellate rights, and ultra vires conduct outside the bounds of lawful government advocacy. Defendant Withrow's deliberate misrepresentation of the record and law violated Plaintiff's Fifth Amendment

right to due process and rendered the appellate proceeding structurally defective.

### 2. Defendant Pauley Knowing Mischaracterization of Appeal And Refusal to Address Jurisdictional Arguments:

347. On June 28, 2017, Plaintiff mailed a Motion to Dismiss Charges to the Board of Immigration Appeals (BIA), asserting that his conviction was not final for immigration purposes and attaching the docketed notice of appeal from the criminal court. (See BIA Record, pp. 237–241.)

348. On July 7, 2017, Defendant Pauley ignored Plaintiff's Motion to Dismiss Charges and issued a decision dismissing the appeal in a manner that knowingly and deliberately mischaracterized the record and refused to address Plaintiff's core jurisdictional arguments. (Id., pp. 242–246.)

349. 317. In a blatant misstatement of fact, Defendant Pauley declared: "Although the respondent challenges the finality of his conviction, he does not contest his removability. We consider the respondent's removability settled, and do not revisit that finding here." (Id., p. 245, fn. 6.) This statement is demonstrably false. Plaintiff's Notice of Appeal explicitly contested removability on two independent jurisdictional grounds: (1) lack of a final conviction (Id., pp. 8, 17), and (2) categorical inapplicability of the Pennsylvania stalking statute to the generic federal definition of a "crime of stalking." (Id., pp. 9, 18.)

141

350. This mischaracterization was not an oversight but a deliberate strategic choice to avoid addressing arguments that would have necessitated termination of proceedings. By falsely claiming Plaintiff conceded removability, Defendant Pauley created a pretext to sidestep his duty to review Defendant Durling's ultra vires conduct.

351. Defendant Pauley compounded this error by affirming Defendant Durling's "particularly serious crime" (PSC) finding. In doing so, he explicitly relied on improperly admitted witness testimony obtained through the government's ambush tactic, citing the victims' fear and the "lasting impact on their lives." This demonstrates Defendant Pauley's willing participation in the enterprise, ratifying the use of evidence obtained through due process violations to uphold a legally insupportable finding.

352. Most egregiously, Defendant Pauley's affirmance of the PSC finding directly contradicts BIA's own acknowledgment that Plaintiff's conviction was not an aggravated felony "crime of violence." At no point did Defendant Pauley reconcile this contradiction with binding Third Circuit precedent in *Alaka v. Att'y Gen.*, which mandates that a conviction must first qualify as a "crime of violence" before it can be deemed "particularly serious." His refusal to apply controlling law constitutes an ultra vires act and an abdication of the BIA's appellate function.

142

353. This decision evidences a coordinated effort between Defendants Durling, Withrow, and Pauley to manufacture a record for appellate review that avoids Plaintiff's winning arguments. By misstating the appeal, ignoring binding precedent, and relying on tainted evidence, Defendant Pauley acted not as a neutral appellate adjudicator but as a rubber stamp for a legally void removal order.[19]

354. Acting in an administrative capacity, Defendant Pauley intentionally mischaracterized the contents of Plaintiff's Notice of Appeal, falsely stating that Plaintiff "did not contest his removability" when the record clearly shows otherwise. This administrative falsification of the record, undertaken to avoid addressing meritorious legal arguments, exceeds the bounds of judicial immunity and constitutes a violation of Plaintiff's Fifth Amendment right to due process.

### 3. Defendant Guendelsberger Strategic Administrative Closure to Avoid Termination and Maintain Pressure

---

19.    Immediately following Defendant Pauley's July 7, 2017, order affirming Defendant Durling's February 7, 2017, removal order, an order issued in clear absence of jurisdiction, Plaintiff filed a Petition for Review in the United States Court of Appeals for the Third Circuit, docketed as Case No. 17-2091. This petition challenged the legality of the removal order on jurisdictional grounds, including the non-finality of Plaintiff's conviction and the categorical inapplicability of the Pennsylvania stalking statute under *INA § 237(a)(2)(E)(i)*.

143

**Campaign**

355.  On July 19, 2017 (see BIA Record, pp. 251–259) and August 20, 2017 (Id., pp. 261–272), Plaintiff filed a Motion to Reopen and Terminate Removal Proceedings before the Board of Immigration Appeals (BIA), asserting that his conviction was not final for immigration purposes. On October 10, 2017, Plaintiff supplemented the motion with additional evidence demonstrating that the conviction did not qualify as a "crime of stalking" under *INA § 237(a)(2)(E)(i)*. (Id., pp. 282–286.) Defendant Guendelsberger ignored the October 10, 2017, motion.

356.  On October 10, 2017, Defendant Guendelsberger granted Plaintiff's Motion to Reopen but issued an order deliberately designed to avoid providing meaningful relief. Rather than terminating the proceedings or directing ICE to lift its detainer, Defendant Guendelsberger opted for administrative closure pending the outcome of Plaintiff's direct appeal, citing Matter of Avetisyan. While procedurally permissible, this decision preserved the government's enforcement posture and perpetuated Plaintiff's injury.

357. Defendant Guendelsberger's order reflects the enterprise's broader strategy of deploying procedural half-measures to create the illusion of fairness while maintaining maximum leverage over Plaintiff. By keeping the proceedings in suspension rather than terminating them, the BIA ensured

144

that Plaintiff remained under the perpetual threat of reactivated removal proceedings. This "limbo" status functioned as a form of punishment, generating ongoing legal uncertainty, psychological distress, and deprivation of liberty.

358.  Defendant Guendelsberger was fully aware that the ICE detainer was the sole basis for Plaintiff's continued detention and the linchpin of the removal case. A fair and impartial adjudicator, recognizing the foundational invalidity of the proceedings, would have coupled administrative closure with an order to lift the detainer, thereby restoring Plaintiff to his pre-removal status. Defendant Guendelsberger's conscious refusal to do so reveals coordination with ICE's objective: to maintain pressure on Plaintiff and ensure his continued detention or supervision, regardless of the legality of its basis.

327. This action is consistent with the broader pattern of retaliatory enforcement. Every member of the enterprise acted to preserve the status quo of Plaintiff's punishment. Defendant Guendelsberger's order was not a grant of relief but a tactical pause, keeping the machinery of removal oiled and ready to restart at a moment's notice. Plaintiff continued to suffer the deprivations of liberty stemming from a void detainer, and Defendant Guendelsberger's refusal to remedy a known constitutional violation

145

constitutes further evidence of the coordinated effort to achieve the enterprise's objectives.[20]

### 4. Defendant Withrow's Bad Faith Motion to Recalendar Upon Technical Finality, Ignoring Categorical Defect

359. On December 18, 2018, immediately upon learning that the Pennsylvania Superior Court had dismissed Plaintiff's direct appeal, Defendant Withrow filed a Motion to Recalendar before the Board of Immigration Appeals (BIA), demanding reinstatement of the removal order. (See BIA Record, pp. 289–291, 291–325.) This motion exemplifies Defendant Withrow's bad-faith strategy of pursuing removal based on procedural technicalities while willfully ignoring the definitive legal defect that had rendered the removal charge invalid from the outset: Plaintiff's conviction, even if final, categorically did not constitute a "crime of stalking" under *INA § 237(a)(2)(E)(i)*.

---

20.     Immediately following Defendant Guendelsberger's October 10, 2017, order administratively closing removal proceedings without terminating them, Plaintiff filed a Petition for Review in the United States Court of Appeals for the Third Circuit, docketed as Case No. 17-2620. This petition challenged the legality of the BIA's refusal to terminate proceedings despite the acknowledged pendency of Plaintiff's criminal appeal and the absence of a final conviction. Plaintiff asserted that administrative closure, without lifting the ICE detainer or vacating the removal posture, constituted a continuation of unlawful enforcement and a deliberate refusal to remedy known constitutional violations.

360. Defendant Withrow's motion selectively cited *Orabi v. Att'y Gen.*, 738 F.3d 535 (3d Cir. 2014), for the narrow proposition that Plaintiff's conviction was now "final," while deliberately ignoring *Orabi*'s broader holding that a conviction cannot support removability until it has "attained a substantial degree of finality." This selective citation reflects a pattern of weaponizing precedent to achieve removal, rather than applying legal principles in good faith.

361. The motion's sole objective was to leverage the state court's adverse ruling to resurrect a removal order that was void ab initio. It made no attempt to address the unresolved legal challenge to the validity of the removal charge under the categorical approach. Defendant Withrow knew that the BIA's prior dismissal had mischaracterized Plaintiff's appeal and refused to engage with the jurisdictional defects. Her effort to reinstate that flawed decision was a conscious attempt to benefit from the BIA's earlier error and to continue punishing Plaintiff for a conviction that, under federal law, did not render him removable.

362. This motion epitomizes the enterprise's objective: a relentless focus on securing a removal order by any means necessary, regardless of its legal validity. The government's strategy was not to correct the legal errors in the case but to exploit procedural developments to execute the removal order

147

before federal courts could intervene. Defendant Withrow's conduct confirms that her goal was not lawful enforcement of immigration statutes, but the punitive pursuit of a predetermined outcome against Plaintiff.

### 5. Plaintiff's Legally Sophisticated Challenge to Finality and Jurisdiction

363. On December 22, 2018, Plaintiff filed a meticulously researched and legally precise "Application to Continue Administrative Closure and Direct DHS/USICE to Release Petitioner from Detention" with the Board of Immigration Appeals (BIA). (See BIA Record, pp. 327–332; 335–340.) This filing demonstrated a sophisticated understanding of conviction finality jurisprudence that far exceeded the legal analysis presented by the government and immigration courts throughout the proceedings.

364. Plaintiff's application correctly argued that his conviction would not be final for immigration purposes until the entire direct appellate process was exhausted, including the expiration of the time to seek a writ of certiorari from the United States Supreme Court. Plaintiff cited binding precedent including *Clay v. United States*, 537 U.S. 522 (2003), and *Kapral v. United States*, 166 F.3d 565 (3d Cir. 1999), exposing the superficiality of Defendant Withrow's position, which wrongly claimed finality attached upon the Pennsylvania Superior Court's initial dismissal.

365. Plaintiff further identified a foundational jurisdictional defect that the

government and courts consistently ignored: Immigration Judge Durling's removal order was entered on February 7, 2017, months before the Philadelphia Court of Common Pleas deemed Plaintiff's post-sentence motion denied by operation of law on June 27, 2017. As Plaintiff argued, DHS/ICE initiated and maintained the entire removal proceeding while a direct challenge to his conviction was still pending in state court, rendering the immigration court devoid of jurisdiction from the outset under *Orabi v. Att'y Gen.*, 738 F.3d 535 (3d Cir. 2014).

366. Plaintiff also detailed how DHS/ICE, by taking him into custody, actively obstructed his ability to perfect his appeals in state court by preventing him from submitting required paper copies of his filings. This demonstrated a bad-faith tactic by the government: manufacturing the conditions for a "final" conviction by hindering Plaintiff's appellate rights and then using that manufactured finality to justify detention and removal.

367. The BIA's subsequent failure to grant the requested relief, continuing administrative closure and ordering Plaintiff's release despite the unassailable legal reasoning presented, was not a neutral error but a deliberate act of defiance. It reflected a predetermined commitment to upholding the removal order regardless of law or jurisdiction and confirmed Plaintiff's status as a target of a coordinated enforcement enterprise, rather

149

than a participant in a fair legal process.

### 6. Defendants' Knowingly False Legal Construction of the "Crime of Stalking"

368. On February 14, 2019, Plaintiff filed a Motion to Expedite disposition of his pending Application to Continue Administrative Closure and the government's Motion to Recalendar and Reinstate the Removal Order. (See BIA Record, pp. 343–347.) On March 17, 2019, Plaintiff filed an Application to Terminate Removal Proceedings, citing the Board's recent holding in *Matter of Sanchez-Lopez*, 27 I.&N. Dec. 256 (BIA 2018) ("*Sanchez-Lopez II*"). (Id., pp. 348–366, 367–419.)

369. Plaintiff's February 14, 2019, Motion to Expedite further exposed the enterprise's modus operandi: to obscure foundational legal errors through procedural obstinance. The motion directly linked structural defects in Plaintiff's criminal case to the immigration court's own jurisdictional failures, demanding a resolution that would prevent execution of an invalid removal order.

370. Plaintiff's March 17, 2019, Application to Terminate Removal Proceedings surgically dismantled the government's legal basis for removal. Citing *Sanchez-Lopez II*, Plaintiff demonstrated that Defendant Durling's analysis was not merely erroneous but a willful misapplication of settled law. (See BIA Record, pp. 348–366, 367–419, 432–448.)

150

371. Defendant Durling and subsequently Defendants Pauley and Guendelsberger, knowingly and recklessly violated the Supreme Court's mandated categorical approach as articulated in *Taylor v. United States*, *Descamps v. United States*, and *Mathis v. United States*. They unlawfully applied a modified categorical approach to the indivisible Pennsylvania stalking statute, *18 Pa. C.S.A. § 2709.1(a)(1)*, an act tantamount to legal fraud. This was not a neutral judicial error, but a strategic misconstruction designed to fabricate removability.

372. The government's entire case relied on this false predicate. The Pennsylvania statute criminalizes conduct committed with an "intent to cause substantial emotional distress," a mental state that falls entirely outside the BIA's own definition of a "crime of stalking," which requires "intent to cause fear of bodily injury or death." (*Matter of Sanchez-Lopez*, 26 I.&N. Dec. 71 (BIA 2012)).

373. By treating alternative means of violation as separate elements, Defendant Durling fabricated a scenario in which he could extract a qualifying "element" from the record. This act of legal sophistry exposed the enterprise's objective: to obtain a removal order by any means necessary, including the deliberate misapplication of binding precedent and the violation of Plaintiff's Fifth Amendment right to a lawful adjudication.

151

374. Defendants Pauley and Guendelsberger's failure to correct this fundamental and obvious error on appeal was a deliberate act of ratification. It confirmed that the agency was committed to upholding the illegal removal order as a matter of policy, not law, and that they were willing participants in the enterprise to remove Plaintiff under a legally invalid theory.

375.  This strategy was designed to create irreversible facts on the ground namely, Plaintiff's removal, before federal courts could intervene to vindicate his rights and expose the government's legally baseless position. That vindication ultimately came when the Third Circuit recognized the invalidity of the government's actions.

### 7. Defendant Guendelsberger's Bad-Faith Reinstatement of the Facially Invalid Removal Order

376. On April 9, 2019, Defendant Guendelsberger issued a decision that epitomized the enterprise's strategy of employing hollow procedural rationales to evade substantive justice. The decision denied Plaintiff's Motion to Terminate and recklessly reinstated the BIA's 2017 removal order, relying on a transparently pretextual and logically incoherent rationale. (See BIA Record, pp. 451–453.)

377.  Defendant Guendelsberger's order was a textbook exercise in bad-faith judicial evasion. While acknowledging that Plaintiff's direct appeals were ongoing, the order denied relief on the grounds that Plaintiff "did not

152

present evidence that the appeal would relate to the issue of guilt or innocence or concerns a substantive defect in the criminal proceedings." This Catch-22 demand, requiring a pro se detainee to predict the outcome of his pending appeal to prove its merit, was designed to be impossible to satisfy and exposed the decision as a predetermined outcome in service of the removal enterprise.[21]

378. Most egregiously, Defendant Guendelsberger explicitly refused to revisit the underlying legality of the removal order, falsely asserting that Plaintiff "did not contest his removability on appeal and therefore this issue was waived." This statement was a knowing and material falsehood. The record is replete with Plaintiff's challenges to the legal validity of the stalking charge, which formed the jurisdictional foundation of the removal proceedings. The so-called "waiver" was a deliberate fiction manufactured to

---

21.   Plaintiff's Motion to Expedite, filed in connection with his Application to Continue Administrative Closure, explicitly listed the legal questions raised in his petition for allowance of appeal to the Pennsylvania Supreme Court. These questions directly related to Plaintiff's innocence and to structural errors in the underlying criminal proceedings, including prosecutorial misconduct, denial of confrontation rights, and judicial prejudgment. The motion demonstrated that Plaintiff's appeal was not collateral or procedural, but central to the validity of the conviction itself. By refusing to consider these substantive issues, the BIA perpetuated a removal order predicated on a conviction whose legitimacy remained under direct constitutional challenge.

153

shield Defendant Durling's legally bankrupt stalking analysis from scrutiny.[22]

379. By declaring the issue of the invalid "crime of stalking" conviction waived, Defendant Guendelsberger engaged in willful blindness to the core constitutional defect of the proceedings. This act was not a lawful adjudication but a rubber-stamp on a legally void order, confirming that the BIA's function in this case was not to administer justice but to execute the enterprise's objective: removal by any means necessary, including the outright ignoring of fundamental legal errors.

380. This decision represented the culmination of the enterprise's strategy: to run out the clock on Plaintiff's ability to seek judicial review, using procedural blockades to prevent any court from examining the substantive invalidity of the stalking-based removal charge. Defendant Guendelsberger's order was the final, calculated act to fabricate an "enforceable" removal order

---

22.    Plaintiff's Notice of Appeal explicitly stated that, under both the categorical and modified categorical approaches, a conviction under 18 Pa. C.S.A. § 2709.1(a)(1) does not constitute a "crime of stalking" under INA § 237(a)(2)(E)(i). In subsequent filings, Plaintiff cited controlling precedent from the Board of Immigration Appeals and the Third Circuit, demonstrating that the Pennsylvania statute criminalizes conduct with an "intent to cause substantial emotional distress," which materially diverges from the federal generic definition requiring "intent to cause fear of bodily injury or death." This argument was central to Plaintiff's jurisdictional challenge and was repeatedly ignored or mischaracterized by Defendants in their effort to preserve a legally void removal order

out of whole cloth, directly resulting in Plaintiff's continued unlawful detention and the imminent threat of removal based on a nullity.

381.  Immediately following Defendant Guendelsberger's wanton refusal to terminate removal proceedings, Plaintiff filed a Petition for Review in the United States Court of Appeals for the Third Circuit, docketed as Case No. 19-1848. This petition challenged the reinstatement of a facially invalid removal order and preserved Plaintiff's claims of jurisdictional fraud, due process violations, and retaliatory enforcement.[23]

### 8. The Enterprise's Blatant Refusal to Acknowledge Its Own Legal Errors

382.  On April 11, 2019, Plaintiff filed a Motion for Reconsideration with the Board of Immigration Appeals (BIA), followed by a Motion to Reopen and Terminate on August 3, 2019. (See BIA Record, pp. 454–464, 465–519; 535–554, 555–623.) These filings systematically detailed the two fatal flaws in the removal proceedings: (1) the non-finality of Plaintiff's conviction at the

---

23.    On June 21, 2019, Plaintiff filed a Motion to Stay Removal in the United States Court of Appeals for the Third Circuit. On the same day, the Court temporarily granted a stay of removal pending its consideration of the motion. On December 19, 2019, the Third Circuit issued a formal order granting Plaintiff's Motion for Stay of Removal. This judicial intervention confirmed the seriousness of Plaintiff's claims and acknowledged the likelihood of success on the merits, as well as the irreparable harm that would result from executing a removal order predicated on a legally invalid charge.

time of adjudication, and (2) the legal invalidity of the "crime of stalking" charge under the categorical approach. Together, they presented an incontrovertible legal argument that the enterprise's entire foundation was a nullity.

383. On August 12, 2019, Defendant Guendelsberger issued a summary denial devoid of any legal reasoning, stating that there was no "factual or legal error in our prior decision or any aspect of the respondent's case that was overlooked." (Id., pp. 533–534.) This response was not a judicial determination but a conscious and deliberate act of obstruction, designed to foreclose substantive review of the removal order.

384. Defendant Guendelsberger's perfunctory denial confirmed a strategy of willful ignorance. By asserting that the misapplication of the categorical approach to an indivisible statute was not "overlooked," Defendant Guendelsberger effectively admitted that the Board had reviewed the argument and consciously chosen to disregard binding law. This constituted a knowing ratification of the underlying legal fraud.

385. Faced with this blatant refusal to perform its adjudicative duty, Plaintiff was left with no administrative recourse. The enterprise had succeeded in using its own procedural mechanisms to bar the door to any meaningful review, forcing Plaintiff to seek relief from the federal courts to halt the

execution of a legally void removal order.

386.  On August 12, 2019, Plaintiff immediately filed a Petition for Review in the United States Court of Appeals for the Third Circuit, docketed as Case No. 19-2904. This action was a direct consequence of Defendant Guendelsberger's wanton refusal to adhere to the law and represented the only remaining path to challenge the enterprise's orchestrated campaign to remove Plaintiff under a patently invalid charge.

### 9.  The Enterprise's Culminating Act of Bad-Faith: Defendant Gemoets's Summary Denial

387. On September 3, 2019, and again in subsequent filings, Plaintiff submitted a fourth Motion to Reopen and Terminate Removal Proceedings before the Board of Immigration Appeals (BIA). (See BIA Record, pp. 625–656.) This motion meticulously reasserted the foundational legal argument that Plaintiff's conviction under the overbroad Pennsylvania statute did not categorically constitute a "crime of stalking" under *INA § 237(a)(2)(E)(i)*, citing binding precedent in *Matter of Sanchez-Lopez*, 27 I.&N. Dec. 256 (BIA 2018) ("*Sanchez-Lopez II*"). The filing presented the substantive legal challenge the enterprise had evaded for years.

388. On May 4, 2020, Defendant Gemoets issued a decision that epitomized the enterprise's final, cynical refusal to engage with the law. The decision wantonly failed to acknowledge, let alone analyze the core legal

argument that Defendants Pauley and Guendelsberger had previously ignored. (See BIA Record, pp. 661–663.)

389. Defendant Gemoets's order was a textbook example of a predetermined outcome. It falsely claimed that Plaintiff's arguments were "similarly raised" in prior motions and had been "addressed" in previous decisions. This was a material misrepresentation of the record. The prior decisions had willfully refused to address the merits of Plaintiff's categorical approach argument, instead hiding behind fabricated claims of "waiver" and "finality."

390. By stating that Plaintiff "has further failed to state new facts" and "has not established a substantial likelihood that the result in his case would be changed," Defendant Gemoets demonstrated the enterprise's ultimate strategy: to treat a pure question of law, the indivisibility and overbreadth of the Pennsylvania statute as a factual issue requiring "new evidence." This was a knowing misapplication of the legal standard for a motion to reopen, designed exclusively to bar relief.

391. This decision confirmed that the BIA's adjudicative process in Plaintiff's case was a sham. The enterprise's objective was not to correct its own legal errors but to insulate them from review through a series of procedural denials, creating a fait accompli of a final removal order based on a void legal

158

premise. Defendant Gemoets's order was the final brick in this wall of obstruction, cementing the enterprise's campaign to deny Plaintiff a lawful adjudication on the merits.[24]

### 10.    The Enterprise's Conspiratorial Falsification of the Record    to Subvert Due Process

392. The actions of Defendants Pauley, Guendelsberger, and Gemoets constitute a coordinated enterprise that transcended mere adjudicative error and entered the realm of a knowing, bad-faith conspiracy to falsify the administrative record. Despite Plaintiff's unequivocal challenge to the legal validity of the removability charge in his initial Notice of Appeal, these officials acting in a purely administrative and non-judicial capacity, repeatedly and intentionally asserted the demonstrably false claim that Plaintiff "did not contest his removability."

393. This was not a passive oversight but an active and deliberate

---

24.    Immediately following Defendant Marcos Gemoets's May 4, 2020, refusal to terminate removal proceedings, Plaintiff filed a Petition for Review in the United States Court of Appeals for the Third Circuit, docketed as Case No. 20-2027. This petition challenged the Board's continued refusal to engage with the categorical defect in the stalking-based removal charge. Plaintiff subsequently withdrew the petition to expedite resolution of his pending Petitions for Review in Case Nos. 19-1848 and 19-2904, which raised overlapping jurisdictional and constitutional claims. The withdrawal was a strategic decision to streamline judicial review and accelerate relief from the enterprise's unlawful enforcement campaign.

stratagem: a calculated misrepresentation designed to evade their legal and constitutional obligation to address Plaintiff's meritorious categorical and finality arguments. This pattern of adjudicative deception, repeated over years and across multiple decisions, was the essential machinery of the enterprise—allowing it to manufacture a procedurally "final" removal order while insulating its legally void foundation from scrutiny.

394. This conduct operated in clear absence of jurisdiction and falls far outside the scope of any protected judicial function. Defendants' role was not to adjudicate but to execute a predetermined outcome: the extension of criminal penalty and the procurement of Plaintiff's removal by any means necessary, including the falsification of the appellate record. As this campaign was ultra vires, non-judicial, and conspiratorial in nature, Defendants are not entitled to the shield of absolute immunity for these acts.

### 11.   Vindication by the Third Circuit and the Enterprise's Continued Obstruction on Remand

395. On August 24, 2022, the United States Court of Appeals for the Third Circuit issued a precedential opinion in *Vurimindi v. Att'y Gen.*, Case Nos. 19-1848 and 19-2904, delivering full judicial vindication of Plaintiff's years-long legal battle and issuing a damning indictment of the enterprise's misconduct. The Court held unequivocally that Plaintiff's conviction under *18 Pa. C.S.A. § 2709.1(a)(1)* does not constitute a "crime of stalking" under *8*

160

*U.S.C. § 1227(a)(2)(E)(i)*. The Court vacated Defendant Pauley's July 7, 2017, order and Defendant Guendelsberger's April 9, 2019, order, both of which had affirmed Defendant Durling's legally void removal order and remanded the case to the Board of Immigration Appeals (BIA) for further proceedings. (See BIA Record, pp. 664–673.)

396. The Third Circuit's decision confirmed that Plaintiff's core legal argument repeatedly ignored and falsely deemed "waived" by the BIA was not only meritorious but legally correct. The ruling exposed the enterprise's foundational bad faith and the complete absence of legal basis for the removal proceedings.

397. Despite this clear mandate, the enterprise continued its pattern of obstruction. Following notice of the remand, the BIA forced Plaintiff, for a fifth time, to file a motion to terminate removal proceedings. Plaintiff correctly argued that the Third Circuit's vacatur of the removal order automatically restored his lawful permanent resident (LPR) status, as the sole statutory basis for removal had been nullified. The government failed to respond to this motion, rendering it unopposed under BIA's own procedural regulations. Nevertheless, the Board refused to act.

398. In a final act of bad-faith delay, the BIA, rather than complying with the Third Circuit's mandate to terminate proceedings, requested supplemental

briefing on March 9, 2023, concerning an issue already definitively resolved by the federal court. (See BIA Record, pp. 697–698.) This demand for further litigation on a settled question of law was a transparent tactic to prolong proceedings indefinitely, confirming that the enterprise remained committed to harassment and obstruction even in the face of a final, precedential judgment from the Court of Appeals.

### 12.    The Enterprise's Final Act of Evasion: DHS's Motion to Dismiss Without Prejudice

399.  On March 22, 2023, Plaintiff filed a supplemental brief in support of terminating removal proceedings. (See BIA Record, pp. 699–717.) Despite the brief's unopposed status and its reliance on the Third Circuit's precedential vacatur of the removal order, the Department of Homeland Security (DHS), through ICE, filed a Motion to Dismiss its own September 23, 2015, Notice to Appear (NTA) without prejudice on March 28, 2023. This motion conceded the central truth Plaintiff had argued for eight years, stating that he is "not deportable or inadmissible under immigration laws" and that "circumstances of the case have changed... to such an extent that continuation is no longer in the best interest of the government." (Id., pp. 718–721.)

400.  This action was not a concession but the enterprise's final act of strategic evasion. By seeking dismissal without prejudice, DHS attempted to

unilaterally nullify eight years of oppressive and legally baseless removal proceedings, deliberately avoiding a termination with prejudice that would constitute a final judgment on the merits. This maneuver was a transparent attempt to preserve the option of initiating successive removal proceedings based on the same invalid conviction, perpetuating the cycle of harassment and denying Plaintiff the finality and justice he is owed.

401. The enterprise's refusal to allow termination with prejudice, despite both charges in the NTA having been effectively dismissed with prejudice by the Immigration Judge and vacated by the Third Circuit confirms its bad-faith objective: to maintain a perpetual state of legal limbo over Plaintiff. The threat of future proceedings was used as a tool of coercion and punishment, ensuring Plaintiff would "remain in removal proceedings for the foreseeable future." This final act confirms that the enterprise's operation was never about lawful enforcement of immigration statutes, but about the relentless and punitive extension of criminal penalty through any available means.

### 13.    Defendant O'Connor's Punitive and Non-Judicial Termination Without Prejudice

402. On April 20, 2023, Defendant O'Connor issued a decision that served as the enterprise's final act of retaliation for Plaintiff's successful litigation. Rather than granting termination with prejudice as demanded by the law, record, and Third Circuit mandate, Defendant O'Connor punished Plaintiff

163

for exercising his constitutional right to access the courts by terminating the proceedings without prejudice. This decision deliberately rendered eight years of oppressive litigation without a final judgment on the merits, denying Plaintiff the closure and protection from future government harassment that he had unequivocally earned. (See BIA Record, pp. 778–779.)

403. Defendant O'Connor's order was a knowing and intentional act to preserve the enterprise's ability to continue its campaign against Plaintiff. By leaving the case open-ended, Defendant O'Connor provided ICE with an indefinite option to initiate new removal proceedings at any time, based on the same nucleus of operative facts arising from Plaintiff's conviction under *18 Pa. C.S.A. §§ 2709.1* and *5503*. This decision strategically enables future forum shopping, should retroactive changes in law occur or should the government choose to revive previously abandoned legal theories.

404. Faced with this continued bad faith, Plaintiff filed a Motion to Reconsider on May 16, 2023, marking his sixth formal request for termination with prejudice. The motion argued that ICE was collaterally, judicially, and equitably estopped from initiating a new iteration of removal proceedings. Plaintiff detailed how termination without prejudice after a protracted and victorious legal battle constituted an abuse of discretion and a violation of fundamental fairness, designed solely to deny him peace and the ability to

restructure his life. Defendant O'Connor's failure to dispose of this motion further demonstrates the enterprise's strategy: endless delay and obstruction, ensuring Plaintiff remains in a perpetual state of legal uncertainty as a form of unofficial, extra-judicial punishment.

## VII.    The Enterprise's Appellate Process Manipulation

### 1.  Defendant Braga's Bad-Faith Litigation and Systematic Misrepresentation

405.  Defendant Victoria Braga, representing the United States government, acted as a central operative in the enterprise's appellate strategy. Across seven separate Petitions for Review Case Nos. 17-2091, 17-2620, 19-1848, 19-2904, 20-2027, 22-3279, and 23-1334, Defendant Braga repeatedly and knowingly made false representations in both written pleadings and oral arguments. Her singular objective was not to assist the Court in administering justice, but to secure Plaintiff's deportation by any means necessary, including the willful misstatement of procedural history and the deliberate misapplication of settled law. She consistently ignored binding Supreme Court and Third Circuit precedent on conviction finality and the categorical approach, even when directly cited by Plaintiff.

406.  Defendant Braga's conduct transcended aggressive advocacy and constituted systematic litigation fraud. By repeatedly misrepresenting facts and law to multiple panels of the Third Circuit Court of Appeals, she

165

demonstrated a coordinated, enterprise-wide commitment to judicial deception. This pattern was not a series of inadvertent errors but a deliberate strategy to obstruct the appellate courts from recognizing the truth: that the removal order was void ab initio and unsupported by law.

407.  In Case Nos. 17-2091 and 17-2620, Defendant Braga argued that the absence of a final removal order deprived the Third Circuit of jurisdiction, without conceding that both orders were jurisdictionally void and subject to review under the All Writs Act. Her filings failed to acknowledge that federal courts retain authority to review ultra vires administrative actions that violate constitutional and statutory limits.

408.  In Case Nos. 19-1848 and 19-2904, Plaintiff cited *United States v. Gonzalez*, 905 F.3d 165 (3d Cir. 2018), to demonstrate that the Pennsylvania stalking statute was indivisible and overbroad, and therefore ineligible for the modified categorical approach. The Third Circuit in Gonzalez held that "different mental states in a statute constitute alternate means and not alternate elements," confirming that statutes structured like *18 Pa. C.S.A. § 2709.1(a)(1)* must be analyzed under the categorical approach. Despite this direct citation, Defendant Braga refused to concede the statute's indivisibility and continued to argue both in briefing and oral argument that Plaintiff's conviction categorically qualified as a "crime of stalking." Her

166

refusal to acknowledge controlling precedent was a deliberate act of evasion.

409. In Case Nos. 20-2027, 22-3279, and 23-1334, Defendant Braga continued her campaign of obstruction by arguing that the Third Circuit lacked jurisdiction to grant relief, rather than acknowledging the government's ongoing harassment of Plaintiff and the constitutional violations embedded in the removal proceedings. Her refusal to concede the government's misconduct and her insistence on jurisdictional technicalities reflected a broader strategy of suppression and delay.

410. Defendant Braga's repeated misrepresentations were made in both written pleadings and oral arguments before the Third Circuit constituted fraud on the court and exceeded the bounds of lawful government advocacy. While she acted in a judicial forum, her conduct was not protected by prosecutorial immunity because it involved deliberate factual and legal misstatements designed to obstruct judicial review and preserve a removal order that was void ab initio. Her litigation posture was not merely adversarial but conspiratorial, forming part of a coordinated enterprise to deny Plaintiff a lawful adjudication and to extend punitive consequences through deception.

### 2. The Enterprise Exposed: A Systemic Pattern of Governmental Overreach

411. The legal framework governing the categorical approach is settled and well within the competence of DHS and DOJ personnel. The enterprise's

167

consistent overreach charging non-citizens with removability under overbroad statutes they know will not categorically match the generic federal definition—is not a flaw in the system; it is a feature of its design. The strategy is to detain individuals for years, leveraging the unbearable pressure of incarceration to force concessions of removability and voluntary deportation from those who lack the resources or fortitude to fight.

412. Plaintiff's case is not an anomaly but part of a documented pattern of government misconduct. Numerous non-citizens who challenge their removability endure years of detention and ultimately obtain relief from the United States Courts of Appeals. See, e.g.: *Barbosa v. Att'y Gen.*, 919 F.3d 1169 (9th Cir. 2019)(Non-citizen's robbery conviction under Or. Rev. Stat. § 164.395 was not categorically a crime involving moral turpitude (CIMT)); *Monteon-Camargo v. Att'y Gen.*, 2019 U.S. App. LEXIS 12720 (5th Cir. 2019)(Non-citizen's conviction for attempted theft from a person under *Texas Penal Code § 31.03.1* was not categorically a CIMT; and BIA's modified definition of CIMTs as announced in Diaz-Lizarraga (2016) cannot be applied retroactively); *Hernandez v. Att'y Gen.*, 914 F.3d 430 (6th Cir. 2019)(Non-citizen's conviction for felonious assault under Mich. Comp. Laws § 750.82 was not CIMT); *Harbin v. Att'y Gen.*, 860 F.3d 58 (2d Cir. 2017)(Non-citizen's conviction for possession of a controlled substance in the fifth degree under

N.Y.P.L. § 220.31 does not constitute the commission of an aggravated felony for immigration purposes).

413.  A review of federal appellate opinions reveals hundreds of published and unpublished decisions where non-citizens prevailed on these exact grounds, demonstrating that the government's theory of removability was legally invalid from the outset. This exposes a widespread, endemic practice among DHS and DOJ personnel of initiating and maintaining legally baseless removal proceedings often in defiance of settled law and binding precedent with the intent to coerce, punish, and remove individuals without lawful justification.

### 3.  The Enterprise's Multi-District Strategy to Maintain Unlawful Detention

414. Defendant Victoria Braga's role as a central coordinator of the enterprise extended beyond the appellate courts and into active, coordinated litigation across multiple federal judicial districts. Acting in concert with ICE and DHS prosecutors, Defendant Braga strategized and executed a nationwide effort to ensure Plaintiff's indefinite detention. She advised local Assistant U.S. Attorneys on how to oppose Plaintiff's release in multiple habeas corpus proceedings, despite the known legal infirmities of the underlying removal order.

415.  This coordination is evidenced by Defendant Braga's involvement in

the following habeas corpus actions:

a) *Vurimindi v. Lowe*, Case No. 3:19-cv-00007-MEM-DB (U.S. District Court for the Middle District of Pennsylvania).

b) *Vurimindi v. Lowe*, Case No. 3:20-cv-00561-MEM-DB (U.S. District Court for the Middle District of Pennsylvania).

c) *Vurimindi v. Gillis et al.*, Case No. 5:19-cv-00106-DCB-MTP (U.S. District Court for the Southern District of Mississippi).

d) *Vurimindi v. Tate et al.*, Case No. 4:20-cv-03357 (U.S. District Court for the Southern District of Texas).

416. In each of these jurisdictions, government counsel echoed the same bad-faith arguments developed by the enterprise, advocating for Plaintiff's continued detention despite the collapse of the legal foundation for removal. Defendant Braga's cross-district advisement ensured a unified, relentless front against Plaintiff's lawful efforts to secure his freedom. This transformed separate legal actions into a single, coordinated campaign of oppression. The enterprise's reach was not confined to any single agency or court but operated as a pervasive network acting in concert to achieve its unlawful objective.

417. This systemic overreach and harassment persist because individual actors DHS prosecutors, ICE officers, Immigration Judges, and BIA

members are effectively insulated by doctrines of immunity. Non-citizens who ultimately prevail lack adequate statutory or legal remedies to pursue meaningful civil rights actions against these bad-faith government employees and obtain just compensation for years of unlawful detention. This lack of accountability fosters a culture of impunity, allowing the enterprise to operate without fear of consequence and perpetuating a cycle of abuse against a vulnerable population.

## VIII.    Criminal Enterprise Objectives And Methods

### 1.  Primary Criminal Objective: Unlawful Sentence Extension

418. The enterprise systematically converted immigration enforcement tools into mechanisms of criminal punishment, unlawfully extending Plaintiff's 2.5-year state sentence into over a decade of federal restraint through:

a) Void detainers that prevented parole eligibility and obstructed state-level sentence completion.

b) Prolonged immigration detention exceeding statutory and regulatory limits.

c) Intensive supervision and travel restrictions that created de facto life sentence conditions, despite no lawful basis for continued restraint.

### 2.  Secondary Criminal Objective: Obstruction of Civil Rights

171

419. The enterprise sought to prevent Plaintiff's lawful return to the United States and obstruct civil litigation against its members by:

a) Strategically timing ICE detainer placements to coincide with key developments in Plaintiff's civil cases.

b) Manufacturing a false "serial litigant" narrative to undermine Plaintiff's credibility before courts and agencies.

c) Weaponizing immigration tools such as detention, deportation threats, and document withholding to block Plaintiff's access to courts, witnesses, and evidence.

### 3. Criminal Methods: Racketeering Pattern

420. The enterprise employed a systematic pattern of racketeering activity, including but not limited to the following predicate offenses under *18 U.S.C. § 1961(1)*:

a) Mail and Wire Fraud (§ 1341, § 1343): Submission of false I-213 forms, fabricated waiver records, and knowingly inaccurate procedural certifications via electronic and postal systems to justify detention and removal.

b) Obstruction of Justice (§ 1503, § 1512): Suppression of exculpatory evidence, manipulation of transcripts, and coordinated efforts to prevent judicial review of the legally void removal order.

172

c) Deprivation of Rights Under Color of Law (§ 242): Use of federal immigration authority to impose criminal punishment without lawful conviction, including denial of access to courts, evidence, and witnesses.

d) Conspiracy to Defraud the United States (§ 371): Coordinated actions between DHS, DOJ, ICE, BIA officials, and private actors to maintain unlawful detention and mislead federal courts.

e) Witness Tampering and Retaliation (§ 1512(b), § 1513): Intimidation of witnesses, interference with testimony, and retaliatory transfers designed to obstruct Plaintiff's habeas and FTCA litigation.

f) Travel Act Violations (§ 1952): Interstate transportation of Plaintiff in retaliation for protected legal activity, including filing civil rights claims and habeas petitions.

g) False Statements (§ 1001): Knowingly submitting false information to federal agencies and courts, including fabricated claims that Plaintiff "did not contest removability" and mischaracterized appeal content.

h) Perjury and Subornation of Perjury (§ 1621, § 1622): False testimony and inducement of false statements in administrative and judicial proceedings to sustain a wrongful conviction and removal order.

173

i) Extortion Under Color of Official Right (Hobbs Act – § 1951): Coercing Plaintiff to abandon litigation or concede removability under threat of prolonged detention and deportation.

j) Fraud Leading to Wrongful Conviction (§ 1341, § 1343): Conspiracy by private actors Borowski, Pattinson, and Addimando to file false police complaints, triggering a wrongful conviction that served as the foundation for immigration enforcement.

k) Theft of Honest Services (§ 1346): Immigration judges and BIA officials who knowingly misrepresented the record or refused to apply binding precedent deprived the public of honest adjudication.

## IX.    Ultra Vires Nature Piercing Immunity

421. The enterprise's conduct constitutes ultra vires action wholly outside lawful authority because:

a) No Immigration Enforcement Purpose: The actions taken were not designed to effectuate removal under the Immigration and Nationality Act (INA), but to extend criminal punishment through civil mechanisms, including prolonged detention, retaliatory transfers, and denial of parole.

b) Knowing Jurisdictional Violations: Defendants proceeded with removal proceedings despite clear knowledge that Plaintiff's conviction was not

174

final and that the Pennsylvania statute did not categorically match the federal definition of a "crime of stalking." These jurisdictional defects were repeatedly raised and deliberately ignored.

c) Criminal Law Enforcement Enterprise: The use of immigration authority to impose punitive consequences, including de facto life sentence conditions, suppression of habeas relief, and obstruction of civil litigation, transformed the proceedings into a criminal enforcement operation conducted under false pretenses.

d) Systematic Corruption and Record Manipulation: The enterprise engaged in falsification of administrative records, fabrication of waiver histories, and coordinated misrepresentation of Plaintiff's appellate posture. These acts were not adjudicative errors, but deliberate frauds designed to insulate a void removal order from judicial scrutiny.

e) Private Actor Conspiracy: The enterprise originated with a conspiracy by private actors Borowski, Pattinson, and Addimando to file false police complaints that triggered a wrongful conviction. Their coordinated actions with government officials to suppress evidence and obstruct justice place them squarely within the scope of RICO liability and pierce any claim to immunity.

422. The enterprise's actions were so far outside the bounds of lawful

175

immigration enforcement that they constitute a criminal law enforcement operation conducted under the false guise of civil authority. These ultra vires acts including fraud, obstruction, retaliation, and conspiracy pierce any claim to prosecutorial, judicial, or qualified immunity. The conduct is actionable under Bivens, the Federal Tort Claims Act (FTCA), and the Administrative Procedure Act (APA), and warrants full judicial scrutiny and civil remedy.

## AGENCY LIABILITY UNDER FTCA FRAMEWORK

### I.    United States Liability Under FTCA

423.  On August 12, 2019, Plaintiff mailed a Notice of Federal Tort Claims Act (FTCA) Claim to the appropriate federal agencies, asserting liability for:

   a) The issuance of an illegal Notice to Appear (NTA) and immigration detainer (FTCA Record, pp. 1).

   b) Malicious prosecution arising from fabricated criminal charges and coordinated false complaints (Id., pp. 4).

   c) Negligent loss of Plaintiff's prescription eyeglasses while in federal custody (Id., pp. 6).

424.  On August 13, 2019, Plaintiff mailed a second Notice of FTCA Claim specifically identifying ultra vires conduct by Immigration Judges (IJ), Board of Immigration Appeals (BIA) Members, and Department of Justice (DOJ) Counsel, including knowingly false adjudications and jurisdictional fraud. (Id.,

176

pp. 8.)

425.  On September 4, 2019, Plaintiff mailed a third Notice of FTCA Claim reiterating the ultra vires conduct of IJ, BIA Members, and DOJ Counsel, and supplementing the factual record with additional evidence of procedural manipulation and record falsification. (Id., pp. 11.)

426.  On June 11, 2020, Plaintiff mailed a Second Notice of FTCA Claim, renewing and expanding the claims for:

   a) Illegal NTA and detainer issuance (Id., pp. 17).

   b) Malicious prosecution (Id., pp. 19).

   c) Loss of eyeglasses in federal custody (Id., pp. 21).

   d) Ultra vires conducts by IJ, BIA Members, and DOJ Counsel (Id., pp. 23).

   e) Independent ultra vires conducts by DOJ Counsel, including litigation fraud and suppression of binding precedent (Id., pp. 27).

427.  On June 17, 2024, Plaintiff mailed a Third Notice of FTCA Claim, consolidating and updating the claims for:

   a) Illegal NTA and detainer (Id., pp. 52).

   b) Malicious prosecution and loss of eyeglasses (Id., pp. 52).

   c) Ultra vires conducts by IJ, BIA Members, and DOJ Counsel (Id., pp. 60, 68).

177

d) Ultra vires conducts by Office of the Principal Legal Advisor (OPLA) Counsel, including deliberate misrepresentation of jurisdictional posture and obstruction of judicial review (Id., pp. 44).

### 1. ICE Institutional Policies And Practices

428. ICE maintained an institutional policy and practice of initiating removal proceedings, lodging detainers, and imposing immigration consequences without verifying the finality of underlying convictions. This failure stemmed from training deficiencies, including the agency's refusal to educate officers on *Orabi v. Attorney General*, 738 F.3d 535 (3d Cir. 2014), and the federal legal standard for conviction finality. ICE lacked supervisory review mechanisms to prevent proceedings based on non-final convictions, resulting in quality control failures. ICE's standard operating procedures demonstrated systematic non-compliance by failing to require verification of appellate exhaustion before charging removability.

429. ICE maintained policies that systematically violated detainer regulations and constitutional requirements. ICE policy permitted the issuance of detainers without adequate probable cause determinations, often relying on fabricated or insufficient evidence. ICE's institutional practice was to maintain detainers regardless of administrative closure or jurisdictional defects, using prolonged detention protocols to circumvent

178

judicial oversight. ICE policy encouraged coordination with state parole boards, presenting detainers as evidence of dangerousness without independent verification, thereby obstructing parole eligibility, and extending criminal punishment.

430. ICE failed to implement adequate policies for training officers on the categorical approach, resulting in widespread misapplication of immigration consequences. Officers routinely misapplied Supreme Court precedent, including *Mathis v. United States*, 579 U.S. 500 (2016), due to institutional ignorance of the legal framework. Supervisors failed to review complex categorical determinations, allowing erroneous removability charges to proceed unchecked. ICE's institutional culture promoted aggressive charging practices regardless of legal sufficiency, embedding a pattern of overreach into agency operations.

### 2. EOIR Institutional Failures

431. EOIR maintained institutional policies that systematically violated due process and jurisdictional requirements. EOIR failed to require verification of conviction finality before proceeding with removal adjudications, resulting in jurisdictional defects. EOIR policies discouraged termination with prejudice even when jurisdiction was clearly lacking, relying on defective administrative closure standards to avoid final adjudication. Supervisory

179

review of jurisdictional determinations was inadequate, allowing legally void proceedings to continue without correction.

432.  EOIR policies systematically denied fair hearings through procedural and evidentiary violations. Detainees were routinely denied access to exculpatory evidence and legal counsel due to restrictive evidence access policies. EOIR's institutional practice was to deny subpoenas for relevant defense evidence while permitting prejudicial government submissions, creating an asymmetrical evidentiary record. EOIR failed to maintain adequate policies for preserving hearing transcripts and administrative records, resulting in gaps that obstructed appellate review and post-conviction relief.

### 3.  BIA Institutional Practices

433. The BIA maintained institutional practices that violated appellate review standards through procedural and analytical defects. BIA policy permitted dismissal of appeals based on factual misrepresentation rather than substantive legal analysis, enabling systematic mischaracterization of Plaintiff's claims. The BIA routinely declared preserved jurisdictional challenges "waived" to avoid engaging with binding precedent and constitutional defects. BIA policy discouraged termination with prejudice, preserving the government's ability to reinitiate removal proceedings despite

180

judicial vacatur, thereby undermining finality and perpetuating harassment.

### 4. DOJ Litigation Practice Violations

434. The Department of Justice (DOJ), through its Office of Immigration Litigation (OIL), maintained institutional litigation policies that violated professional and constitutional standards. DOJ policy permitted systematic misrepresentation of procedural history in appellate briefs, relying on factual distortion protocols to obscure jurisdictional defects. DOJ's institutional practice was to defend legally void proceedings for the purpose of exhausting immigrant resources and delaying judicial relief, using jurisdictional defense strategies that knowingly misrepresented the record. DOJ failed to implement policies requiring disclosure of exculpatory evidence, resulting in systemic suppression of material facts critical to Plaintiff's defense.

435. DOJ's Office of the Principal Legal Advisor (OPLA) maintained prosecution policies that violated constitutional and professional standards. OPLA policy permitted improper coordination with private witnesses prior to testimony, undermining impartiality, and due process. OPLA's institutional practice was to prosecute removal cases despite clear jurisdictional defects, relying on internal protocols that prioritized enforcement over legality. OPLA policy authorized continued supervision of individuals even after case termination, using post-order supervision as a coercive tool to pressure

181

concessions and obstruct litigation.

### 5. DHS Oversight And Coordination Failures

436. The Department of Homeland Security (DHS) maintained institutional policies that facilitated constitutional violations through inter-agency coordination failures. DHS policy permitted the sharing of false or unverified intelligence with state parole systems, using information-sharing protocols that lacked safeguards against fabrication. DHS failed to implement adequate oversight of field office operations, allowing local ICE and CBP units to engage in unlawful detention and enforcement practices. DHS lacked internal policies to prevent systematic constitutional violations, resulting in quality assurance defects that enabled prolonged and unlawful restraint.

437. DHS maintained institutional policies that violated statutory detention limits and undermined judicial finality. DHS policy permitted indefinite detention beyond statutory and regulatory limits, relying on prolonged detention standards that lacked legal justification. DHS maintained supervision protocols that continued even after case termination, obstructing Plaintiff's ability to restructure his life and pursue civil remedies. DHS policy created administrative and procedural barriers to release, including refusal to acknowledge vacated removal orders and reliance on outdated or void

182

charging documents, in direct violation of statutory release standards.

## II.   Vicarious Liability For Employee Conduct

### 1.  Scope of Employment Determinations

438.  All challenged conduct occurred within the scope of employment by federal officials acting under the authority of DHS and DOJ institutional policies. Officers implemented agency directives concerning conviction finality, categorical analysis, and case prosecution through authorized activities. These actions furthered institutional objectives of aggressive immigration enforcement and were executed under direct supervisory oversight and institutional approval, consistent with established supervisory direction.

439.  Federal officials acted with apparent authority in executing agency policies. All conduct was carried out through official government channels, documented as actions taken in official capacity. Agencies provided the resources, training, and institutional support necessary to carry out the challenged conduct. Officials represented their actions as authorized government policy, invoking agency representation to justify decisions and shield misconduct from scrutiny.

### 2.  Policy-Level Decision Making

440.  DHS and DOJ agencies made institutional decisions to proceed with

removal actions despite clear jurisdictional defects. Agency leadership was aware of conviction finality issues and categorical mismatches but chose to proceed, demonstrating management-level awareness and endorsement. Agencies allocated substantial resources to prosecute jurisdictionally defective cases, including litigation support, detention infrastructure, and appellate coordination. Despite recognizing patterns of constitutional violations, agencies failed to implement corrective policies, perpetuating systemic abuse through deliberate inaction.

441. Agencies implemented institutional policies that systematically suppressed exculpatory evidence. Discovery limitation protocols restricted immigrant access to relevant records, including criminal transcripts, appellate filings, and administrative exhibits. Agencies coordinated suppression of material evidence across multiple proceedings, obstructing judicial review and habeas relief. Institutional cover-up policies were designed to conceal constitutional violations from courts, oversight bodies, and internal accountability mechanisms, ensuring that unlawful conduct remained insulated from remedy.

## III.   Negligence And Intentional Tort Liability
### 1.  Negligent Training and Supervision

442. Agencies negligently failed to provide adequate training on

constitutional and statutory requirements. The agencies failed to train officers on federal conviction finality requirements through conviction finality training defects. Agencies failed to provide adequate training on Supreme Court categorical approach through categorical analysis training failures. Agencies failed to train officers on due process requirements in immigration proceedings through constitutional training deficiencies.

443.  Agencies negligently supervised field office operations. The agencies failed to implement adequate review of charging decisions through quality control failures. Agencies failed to identify and correct systematic constitutional violations through pattern recognition failures. Agencies failed to implement corrective measures despite notice of constitutional violations through corrective action failures.

### 2.  Intentional Infliction of Emotional Distress

444. Agencies implemented institutional policies designed to inflict emotional distress as a matter of institutional policy. The agencies maintained policies designed to create prolonged legal uncertainty to coerce concessions through prolonged uncertainty protocols. Agencies engaged in institutional use of deportation threats to coerce cooperation through family separation threats. Agencies maintained institutional policies punishing exercise of constitutional rights through retaliation policies.

185

445.  Agencies used legal processes as instruments of harassment through systematic harassment. Agencies maintained institutional policy of successive prosecutions to exhaust resources through repetitive prosecution strategies. Agencies engaged in systematic manipulation of administrative processes to deny fair hearings through process manipulation. Agencies maintained policies targeting individuals who successfully challenge government action through institutional retaliation.

### 3.  Abuse of Process and False Imprisonment

446.  Agencies engaged in abuse of legal process by using immigration proceedings, detainers, and supervision protocols for purposes unrelated to lawful enforcement. These actions were designed to extend criminal punishment, retaliate for protected litigation, and suppress Plaintiff's civil rights. The legal process was manipulated to achieve objectives not authorized by statute, constituting actionable abuse of process.

447.  Plaintiff was subjected to false imprisonment by federal agents who detained him under void removal orders, non-final convictions, and fabricated detainers. ICE maintained custody despite judicial vacatur and lack of statutory authority, resulting in unlawful restraint of liberty. These actions were committed within the scope of employment and are actionable under FTCA.

186

## IV.    Supervisory and Policy-Maker Liability

### 1.  Final Policy-Maker Actions

448.  Agency heads ratified the challenged conduct through formal policy implementation and resource allocation. DHS and DOJ leadership allocated budgetary and personnel resources to support enforcement practices that violated statutory and constitutional limits. Despite repeated notice of jurisdictional defects, conviction finality violations, and categorical misapplications, agency leadership continued these policies without corrective action. Agencies defended the challenged practices in litigation and administrative proceedings, invoking institutional authority to shield misconduct from scrutiny and judicial review.

449.  Agencies established customs and practices that systematically violated constitutional rights. These institutional precedents were embedded in training materials, policy manuals, and supervisory directives, creating a culture of impunity. Agencies integrated unconstitutional practices into official training protocols, including suppression of exculpatory evidence, denial of due process, and obstruction of judicial review. These policies were systematically implemented across multiple field offices and adjudicative forums, demonstrating that the violations were not isolated incidents but the product of deliberate institutional design.

187

## V.    Jurisdictional Averments and Statutory Waiver of Sovereign Immunity

450.    Plaintiff avers that the claims asserted in ¶¶400–426 fall squarely within the waiver of sovereign immunity codified at *28 U.S.C. §§ 1346(b)*, *2671–2680* and are not barred by any statutory exception.

451.  The United States is the sole proper defendant in FTCA actions. See *FDIC v. Meyer*, 510 U.S. 471, 476 (1994). All tort claims arising from the acts or omissions of employees of ICE, DHS, DOJ, EOIR, and BIA are properly asserted against the United States.

452.  Plaintiff's claims arise from conduct that occurred within the territorial jurisdiction of Pennsylvania, Mississippi, and Texas, and are actionable under the tort law of each respective state. See *Richards v. United States*, 369 U.S. 1, 6–7 (1962).

453. The conduct alleged includes operational negligence, ministerial failure, and ultra vires acts that violated mandatory directives and statutory limits. These acts are not shielded by the discretionary function exception under *28 U.S.C. § 2680(a)*. See *Berkovitz v. United States*, 486 U.S. 531, 536–37 (1988); *Gaubert v. United States*, 499 U.S. 315, 322–23 (1991).

454. Plaintiff further avers that the challenged conduct includes constitutional violations and ultra vires acts taken in clear absence of jurisdiction, which fall outside the scope of lawful discretion and are not

protected by sovereign immunity. See *Lane v. Peña*, 518 U.S. 187, 192 (1996); *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 689–91 (1949).

455. Plaintiff has exhausted administrative remedies pursuant to *28 U.S.C. § 2675(a)*, having timely filed multiple FTCA claims with DHS, DOJ, and EOIR, and received either final denial or constructive exhaustion.

456. Accordingly, this Court possesses subject-matter jurisdiction over Plaintiff's FTCA claims, and Defendant's assertion of sovereign immunity must be rejected as a matter of law.

## CLAIMS FOR RELIEF

### I.  FIRST CLAIM FOR RELIEF

(Violation of Fifth Amendment to the U.S. Constitution – Due Process)
(Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics)
(Against Defendants Hott, Decker, Ritchey, Ervin, Kwiatowski, Hoffman, Reid, Wright, Rife, Espinoza, Ulloa, Joyce, Witte, Bible, Correa, ICE Does 1–10, Bubier, Gaffney, Withrow, Braga, McDonnell, Doll, McLane, and Doyle)

457. Plaintiff realleges and incorporates by reference all allegations contained in paragraphs 1 through 456 of the operative complaint as if fully set forth herein.

458. Defendants Hott, Decker, Ritchey, Ervin, Kwiatowski, Hoffman, Reid, Wright, Rife, Espinoza, Ulloa, Joyce, Witte, Bible, Correa, ICE Does 1–10,

and Government Attorneys Bubier, Gaffney, Withrow, McDonnell, Doll, Braga, McLane, and Doyle (collectively, "ICE Defendants" and "Government Attorneys") engaged in illegal, arbitrary, and capricious detention and supervision practices against Plaintiff over a period exceeding a decade.

459. This prolonged and unlawful detention, coupled with coercive supervision, was undertaken to compel Plaintiff to concede removability and facilitate multiple wrongful deportation orders, despite the absence of lawful authority or jurisdictional basis.

460. Defendants effectuated Plaintiff's deportation by obtaining travel documents, forcibly shackling him, and transporting him onto an airplane bound for India, all without lawful authority or reasonable basis. These actions deprived Plaintiff of his constitutional right to liberty without due process of law, in violation of the Fifth Amendment to the United States Constitution.

461. The ICE Defendants and Government Attorneys acted under color of federal law and in purported performance of official duties, in violation of clearly established constitutional rights of which they knew or should have known.

462. The extended detention, refusal to release despite non-final convictions, falsification of evidence, suppression of exculpatory information,

190

and manipulation of administrative processes constitute intentional, reckless, and deliberately indifferent actions demonstrating a callous disregard for Plaintiff's safety, liberty, and constitutional protections. Defendants deprived Plaintiff of liberty and property through fraud, obstruction, and abuse of process, violating his Fifth Amendment right to due process. Their coordinated misconduct, including falsification of records, suppression of exculpatory evidence, and retaliatory detention, constituted a systemic denial of procedural fairness and access to judicial remedies.

463. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered severe economic damages, physical injuries, and enduring emotional and psychological harm.

464. These violations constitute actionable claims under Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971), and entitle Plaintiff to compensatory damages, punitive damages, and such other relief as the Court deems just and proper.

## II.   SECOND CLAIM FOR RELIEF

(Fifth Amendment to the U.S. Constitution / Equal Protection)
(Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics)
(Against Defendants Hott, Decker, Ritchey, Ervin, Kwiatowski, Hoffman, Reid, Wright, Rife, Espinoza, Ulloa, Joyce, Witte, Bible, Correa, ICE Does 1–10, Bubier, Gaffney, Withrow, Braga, McDonnell, Doll, McLane, and Doyle)

191

465. Plaintiff hereby realleges and incorporates by reference all preceding paragraphs 1 through 464 as though fully set forth herein.

466. Defendants, acting individually and collectively as ICE enforcement agents, attorneys, and officials, unlawfully and arbitrarily detained Plaintiff for over a decade post-imposition of his state court sentence with the specific intent to coerce Plaintiff into voluntarily conceding removability and to secure multiple wrongful deportation orders, including procuring travel documents and forcibly transporting him, shackled, onto an airplane for removal to India.

467. These actions were carried out with discriminatory animus against Plaintiff based on his race, ethnicity, national origin, and perceived immigration status, resulting in a deliberate denial of Plaintiff's right to equal protection under the law, guaranteed by the Due Process Clause of the Fifth Amendment to the United States Constitution.

468. Defendants Hott, Decker, Ritchey, Ervin, Kwiatowski, Hoffman, Reid, Wright, Rife, Espinoza, Ulloa, Joyce, Witte, Bible, Correa, ICE Does 1–10, and Government Attorneys Bubier, Gaffney, Withrow, Braga, McDonnell, Doll, McLane, and Doyle acted under color of federal law and purported to perform official duties pursuant to federal statutes, regulations, and policies, yet did so with knowledge, or with reckless disregard of clearly established

192

constitutional protections, exhibiting intentional and purposeful discrimination against Plaintiff.

469. Defendants' conduct encompassed policies, patterns, practices, omissions, and customs which evidenced deliberate indifference and callous disregard to Plaintiff's constitutional rights and personal liberty, subjecting him to prolonged unlawful incarceration, deprivation of procedural protections, obstruction of access to counsel and courts, and extended immigration supervision beyond any lawful or statutory authority.

470. These violations constitute compensable constitutional torts under the cause of action recognized in *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

471. As a direct and proximate result of the deliberate and discriminatory acts and omissions of these Defendants, Plaintiff has suffered significant economic losses, physical injury, emotional distress, reputational harm, loss of property including critical personal effects, and deprivation of liberty, all in contravention of the Fifth Amendment right to equal protection and due process.

472. Defendants' conduct was rooted in discriminatory animus and executed through institutional mechanisms that disproportionately targeted Plaintiff based on his race, ethnicity, national origin, and perceived

immigration status. The enforcement actions taken against Plaintiff, prolonged detention, repeated denial of release, retaliatory transfers, and obstruction of judicial access, were not isolated or incidental, but part of a broader pattern of selective enforcement and coercive supervision disproportionately imposed on South Asian nationals. The absence of lawful basis, coupled with the timing, intensity, and persistence of these actions, evidences purposeful discrimination and a deliberate departure from neutral enforcement standards. Plaintiff need not identify a specific comparator to establish this claim, as the totality of circumstances, including Defendants' intent, institutional posture, and repeated deviation from legal norms, independently supports the finding of unconstitutional discrimination under the Fifth Amendment.

## III.    THIRD CLAIM FOR RELIEF

(Fourth Amendment to the United States Constitution)
(Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics)
(Against Defendants Hott, Decker, Ritchey, Ervin, Kwiatowski, Hoffman, Reid, Wright, Rife, Espinoza, Ulloa, Joyce, Witte, Bible, Correa, ICE Does 1–10, Bubier, Gaffney, Withrow, Braga, McDonnell, Doll, McLane, and Doyle)

473.  Plaintiff hereby realleges and incorporates by reference all preceding paragraphs 1 through 472 as though fully set forth herein.

474.  Defendants Hott, Decker, Ritchey, Ervin, Kwiatowski, Hoffman, J.

194

Reid, Wright, Rife, Espinoza, Ulloa, John Doe, Bible, Correa, the ICE Does 1–10, and Government Attorneys Bubier, Gaffney, Withrow, Braga, McLane, and Doyle, acting under color of federal law and purporting to perform their official duties pursuant to federal, state, and local laws, intentionally subjected Plaintiff to prolonged detention without lawful basis.

475. These Defendants knowingly, or with deliberate indifference, violated Plaintiff's clearly established constitutional right under the Fourth Amendment to be free from unreasonable seizures, through their unlawful detention, prolonged incarceration, and refusal to release Plaintiff despite the absence of probable cause and jurisdiction, including knowingly maintaining detainers based on non-final convictions and faulty legal grounds.

476. The actions, omissions, policies, patterns, customs, and practices of these Defendants reflect a calculated and reckless disregard for Plaintiff's liberty, security, and constitutional protections. Defendants extended Plaintiff's detention beyond his valid criminal sentence by leveraging immigration detainers, obstructed timely release on parole, and coerced Plaintiff's submission to invalid removal proceedings with full knowledge of the absence of legal authority.

477. These Defendants' conduct amounted to a willful and ultra vires deprivation of Plaintiff's rights, exceeding any lawful authority and falling

195

outside the protection of qualified or prosecutorial immunity, given that such violations were obvious and known to reasonable officials.

478. As a direct and proximate result of these constitutional violations, Plaintiff suffered substantial economic loss, including deprivation of property and business opportunities, physical injuries, severe emotional distress, reputational harm, and the violation of his fundamental rights to liberty and due process, entitling him to damages under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

## IV.  FOURTH CLAIM FOR RELIEF

(Violation of Fifth Amendment to the U.S. Constitution – Due Process; Section 504 of the Rehabilitation Act of 1973; Immigration and Nationality Act)
(Damages and Injunctive Relief to Protect Mentally Disabled Persons from Illegal Deportation)
(Brought Against Defendants Pam Bondi, Kristi Noem, Sirce E. Owen, Todd Lyons, Anna C. Little, Garry D. Malphrus, and Marcos Charles in their official capacities)

479. Plaintiff hereby realleges and incorporates by reference all preceding paragraphs 1 through 478 as though fully set forth herein.

480. Defendants Bondi (Attorney General), Noem (Secretary of Homeland Security), Owen (Director of EOIR), Lyons (Director of ICE), Little (Chief Immigration Judge), Malphrus (Chief Appellate Immigration Judge), and

196

Charles (Director of ICE Office of Detention and Removal) are officials responsible for the oversight, implementation, and enforcement of immigration policies and procedures within federally funded agencies subject to Section 504 of the *Rehabilitation Act, 29 U.S.C. § 794*.

481. Plaintiff, who was designated as mentally ill and placed under enhanced psychiatric supervision by the Pennsylvania DOC, a status of which Defendants were aware or should have been aware, qualifies as an individual with a disability under *29 U.S.C. § 705* and *42 U.S.C. § 12102* due to his documented mental health conditions and repeated manifestations of cognitive and psychological impairments, which Defendants disregarded by denying accommodations, refusing to appoint legal assistance, and ignoring professional evaluations throughout his immigration detention and proceedings.

482. Section 504 of the Rehabilitation Act prohibits discrimination on the basis of disability by any program or activity receiving federal financial assistance, including immigration detention, adjudication, and removal processes administered by DHS, ICE, DOJ, and EOIR.

483. These Defendants owed Plaintiff a legal and constitutional duty to promulgate, implement, and enforce policies that identify, accommodate, and protect individuals with mental disabilities in immigration custody and

proceedings. This includes mandatory competency evaluations, appointment of counsel, access to legal resources, and procedural safeguards tailored to disability-related limitations.

484. The Due Process Clause of the Fifth Amendment mandates fairness in all government proceedings, including immigration adjudications. Where a respondent lacks mental competence to represent themselves, due process requires accommodations such as appointed counsel and modified procedures to ensure meaningful participation and protection of liberty interests.

485. The *Immigration and Nationality Act*, *8 U.S.C. § 1229a(b)(4)*, guarantees respondents a full and fair opportunity to examine evidence, present witnesses, and contest removal. For mentally disabled individuals, this statutory guarantee logically requires procedural accommodations and legal representation to ensure effective advocacy.

486. Despite actual knowledge of Plaintiff's disability, Defendants failed to implement any meaningful safeguards. They neglected to assess Plaintiff's competency, failed to appoint counsel, denied access to exculpatory evidence, and permitted removal proceedings to continue without accommodations, resulting in a fundamentally unfair process.

487. These failures led to Plaintiff's misidentification as a dangerous

criminal alien, prolonged detention, family separation, and ultimately illegal deportation, all based on fabricated or unsupported evidence and in violation of constitutional and statutory protections.

488. Defendants' refusal to implement disability accommodation policies including legal representation, communication assistance, and procedural safeguards, constitutes intentional discrimination under the Rehabilitation Act and a deprivation of liberty without due process under the Fifth Amendment.

489. These acts and omissions reflect deliberate indifference and reckless disregard for Plaintiff's mental disability and constitutional rights, resulting in severe emotional distress, physical harm, reputational damage, and irreparable infringement of civil liberties.

490. The violations alleged herein are actionable under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), Section 504 of the Rehabilitation Act, and the Immigration and Nationality Act, entitling Plaintiff to compensatory and punitive damages, declaratory relief, and injunctive relief.

491. Plaintiff seeks declaratory and injunctive relief mandating Defendants to implement comprehensive policies for identifying and accommodating mentally disabled individuals in immigration enforcement and adjudication,

199

including mandatory competency evaluations, appointment of counsel, procedural modifications, and prohibition of discriminatory detention and removal practices.

492. Plaintiff further seeks compensatory damages for the harms suffered, a permanent injunction preventing recurrence of such abuses, and any additional relief this Court deems just and proper to safeguard the rights of mentally disabled individuals in immigration custody.

493. During the course of Plaintiff's immigration proceedings, Defendant judicial officers, including Judge Durling, referred to Plaintiff using the clinical term "delusional" without any formal psychiatric evaluation or evidentiary basis. This characterization was used to dismiss Plaintiff's legal arguments and justify adverse rulings, despite documented mental health impairments and placement under psychiatric supervision. The use of such terminology without procedural safeguards or disability accommodations constitutes constructive notice of Plaintiff's disability and triggered a legal duty under the Rehabilitation Act and the Due Process Clause to assess competency, appoint counsel, and modify procedures accordingly. Defendants' failure to do so reflects deliberate indifference and unlawful discrimination.

## V.   FIFTH CLAIM FOR RELIEF

(Violation of Fifth Amendment Due Process – Systemic Policy Failures)

200

(Injunctive Relief Sought to Protect U.S. Citizens and Lawful Residents from Removal Based on Non-Final or Categorically Mismatched Convictions)
(Brought Against Defendants Kristi Noem, Sirce E. Owen, Anna C. Little, Garry D. Malphrus, Todd Lyons, and Marcos Charles in their Official Capacities)

494.  Plaintiff hereby realleges and incorporates by reference all preceding paragraphs 1 through 493 as though fully set forth herein.

495.  Defendants Noem (Secretary of DHS), Owen (Director of EOIR), Little (Chief Immigration Judge), Malphrus (Chief Appellate Immigration Judge), Lyons (Director of ICE), and Charles (Director of ICE Office of Detention and Removal) (collectively, "Agency Head Defendants") are final policymakers for their respective agencies. They are responsible for promulgating, implementing, and enforcing the policies, practices, and procedures that govern the initiation and adjudication of removal proceedings.

496. The Due Process Clause of the Fifth Amendment prohibits the government from depriving any person of liberty or property without constitutionally adequate procedures. For U.S. citizens, the initiation of removal proceedings is per se unlawful absent verified renunciation, fraud, or error. The Constitution demands that agencies implement safeguards to prevent the initiation and maintenance of ultra vires proceedings against citizens and lawful residents.

201

497.  Agency Head Defendants, through official policy, custom, or deliberate indifference, have maintained systems that are structurally defective and prone to error, resulting in the unlawful targeting of U.S. citizens and lawful residents for removal. These systemic failures include:

a) Finality Verification Failure: The absence of a mandatory policy requiring ICE and DHS attorneys to confirm that a predicate conviction is final i.e., all direct appellate review has been exhausted or waived before issuing a Notice to Appear (NTA) or lodging a detainer, in direct contravention of *Orabi v. Attorney General*, 738 F.3d 535 (3d Cir. 2014).

b) Categorical Analysis Failure: The failure to train and require ICE and DHS attorneys to apply the categorical approach (*Taylor*, *Descamps*, *Mathis*) before charging removability, resulting in proceedings initiated on legally invalid theories.

c) Jurisdictional Integrity Failure: The policy of opposing motions to terminate proceedings even after jurisdictional defects are apparent, and the practice of dismissing cases "without prejudice" to preserve the ability to refile charges, thereby subjecting individuals to perpetual legal jeopardy.

d) Citizenship Verification Failure: The absence of a mandatory protocol requiring ICE and DHS to verify citizenship status including review of

202

birth records, naturalization certificates, and sworn affidavits before initiating removal proceedings, resulting in the unlawful targeting of U.S. citizens.

498. These policies and practices were the direct and proximate cause of the decade-long campaign of unlawful detention, supervision, and removal efforts against Plaintiff, a U.S. citizen, based on a conviction that was neither final nor categorically removable under federal law.

499. The systemic deficiencies described herein are not isolated to Plaintiff's case but reflect a broader institutional failure within DHS, ICE, and EOIR. Without injunctive relief, these agencies will continue to expose U.S. citizens and lawful residents to unconstitutional deprivation of liberty and property through defective removal proceedings.

500. Plaintiff is a naturalized United States citizen and, as such, possesses an irrevocable constitutional right to remain in the United States, free from removal proceedings absent lawful renunciation or fraud. The initiation and maintenance of removal proceedings against Plaintiff, despite his citizenship status and the absence of a final or categorically removable conviction, constituted a jurisdictional nullity and a per se violation of the Fifth Amendment. The systemic policy failures described herein particularly the lack of mandatory citizenship verification, conviction finality review, and

categorical analysis, continue to expose Plaintiff to collateral consequences, reputational harm, and the substantial risk of reinitiated proceedings or extended supervision. Plaintiff's standing to seek injunctive relief is grounded not only in the concrete injuries suffered but in the ongoing threat posed by institutional practices that remain uncorrected and capable of repetition, yet evading review.

501.  Plaintiff seeks injunctive relief requiring the Agency Head Defendants to promulgate and implement the following systemic safeguards:

a) A mandatory pre-charge verification procedure requiring ICE to obtain and review complete state court dockets to confirm conviction finality before issuing an NTA or lodging a detainer.

b) A mandatory legal review procedure requiring DHS attorneys to apply the categorical approach and certify that a state conviction matches a generic federal removable offense before filing charges.

c) A policy mandating that Immigration Judges and the BIA terminate proceedings with prejudice where jurisdiction was lacking ab initio, including cases involving non-final convictions or categorical mismatches.

d) Comprehensive mandatory training for ICE and DHS attorneys on conviction finality under Orabi and categorical analysis under Taylor, Descamps, and Mathis.

e) A categorical bar on initiating removal proceedings against individuals claiming U.S. citizenship without first conducting a formal citizenship verification process, including review of birth records, naturalization certificates, and sworn affidavits.

502. WHEREFORE, Plaintiff respectfully requests that this Court grant injunctive relief as specified above and award any further relief the Court deems just and proper to prevent recurrence of these systemic constitutional violations.

## VI.    SIXTH CLAIM FOR RELIEF

(Violation of the Fifth Amendment – Due Process Clause)
(Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics)
(Against Defendants Durling, Pauley, Guendelsberger, Gemoets, and O'Connor in Their Individual Capacities)

503. Plaintiff hereby realleges and incorporates by reference all preceding paragraphs 1 through 502 as though fully set forth herein.

504. At all relevant times, Defendants Walter Durling, Roger Pauley, John Guendelsberger, Marcos Gemoets, and Blair O'Connor (collectively, "Administrative Adjudicators") acted under color of federal law but in a

205

manner that deprived Plaintiff of his clearly established rights under the Due Process Clause of the Fifth Amendment.

505. Administrative Adjudicators unlawfully exercised jurisdiction over Plaintiff despite knowing that, under binding Third Circuit precedent (e.g., *Orabi v. Att'y Gen.*, 738 F.3d 535 (3d Cir. 2014)), a conviction must be final i.e., no longer subject to direct appellate review before it may trigger immigration consequences. Plaintiff's conviction was not final under Pennsylvania law when removal proceedings were initiated or adjudicated, and Administrative Adjudicators had actual or constructive knowledge of this jurisdictional defect.

506. In complete disregard of this jurisdictional bar, Defendants knowingly misapplied the INA by classifying Plaintiff's non-final conviction under *18 Pa. C.S.A. § 2709.1(a)(1)* as a removable "crime of stalking" and "aggravated felony," despite its lack of elements matching the federal generic definitions. In doing so, they violated the Supreme Court's categorical and modified categorical approach mandates, including *Taylor v. United States*, *Moncrieffe v. Holder*, *Descamps v. United States*, and *Mathis v. United States*.

507. Administrative Adjudicators are not vested with specialized expertise in interpreting state criminal statutes and are legally bound to apply the

206

categorical approach as articulated in *Taylor*, *Descamps*, and *Mathis*. Despite this limitation, Defendants usurped jurisdiction by recharacterizing Plaintiff's non-final Pennsylvania conviction under *18 Pa. C.S.A. § 2709.1(a)(1)* as a removable offense, ignoring its statutory elements and categorical mismatch. Their actions reflect a deliberate departure from legal standards and a misuse of adjudicative authority to achieve predetermined enforcement outcomes.

508. Administrative Adjudicators knew that they lacked subject matter jurisdiction under *8 U.S.C. §§ 1227* and *1229(d)*, and that Plaintiff remained a Lawful Permanent Resident (LPR) not convicted of a deportable offense. Yet they nonetheless entered multiple void removal orders to facilitate ICE Defendants' unlawful detention, supervision, and eventual deportation.

509. Administrative Adjudicators derive their jurisdiction exclusively from statutory authority under the Immigration and Nationality Act, including *8 U.S.C. §§ 1229(a)* and *1227(a)*, which impose clear prerequisites for initiating and adjudicating removal proceedings. These prerequisites include the existence of a final conviction and a removable offense that categorically matches the federal definition. Where these conditions are not met, adjudicators lack subject matter jurisdiction, and any orders issued are void ab initio. Defendants knowingly proceeded despite the absence of these

207

statutory prerequisites, rendering their actions ultra vires and constitutionally infirm.

510.  Defendants compounded these violations by denying Plaintiff access to basic procedural safeguards despite being aware of his mental health impairments and the I-213 notations that he was under mental health supervision. They refused to provide reasonable accommodations, failed to delay proceedings to allow Plaintiff to secure counsel, and rejected Plaintiff's repeated requests for subpoenas and evidence production actions that violated both *Matter of M-A-M-* and *Matter of J-R-R-A-* due process standards.

511.  These actions were not mere legal errors. Administrative Adjudicators knowingly participated in an unlawful scheme to convert immigration proceedings into punitive criminal enforcement tools in furtherance of a coordinated criminal enterprise, whose purpose was to extend Plaintiff's punishment, obstruct civil litigation, and remove him from the United States without legal basis.

512. Defendants' adjudications ignored binding precedent, excluded exculpatory evidence, suppressed Plaintiff's jurisdictional objections as "waived" without cause, and misrepresented facts about conviction finality. Their conduct furthered the retaliatory and unlawful objectives of DOJ, ICE,

208

and OPLA officials, rendering proceedings void ab initio.

513. These ultra vires actions caused Plaintiff to be detained, surveilled, and ultimately deported without lawful authority or meaningful judicial review. They directly deprived Plaintiff of liberty and property without due process in violation of the Fifth Amendment.

514. Administrative Adjudicators' conduct was intentional, reckless, and in conscious disregard of Plaintiff's constitutional rights. Their acts fell outside the scope of any judicial immunity, as they were taken in complete absence of jurisdiction, and involved non-judicial functions including aiding ICE in executing a deportation unsupported by law. Their actions were not adjudicative in nature but administrative and enforcement-oriented, including coordination with ICE to execute removal orders lacking legal foundation, thereby falling outside the protections of judicial immunity under *Stump v. Sparkman*, 435 U.S. 349 (1978), and its progeny.

515. These violations are actionable under *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971). Plaintiff seeks damages for physical, emotional, reputational, and economic harm, including prolonged detention, deportation, loss of property, and the destruction of his career.

## VII.   SEVENTH CLAIM FOR RELIEF

(Fifth Amendment – Equal Protection Component of Due Process Clause)

(Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics)
(Against Defendants Durling, Pauley, Guendelsberger, Gemoets, and
O'Connor in Their Individual Capacities)

516.  Plaintiff hereby realleges and incorporates by reference all preceding paragraphs 1 through 485 as though fully set forth herein.

517.  At all relevant times, Defendants Walter Durling, Roger Pauley, John Guendelsberger, Marcos Gemoets, and Blair O'Connor ("Administrative Adjudicators") acted under color of federal law and within the Executive Office for Immigration Review ("EOIR") and Board of Immigration Appeals ("BIA"). In so doing, they engaged in intentional, unlawful discrimination against Plaintiff on the basis of his national origin, ethnicity, and race, thereby violating his rights under the equal protection component of the Fifth Amendment's Due Process Clause.

518.  Administrative Adjudicators were aware that Plaintiff was the only male of Indian origin, Hindu faith, and South Asian ethnicity residing in the targeted Philadelphia condominium. They were aware of the racialized context surrounding Plaintiff's state court prosecution, including falsified civilian complaints designed to paint him as a security threat, and ICE's surveillance and profiling efforts that preceded any criminal conviction. Nevertheless, Defendants ignored these red flags and treated Plaintiff differently from similarly situated respondents without any neutral or lawful justification.

519. Administrative Adjudicators ratified and advanced a racially motivated campaign by rubber-stamping void removal orders based on non-final convictions, rejecting valid jurisdictional defenses as "waived," and facilitating ICE's continued efforts to detain and deport Plaintiff despite binding circuit precedent (e.g., *Orabi v. Att'y Gen.*, 738 F.3d 535 (3d Cir. 2014)) holding such removal unlawful.

520. Plaintiff was denied safeguards routinely afforded to other non-citizens in immigration proceedings, including appointment of counsel in light of his mental health needs, assistance securing exculpatory evidence, and the opportunity to meaningfully participate in his own defense. Administrative Adjudicators selectively ignored federal rules and agency precedents (e.g., *Matter of M-A-M-*, 25 I&N Dec. 474 (BIA 2011)) in order to facilitate Plaintiff's removal and conceal enterprise misconduct.

521. The disparate treatment Plaintiff suffered was not the result of mere oversight or poor judgment. It was the product of purposeful discrimination or, at minimum, deliberate indifference to Plaintiff's right to equal protection under the law. Defendants treated Plaintiff not as a lawful permanent resident entitled to the full protections of the Constitution, but as a disposable foreigner—based on his origin, religion, and ethnicity.

522. These actions occurred in the absence of lawful jurisdiction and in

211

furtherance of a criminal enterprise that weaponized immigration adjudication for punitive and retaliatory purposes, including to obstruct Plaintiff's civil litigation and shield state and federal officials from accountability. These actions were not isolated or incidental, but part of a broader pattern of discriminatory adjudication and retaliatory enforcement targeting Plaintiff based on protected characteristics, in coordination with ICE and DOJ officials.

523. The conduct of Defendants Durling, Pauley, Guendelsberger, Gemoets, and O'Connor violated clearly established constitutional rights of which they knew, or of which any reasonable official would have known.

524. These violations are actionable under *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971), and entitle Plaintiff to compensatory and punitive damages. As a direct and proximate result of these unlawful acts, Plaintiff suffered unlawful incarceration, deportation, surveillance, economic loss, reputational injury, and severe emotional distress.

## VIII. EIGHTH CLAIM FOR RELIEF

(Violation of the Fourth Amendment – Unreasonable Seizure)
(Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics)
(Against Defendants Durling, Pauley, Guendelsberger, Gemoets, and
O'Connor in Their Individual Capacities)

525. Plaintiff hereby realleges and incorporates by reference all preceding paragraphs 1 through 524 as though fully set forth herein.

212

526. Defendants Walter Durling, Roger Pauley, John Guendelsberger, Marcos Gemoets, and Blair O'Connor ("Administrative Adjudicators"), acting under color of federal law, knowingly and unlawfully aided and abetted ICE and DOJ officials in detaining Plaintiff in violation of his Fourth Amendment right to be free from unreasonable seizures.

527. Plaintiff's prolonged immigration detention and supervision, which continued even after it was judicially established that he was not removable, constituted an unlawful seizure unsupported by probable cause, legal authority, or jurisdictional basis. The immigration proceedings that purported to justify his detention were void ab initio, as they were predicated on a conviction that was not final and on statutes that categorically did not apply.

528. Administrative Adjudicators had actual or constructive knowledge that Plaintiff's Pennsylvania stalking conviction was not final for immigration purposes under *Orabi v. Att'y Gen*., 738 F.3d 535 (3d Cir. 2014), and that the statutory predicates for removability (e.g., "crime of stalking," "crime of violence," "aggravated felony") were inapplicable to his offense under the categorical and modified categorical approach required by Moncrieffe, Mathis, and Descamps. Nonetheless, they issued and upheld void removal orders to provide ICE with a pretext to continue detaining Plaintiff.

529. This seizure was not incident to a lawful removal process, but rather

213

part of a criminal law enforcement scheme designed to extend Plaintiff's state criminal sentence through extra-judicial federal punishment. By adjudicating under a knowingly fabricated record including a false I-213 and misclassified offense, Administrative Adjudicators became active participants in an ultra vires enterprise operating outside the bounds of immigration law. These actions were not incidental to immigration adjudication but constituted a deliberate misuse of administrative authority to facilitate unlawful detention under the guise of civil enforcement, thereby transforming immigration proceedings into a punitive extension of Plaintiff's expired criminal sentence.

530. The seizure of Plaintiff's person was thus unreasonable within the meaning of the Fourth Amendment. It was carried out without valid legal process, without probable cause, and in disregard of binding circuit authority invalidating the government's removal theory.

531. These actions were not judicial in nature, nor protected by judicial immunity, because they were taken in the complete absence of jurisdiction and in furtherance of ICE's execution of illegal detainers and prolonged post-order custody. The adjudicators' conduct was administrative and enforcement-oriented, including coordination with ICE to execute detention unsupported by lawful orders, and therefore fell outside the scope of judicial

214

immunity under *Stump v. Sparkman*, 435 U.S. 349 (1978), and its progeny.

532. Defendants' actions violated clearly established constitutional rights. Any reasonable adjudicator would have known that continued detention under these circumstances, especially where jurisdictional defects were repeatedly raised, violated the Fourth Amendment's guarantee against unreasonable seizures.

533. These violations are compensable under *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971). As a direct and proximate result of the unlawful conduct of these Defendants, Plaintiff was subjected to over 26 months of illegal ICE detention and multiple years of unlawful ISAP supervision, causing significant loss of liberty, emotional and psychological harm, economic loss, reputational damage, and physical injury.

## IX.    NINTH CLAIM FOR RELIEF

(False Imprisonment – *Federal Tort Claims Act*, *28 U.S.C. § 1346(b), §§ 2671–2680*)
(Against Defendant United States of America)

534. Plaintiff hereby realleges and incorporates by reference all preceding paragraphs 1 through 533 as though fully set forth herein.

535. This claim is brought against the United States of America pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346(b) and §§ 2671–2680, for damages caused by the tortious conduct of federal employees

215

including ICE Officers, DHS agents, EOIR adjudicators, and DOJ attorneys acting within the scope of their employment.

536. Federal officials, including ICE Field Directors, deportation officers, OPLA attorneys, EOIR Immigration Judges, and BIA members, acting in coordination and under color of federal authority, intentionally and unlawfully deprived Plaintiff of his liberty through a sustained course of false imprisonment, including:

a) Filing a fabricated Form I-213 that falsely stated Plaintiff's stalking conviction was final,

b) Initiating removal proceedings despite knowing that Plaintiff's conviction lacked finality under Pennsylvania and Third Circuit law,

c) Charging Plaintiff as removable under statutes that categorically did not apply to the offense of conviction,

d) Detaining Plaintiff under void immigration detainers even during administrative closure,

e) Repeatedly obtaining and enforcing removal orders despite controlling circuit precedent (*Orabi v. Att'y Gen.*, 738 F.3d 535 (3d Cir. 2014)) invalidating removability,

f) Procuring travel documents and forcibly deporting Plaintiff to India despite the lack of lawful authority, and

216

g) Detaining Plaintiff in ICE custody and ISAP supervision for more than a decade to coerce a concession of removability and to obstruct his civil litigation against enterprise participants.

537. These acts were committed knowingly and deliberately, with actual knowledge that Plaintiff's detention and removal lacked lawful basis. Defendants' intentional torts such as false imprisonment, and abuse of process are not protected by the discretionary function exception and fall within the FTCA's waiver of sovereign immunity. The United States, through its employees, used immigration enforcement mechanisms not for any lawful administrative purpose, but to unlawfully extend Plaintiff's punishment beyond the term imposed by state court and to prevent him from pursuing legal claims against public officials and private co-conspirators.

538. Plaintiff never consented to any of the detentions, deportation efforts, or ISAP surveillance imposed upon him by ICE and other federal officials. At all times, he contested his removability, objected to continued detention, and asserted jurisdictional defenses, which were ignored or deliberately suppressed.

539. The prolonged and unlawful restraint on Plaintiff's liberty was not based on a facially valid warrant or judicial order. It arose from a void administrative process grounded in fraud, false evidence, and legal

217

misrepresentation, rendering the entire period of detention and removal legally unauthorized and tortious under state-law principles incorporated into FTCA.

540. Plaintiff filed administrative claims with the Department of Homeland Security, the Department of Justice, and the Executive Office for Immigration Review, fully describing the factual basis of this tort. More than six (6) months have passed since filing, and Plaintiff has received no response, thereby exhausting administrative remedies under *28 U.S.C. § 2675(a)*.

541. As a direct and proximate result of this unlawful and tortious conduct by federal employees, Plaintiff suffered severe injury, including:

a) 26+ months of unlawful ICE detention.

b) years of coercive ISAP supervision.

c) loss of employment and income.

d) forced foreclosure of his Philadelphia condominium.

e) physical injury while in custody.

f) emotional and psychological distress.

g) reputational harm from being wrongfully labeled as deportable and dangerous.

542. These harms are compensable under the FTCA, and Plaintiff demands judgment against the United States of America in an amount to be

218

determined at trial.

543. Plaintiff's FTCA claim is timely under principles of equitable tolling and delayed accrual. After submitting his initial FTCA notice and filing a habeas corpus petition, Plaintiff was subjected to retaliatory transfer to a new detention facility and continued threat of removal, despite the government's knowledge that Plaintiff was not lawfully removable. These retaliatory actions created a coercive environment that prevented Plaintiff from safely pursuing his claims. Plaintiff acted diligently and filed a renewed FTCA notice within one month of receiving formal recognition of his U.S. citizenship, which neutralized the threat of removal and enabled him to assert his rights without fear of further retaliation. Under *Irwin v. Department of Veterans Affairs*, 498 U.S. 89 (1990), and related precedent, these extraordinary circumstances justify tolling and render this action timely.

544. The tortious acts and omissions giving rise to Plaintiff's FTCA claims occurred across multiple jurisdictions, including Pennsylvania, Mississippi, and Texas. Plaintiff was unlawfully detained, surveilled, and subjected to retaliatory transfers and ISAP supervision in facilities located in these states. Under *28 U.S.C. § 1346(b)*, the United States is liable "in accordance with the law of the place where the act or omission occurred." Accordingly, Plaintiff's claims for false imprisonment, negligence, and intentional infliction

219

of emotional distress are governed by the applicable tort law of Pennsylvania, Mississippi, and Texas, respectively, and are actionable under the FTCA to the full extent permitted by each jurisdiction's legal standards.

## X.   TENTH CLAIM FOR RELIEF

(Negligence – *Federal Tort Claims Act*, *28 U.S.C. § 1346(b), §§ 2671–2680*)
(Against Defendant United States of America)

545.  Plaintiff hereby realleges and incorporates by reference all preceding paragraphs 1 through 544 as though fully set forth herein.

546.  This claim is brought against the United States of America pursuant to the *Federal Tort Claims Act* ("FTCA"), *28 U.S.C. § 1346(b)*, for damages resulting from the negligence of employees and officers of the Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), the Department of Justice (DOJ), the Executive Office for Immigration Review (EOIR), and the Board of Immigration Appeals (BIA), acting within the scope of their employment.

547.  The United States owed Plaintiff a duty to exercise reasonable care in the enforcement of immigration laws, particularly where detention, deportation, and fundamental constitutional rights were at stake. That duty included verifying legal predicates for removal, applying established legal

220

standards, accommodating mental health conditions, and avoiding discriminatory practices. This duty is heightened where federal officers exercise custodial authority over individuals asserting protected legal status, such as Lawful Permanent Residents or U.S. citizens, and where enforcement actions implicate liberty, property, and due process rights under the Fifth Amendment and Rehabilitation Act.

548. ICE officials, OPLA attorneys, government litigators, and immigration adjudicators breached that duty through acts and omissions that fell below the standard of care required of similarly situated federal officers. These negligent acts include, but are not limited to:

a) Failure to review the Case-4 docket and related filings which conclusively showed Plaintiff's conviction was not final for immigration purposes under Pennsylvania and federal law, thereby negating any lawful basis for removal.

b) Negligently initiating and continuing removal proceedings despite actual or constructive knowledge that Plaintiff's stalking conviction under *18 Pa. C.S.A. § 2709.1(a)(1)* did not qualify as a "crime of violence," "aggravated felony," or "crime of stalking" under the categorical approach mandated by *Taylor, Moncrieffe, Descamps,* and *Mathis*.

221

c) Detaining Plaintiff unlawfully for over a decade, including 26+ months of ICE custody and multiple years under ISAP supervision, as part of a coercive campaign to force a concession of removability.

d) Failing to provide accommodations or appointing counsel for Plaintiff during removal proceedings, despite documented indicators of mental health impairment, in violation of *Matter of M-A-M-,* 25 I&N Dec. 474 (BIA 2011), and DHS obligations under the Rehabilitation Act.

e) Creating, tolerating, or negligently failing to prevent policies and practices that led to discriminatory profiling, targeting, and extended detention of individuals based on race, national origin, and perceived immigration status.

f) Negligently failing to train and supervise ICE, EOIR, and OPLA personnel, resulting in widespread violations of Plaintiff's constitutional rights and statutory protections.

g) Deporting a Lawful Permanent Resident based on a non-final and non-removable conviction, despite binding Third Circuit precedent (*Orabi v. Att'y Gen.*, 738 F.3d 535 (3d Cir. 2014)) barring such removal.

549. These acts and omissions were committed by federal officers and employees acting within the course and scope of their official duties and are attributable to the United States under principles of respondent superior.

550.  As a direct and proximate result of these negligent actions and failures, Plaintiff suffered significant harm, including:

  a) unlawful ICE detention and deportation.

  b) continuous ISAP surveillance and monitoring.

  c) loss of career and livelihood.

  d) foreclosure of his Philadelphia condominium.

  e) emotional distress, reputational harm, and psychological trauma.

  f)  medical injury and diminished quality of life.

551.  Plaintiff timely filed administrative claims with DHS, DOJ, and EOIR as required under *28 U.S.C. § 2675(a)*, fully describing the factual basis for this negligence claim. More than six (6) months have elapsed with no response, and Plaintiff is therefore deemed to have exhausted his administrative remedies. Plaintiff's administrative claims were filed in good faith and with diligence. To the extent any delay is alleged, Plaintiff invokes equitable tolling based on retaliatory transfer, continued threat of removal, and obstruction of access to legal counsel and records. Plaintiff filed a renewed FTCA notice within one month of receiving formal recognition of his U.S. citizenship, which neutralized the threat and enabled him to assert his claims without fear of further retaliation.

552.  Plaintiff seeks compensatory damages in an amount to be determined

223

at trial for the full measure of harm caused by the United States' negligent acts and omissions.

## XI.    ELEVENTH CLAIM FOR RELIEF

(Intentional Infliction of Emotional Distress – Federal Tort Claims Act)
(Against Defendant United States of America)

553.  Plaintiff hereby realleges and incorporates by reference all preceding paragraphs 1 through 552 as though fully set forth herein.

554.  This claim is brought against the United States of America pursuant to the *Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346(b)*, for damages caused by the intentional and outrageous conduct of federal employees including agents and officials of DHS, ICE, DOJ, EOIR, and the BIA acting within the scope of their employment.

555. Federal officials, including ICE deportation officers, field directors, OPLA attorneys, EOIR adjudicators, and government litigators, knowingly and willfully engaged in extreme and outrageous conduct that was intended to cause, or carried a high probability of causing, severe emotional distress to Plaintiff. This conduct includes:

a) Fabricating Form I-213 to falsely represent Plaintiff's stalking conviction as final, enabling unlawful detention and removal proceedings.

224

b) Knowingly charging Plaintiff as removable based on statutes (INA § 237(a)(2)(E)(i) and "crime of violence" under 8 U.S.C. § 16) that categorically did not apply to his offense under controlling U.S. Supreme Court and Third Circuit precedent.

c) Initiating and prolonging detention and ISAP supervision for over a decade including 26+ months of unlawful post-order ICE incarceration to break Plaintiff's will and force a concession of removability.

d) Orchestrating and facilitating Plaintiff's deportation to India, including forcibly shackling and boarding him onto an aircraft, even though they knew or should have known the underlying removal order was void.

e) Suppressing exculpatory evidence, refusing to allow subpoenaed records, denying procedural safeguards for a mentally impaired LPR, and manipulating administrative and appellate processes to obstruct relief.

f) Coordinating retaliation against Plaintiff for filing civil rights lawsuits, including through continued ISAP restrictions and malicious delays in terminating proceedings after the Third Circuit ruled Plaintiff was not removable.

g) Intentionally isolating and discrediting Plaintiff by branding him a frivolous litigant and mentally incompetent, including exploiting a

225

history of mental health treatment and triggering his involuntary psychiatric commitments.

556. The above-described conduct was undertaken with actual malice, deliberate indifference, or reckless disregard for Plaintiff's mental and emotional well-being, and constitutes conduct that shocks the conscience.

557. At all relevant times, the responsible employees and agents of ICE, DHS, DOJ, and EOIR acted within the scope of their federal employment, making the United States liable for their tortious acts under the FTCA.

558. As a direct and proximate result of this conduct, Plaintiff suffered and continued to suffer severe emotional and psychological trauma, including anxiety, depression, humiliation, insomnia, and fear. These harms were compounded by unlawful surveillance, prolonged confinement, forced deportation, and separation from his home, property, and community.

559. Plaintiff has incurred and continues to incur medical expenses and economic loss and has sustained physical injury and lasting mental anguish as a result of the extreme emotional distress caused by Defendants' conduct.

560. Plaintiff filed timely FTCA claims with the Department of Homeland Security, the Department of Justice, and the Executive Office for Immigration Review. More than six (6) months have elapsed without a decision, and Plaintiff is therefore deemed to have exhausted administrative remedies

under *28 U.S.C. § 2675(a)*. Plaintiff's FTCA claims were filed in good faith and with diligence. To the extent any delay is alleged, Plaintiff invokes equitable tolling based on retaliatory detention, continued threat of removal, and obstruction of access to legal counsel and records. Plaintiff filed a renewed FTCA notice within one month of receiving formal recognition of his U.S. citizenship, which neutralized the threat and enabled him to assert his claims without fear of further retaliation.

561.  Plaintiff seeks compensatory damages in an amount to be determined at trial for the mental and physical injuries caused by the intentional and outrageous actions of the United States' agents and employees.

## XII.    TWELFTH CLAIM FOR RELIEF

(Abuse of Process – *Federal Tort Claims Act*, *28 U.S.C. § 1346(b), §§ 2671–2680*)
(Against Defendant United States of America)

562.  Plaintiff hereby realleges and incorporates by reference all preceding paragraphs 1 through 561 as though fully set forth herein.

563.  This claim arises under the *Federal Tort Claims Act* ("FTCA"), *28 U.S.C. § 1346(b)*, for damages resulting from the intentional abuse of legal and administrative processes by employees and agents of the Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), the Department of Justice (DOJ), and the Executive Office for Immigration

Review (EOIR), acting within the scope of their federal employment.

564.  Federal officials, including ICE officers, OPLA attorneys, government litigators, and immigration adjudicators, intentionally misused legal processes for illegitimate purposes unrelated to any lawful governmental function, thereby committing the common law tort of abuse of process. Abuse of process under state law occurs when legal procedures are used for a purpose other than that for which they were designed, resulting in harm. The conduct described herein meets and exceeds that threshold, constituting a deliberate misuse of immigration and administrative procedures to achieve extrajudicial objectives.

565.  The legal process was set in motion under pretextual and unlawful circumstances, including the filing of a fabricated I-213 falsely asserting Plaintiff's conviction was final; the initiation of removal proceedings based on statutes that were categorically inapplicable; and the use of void removal orders to detain Plaintiff indefinitely and ultimately deport him.

566.  These proceedings were not conducted for the legitimate purpose of adjudicating removability under the Immigration and Nationality Act (INA). Instead, federal officials exploited the immigration process as a means to:

    a) Extend Plaintiff's criminal sentence through prolonged civil detention without lawful cause.

b) Retaliate against Plaintiff for exercising his First and Fifth Amendment rights in filing civil claims against federal and state officials.

c) Obstruct discovery and judicial oversight by rendering Plaintiff unreachable, unrepresented, or physically outside the country.

d) Pressure Plaintiff into waiving jurisdictional and constitutional objections, through coercion and psychological manipulation.

e) Shield federal and state officials from liability for constitutional violations and misconduct in criminal proceedings and civil litigation.

567. Throughout the course of these proceedings, federal officials took overt acts including deliberately denying accommodations, refusing to subpoena exculpatory evidence, refusing to terminate proceedings even after the Third Circuit ruled Plaintiff not removable, and physically deporting Plaintiff to further improper objectives that went far beyond any lawful enforcement mandate.

568. These abuses of legal process were undertaken willfully, maliciously, and in knowing disregard of established law, including binding Third Circuit precedent (e.g., *Orabi v. Att'y Gen.*, 738 F.3d 535 (3d Cir. 2014)), the categorical approach doctrine, and fundamental constitutional protections.

569. At all times relevant to this claim, the individual ICE agents, DOJ attorneys, and EOIR adjudicators who engaged in this pattern of misconduct

229

were acting within the course and scope of their federal employment, making the United States liable under the FTCA.

570.  Plaintiff filed administrative claims with DHS, DOJ, and EOIR detailing the abuse of process and the resulting injuries. More than six (6) months have elapsed with no agency response, and Plaintiff has thus exhausted administrative remedies under *28 U.S.C. § 2675(a)*. Plaintiff's administrative claims were filed in good faith and with diligence. To the extent any delay is alleged, Plaintiff invokes equitable tolling based on retaliatory detention, continued threat of removal, and obstruction of access to legal counsel and records. Plaintiff filed a renewed FTCA notice within one month of receiving formal recognition of his U.S. citizenship, which neutralized the threat and enabled him to assert his claims without fear of further retaliation.

571.  As a direct and proximate result of the abuse of process by federal officials, Plaintiff suffered:

    a) wrongful detention, deportation, and surveillance.

    b) the derailment of civil rights litigation.

    c) loss of liberty, property, and professional standing.

    d) severe emotional, psychological, and physical harm.

572.  Plaintiff is entitled to compensatory damages under the FTCA in an amount to be determined at trial for the injuries caused by the government's

deliberate misuse of immigration and legal processes for improper, extrajudicial objectives.

## XIII.    THIRTEENTH CLAIM FOR RELIEF

(Conversion – *Federal Tort Claims Act*, *28 U.S.C. § 1346(b), §§ 2671–2680*)
(Against Defendant United States of America)

573.  Plaintiff hereby realleges and incorporates by reference all preceding paragraphs 1 through 572 as though fully set forth herein.

574.  This claim arises under the *Federal Tort Claims Act* ("*FTCA*"), *28 U.S.C. § 1346(b)*, for damages resulting from the unlawful conversion of Plaintiff's personal property by federal employees and agents acting within the scope of their employment, including officers and personnel of ICE, DHS, and affiliated detention facilities.

575.  Plaintiff was in lawful possession of a pair of custom gold eyeglasses, which held substantial monetary and sentimental value. These eyeglasses were taken from Plaintiff during immigration detention intake procedures and were never returned, despite repeated requests and formal inquiries.

576. Federal officers and detention personnel exercised unauthorized dominion and control over Plaintiff's property, refused to document or preserve the item, and failed to follow agency protocols for inventory, safekeeping, and return of personal effects upon release or transfer.

231

577. The wrongful retention and disposal of Plaintiff's gold eyeglasses constituted conversion under applicable state law, including Texas and Pennsylvania tort principles, which recognize conversion as the unauthorized exercise of control over another's personal property to the exclusion of the rightful owner.

578. At all relevant times, the responsible federal employees were acting within the scope of their official duties, making the United States liable under the FTCA for the tortious conversion of Plaintiff's property.

579. Plaintiff filed administrative claims with DHS and ICE detailing the unlawful taking and non-return of his gold eyeglasses. More than six (6) months have elapsed without agency response, and Plaintiff has therefore exhausted administrative remedies under *28 U.S.C. § 2675(a)*.

580. As a direct and proximate result of this unlawful conversion, Plaintiff suffered economic loss, emotional distress, and deprivation of irreplaceable personal property.

581. Plaintiff seeks compensatory damages in an amount to be determined at trial for the full value of the converted property and the consequential harm resulting from the government's unlawful conduct.

## XIV.    FOURTEENTH CLAIM FOR RELIEF

(Violations of the Racketeer Influenced and Corrupt Organizations Act

232

(RICO), *18 U.S.C. § 1962(C)*)
(Against Defendants Hott, Decker, Kwiatkowski, Hoffman, Withrow, Bubier, Gaffney, Durling, Pauley, Guendelsberger, Gemoets, O'Connor, Ervin, Ritchey, Joyce, Witte, Bible, Correa, Espinoza, Ulloa, Borowski, Pattinson, Addimando)

## 1. The RICO Enterprise

582. Plaintiff hereby realleges and incorporates by reference all preceding paragraphs 1 through 581 as though fully set forth herein. The Defendants formed an association-in-fact enterprise under *18 U.S.C. § 1961(4)*, composed of federal officials, agency personnel, and private actors who coordinated acts to silence, retaliate against, and ultimately deport Plaintiff by unlawful means. Enterprise engaged in, and its activities affected, interstate and foreign commerce.

583. The Enterprise was not a legal entity but a continuing unit, functioning as a continuing unit composed of four interdependent coordinated tiers:

a) Tier 1 - Federal Leadership & Policy: Defendants Russell Hott (Director, Office of Detention and Removal), Thomas Decker, Sean Ervin, Jennifer Ritchey (ICE Field Office Directors, Philadelphia), William Joyce, Diane Witte (ICE Field Office Directors, Jackson), Daniel Bible, Jose Correa (ICE Field Office Directors, Texas), and Patrick McLane (OPLA-San Antonio Chief) established policies,

233

allocated resources, and directed operations to maintain Plaintiff's detention and removal proceedings despite knowing of their jurisdictional defects.

b) Tier 2 - Operational Implementation & Prosecution: Defendants Andrew Kwiatkowski (Supervisory Detention Officer), Chris Hoffman (Immigration Enforcement Agent), Jeffrey Bubier, Maureen Gaffney (ICE OPLA Attorneys), Mary Withrow (DOJ Trial Attorney), and Cesar Espinoza, Veronica Ulloa (ICE Enforcement Officers) executed the daily operations of the Enterprise, including fabricating evidence, suppressing exculpatory material, coordinating with private parties, and prosecuting void removal proceedings.

c) Tier 3 - Corrupted Adjudication & Administrative Cover: Defendants Walter Durling (Immigration Judge), Roger Pauley, John Guendelsberger, Marcos Gemoets, Blair O'Connor (BIA Members), and clerks of the BIA and Pennsylvania courts provided administrative and judicial cover for the Enterprise's racketeering activity by issuing orders without jurisdiction, falsifying appellate records, denying access to transcripts, and terminating proceedings in bad faith to allow for future harassment.

234

d) Tier 4 - State & Private Co-Conspirators: Defendants from the Pennsylvania Board of Probation And Parole (PBPP), Allison Borowski, Rajani Pattinson, Leonidas Addimando, Ann Boris, and John Boris were integral participants who willfully joined the Enterprise. They provided false information, filed fraudulent complaints, offered perjured testimony, and denied parole based on Enterprise's void detainer, all to further Enterprise's objectives.

## 2. Enterprise Purpose

584. The Enterprise's common purpose included:

a) Extending Plaintiff's criminal sentence by sabotaging post-conviction and appellate relief.

b) Obstructing Plaintiff's access to legal redress in state and federal courts.

c) Removing Plaintiff unlawfully to discredit his civil lawsuits and protect Defendants from accountability.

585. The enterprise further aimed to retaliate against Plaintiff as a foreign-born, non-white immigrant who resisted systemic misconduct, in a culture of retaliatory enforcement common across ICE and EOIR.

## 3. Pattern of Racketeering Activity – Predicate Acts

586. The Enterprise engaged in a pattern of racketeering activity as defined

235

by *18 U.S.C. §§ 1961(1) and (5)*, consisting of multiple predicate acts committed over a period of years. These acts were related, continuous, and committed with the shared purpose of unlawfully extending Plaintiff's punishment, obstructing his civil rights litigation, and securing his removal from the United States. Each Defendant committed at least two predicate acts, and each act is pled with specificity under *Rule 9(b)* as follows:

### a) Fabrication of False Government Record

587.  On or about September 23, 2015, at the Philadelphia ICE Field Office, Defendants Decker, Kwiatkowski, Reid and Hoffman knowingly and intentionally fabricated *Form I-213* to obstruct Plaintiff's civil litigation and retaliate against his protected activity. This fabrication occurred shortly after Plaintiff formally objected to the removal of his civil case from deferment and was designed to derail his access to judicial review by manufacturing false jurisdictional facts.

588.  The fabricated Form I-213 falsely stated that Plaintiff's Pennsylvania stalking conviction was final, that Plaintiff had admitted to "no fear of persecution" during a non-existent interview, and that he had been convicted of "child abuse",  a wholly invented charge unsupported by any judicial record. These falsehoods were inserted with deliberate intent to trigger immigration enforcement actions and obstruct Plaintiff's parole eligibility and

236

appellate review in *Commonwealth v. Vurimindi*, CP-51-CR-0008022-2012.

589. The use of this falsified document to lodge a void ICE detainer constituted obstruction of justice and mail fraud under *18 U.S.C. §§ 1512(c)* and *1341*. The timing and content of the fabrication reflect a coordinated effort to retaliate against Plaintiff for asserting his legal rights and to suppress his civil claims through unlawful detention and surveillance.

590. The fabrication of *Form I-213* served the shared objective of the Enterprise: to remove Plaintiff from the United States, obstruct his access to justice, and benefit private parties facing civil liability. Defendants Decker, Kwiatkowski, Reid and Hoffman acted in concert with other Enterprise members to further this unlawful scheme.

591. As held in *Dennis v. Sparks*, 449 U.S. 24 (1980), private and government actors who conspire to commit unlawful acts are jointly liable for the harm caused. The fabrication of *Form I-213* was a predicate act of racketeering under *18 U.S.C. § 1962(d)*, and a knowing violation of Plaintiff's constitutional and statutory rights.

592. This conspiracy was not an isolated incident but part of a broader pattern of racketeering activity as alleged in Plaintiff's Fifteenth Claim for Relief under *18 U.S.C. § 1962(d)*. Defendants Decker, Kwiatkowski, Reid and Hoffman's participation in the conspiracy transformed their actions from

237

mere governmental functions into criminal conduct undertaken to benefit private parties and deprive Plaintiff of his rights.

### b) Suppression of Exculpatory Evidence to Obstruct Judicial Review

593. Between November 2016 and January 2017, at York Immigration Court in Pennsylvania, Defendants Withrow, Bubier, Gaffney, and Durling knowingly and intentionally suppressed exculpatory evidence by obstructing Plaintiff's subpoenas for 220 hours of condominium security footage, IRS records, and psychiatric evaluations. These materials were critical to exposing perjury by Defendants Borowski and Pattinson and judicial misconduct in Plaintiff's underlying criminal case. The suppression of this evidence denied Plaintiff a fair hearing and directly facilitated the issuance of an unlawful removal order.

594. This conduct was not judicial in nature, nor was it a lawful exercise of prosecutorial discretion. It was administrative and retaliatory, undertaken in concert with private parties to obstruct Plaintiff's access to justice. As held in *Butz v. Economou*, 438 U.S. 478 (1978), federal officials are not entitled to absolute immunity for acts that exceed their statutory authority or violate clearly established constitutional rights. The suppression of exculpatory evidence falls outside the protected perimeter of adjudicatory functions.

595. The deliberate exclusion of exculpatory material violated Plaintiff's Fifth

Amendment right to due process and constituted obstruction of justice under *18 U.S.C. §§ 1512(b)* and *1503*. As held in *Brady v. Maryland*, 373 U.S. 83 (1963), the suppression of evidence favorable to the accused violates due process where the evidence is material to guilt or punishment. The Supreme Court has further held that obstruction statutes apply to conduct intended to corruptly influence or impair judicial proceedings. See *United States v. Aguilar*, 515 U.S. 593, 599 (1995).

596.   Defendants' conduct was not protected by qualified immunity because the rights at issue were clearly established, and any reasonable official would have known that suppressing exculpatory evidence to facilitate removal violated constitutional and statutory limits. Their actions were not discretionary but ultra vires, undertaken with intent to retaliate against Plaintiff and benefit private parties.

597.   The suppression of exculpatory evidence served the shared objective of the Enterprise: to remove Plaintiff from the United States, shield private parties from civil liability, and prevent judicial scrutiny of misconduct. Defendants Withrow, Bubier, Gaffney, and Durling acted in concert with other Enterprise members to further this unlawful scheme.

598. As held in *Dennis v. Sparks*, 449 U.S. 24 (1980), private and government actors who conspire to commit unlawful acts are jointly liable for

239

the harm caused. The suppression of exculpatory evidence was a predicate act of racketeering under *18 U.S.C. § 1962(d)*, and a knowing violation of Plaintiff's constitutional and statutory rights.

599. This overt act was not an isolated incident, but part of a broader pattern of racketeering activity as alleged in Plaintiff's Fifteenth Claim for Relief under *18 U.S.C. § 1962(d)*. Defendants Withrow, Bubier, Gaffney, and Durling's participation in the conspiracy transformed their actions from mere governmental functions into criminal conduct undertaken to benefit private parties and deprive Plaintiff of his rights.

### c) Retaliatory Interstate Transport to Obstruct Litigation

600. Between October 2019 and March 2020, following Plaintiff's filing of *Federal Tort Claims Act* (FTCA) claims and a habeas corpus petition in *Vurimindi v. Lowe*, Defendants Ervin, Ritchey, Joyce, Witte, and Bible knowingly and intentionally orchestrated Plaintiff's retaliatory transfer from Adams County Correctional Center in Natchez, Mississippi to Montgomery County Detention Center in Conroe, Texas. This transfer was not based on any legitimate custodial need but was undertaken to obstruct Plaintiff's access to Pennsylvania legal materials, isolate him from counsel, and suppress his litigation efforts.

601. ICE transport documents falsely labeled Plaintiff a "flight risk," despite

240

no record of escape attempts or noncompliance. This misrepresentation was used to justify the interstate transfer and to impose restrictive conditions that interfered with Plaintiff's ability to pursue his legal claims. The transfer constituted a violation of the Travel Act, *18 U.S.C. § 1952,* which prohibits the use of interstate facilities to carry out unlawful activity, including obstruction of justice and retaliation against protected legal action.

602. The conduct alleged was not protected by absolute or qualified immunity. It was administrative and retaliatory in nature, undertaken in clear absence of jurisdiction and outside the scope of any lawful discretionary authority. As held in *Butz v. Economou*, 438 U.S. 478 (1978), federal officials are not entitled to immunity for acts that exceed their statutory authority or violate clearly established constitutional rights. The retaliatory transfer of a detainee to suppress litigation is not a protected function.

603. Defendants' actions violated Plaintiff's First Amendment right to petition the government and his Fifth Amendment right to access the courts. The retaliatory nature of the transfer was clearly established as unlawful under *Hartman v. Moore*, 547 U.S. 250 (2006), which held that government officials may not take adverse action against individuals in retaliation for protected speech or litigation.

604. This overt act was part of a broader conspiracy involving both private

241

and government actors, as detailed above. The retaliatory transfer served the shared objective of the Enterprise: to obstruct Plaintiff's access to justice, suppress his civil claims, and benefit private parties facing liability. Defendants Ervin, Ritchey, Joyce, Witte, and Bible acted in concert with other Enterprise members to further this unlawful scheme.

605. As held in *Dennis v. Sparks*, 449 U.S. 24 (1980), private and government actors who conspire to commit unlawful acts are jointly liable for the harm caused. The retaliatory interstate transport was a predicate act of racketeering under *18 U.S.C. § 1962(d)*, and a knowing violation of Plaintiff's constitutional and statutory rights.

606.  This overt act was not an isolated incident, but part of a broader pattern of racketeering activity as alleged in Plaintiff's Fifteenth Claim for Relief under *18 U.S.C. § 1962(d)* undertaken by the Enterprise to retaliate against Plaintiff, obstruct judicial proceedings, and deprive him of protected rights.

### d)  Witness Tampering and False Complaints

607. Between January and March 2011, in Philadelphia, Pennsylvania, private individuals and enterprise members Defendants Allison Borowski, Rajani Pattinson, and Leonidas Addimando conspired with ICE agents to fabricate evidence, file false complaints, and trigger Plaintiff's detention and deportation. These acts constitute witness tampering under *18 U.S.C.*

242

*§ 1512(b)*. Their actions included:

a) A January 24, 2011, email from Defendant Addimando stating, "We need to lock him up."

b) Between January 24, 2011, and March 29, 2011, Defendants Borowski, and Pattinson filed dozens of false police complaints

c) Defendant Borowski's admission in a March 29, 2011, written complaint that she fabricated allegations to "help the case."

608. Defendants Borowski, Pattinson, and Addimando are private individuals with no lawful authority or governmental role. They knowingly and intentionally conspired with government actors to deport Plaintiff and prevent him from pursuing his legal claims against them. The shared objective of this conspiracy was to benefit private parties by removing Plaintiff from the United States and obstructing his access to justice.

609. Defendants Withrow and Durling, as government actors, knowingly participated in this conspiracy by abusing their authority to further the private interests of their co-conspirators. Their actions were not lawful exercises of discretion, but criminal conduct undertaken to deprive Plaintiff of his rights and benefit private parties.

610. This conspiracy was not an isolated incident but part of a broader pattern of racketeering activity as alleged in Plaintiff's Fifteenth Claim for

Relief under *18 U.S.C. § 1962(d)*. Defendants Withrow and Durling's participation in the conspiracy transformed their actions from mere governmental functions into criminal conduct undertaken to benefit private parties and deprive Plaintiff of his rights.

611. Under *18 U.S.C. § 371* (conspiracy to defraud the United States) and *18 U.S.C. § 1962(d)* (RICO conspiracy), both private and government actors can be held liable for their participation in a conspiracy to deprive an individual of their rights. As held in *Dennis v. Sparks*, 449 U.S. 24 (1980), a conspiracy requires an agreement to commit an unlawful act, and all participants regardless of their status are jointly liable for the harm caused.

### e) Perjury and Ambush Testimony

612. On November 14, 2016, at York Immigration Court, Defendants Withrow and Durling coordinated with Ann Boris and John Boris, and orchestrated a surprise testimony from John Boris without prior notice to Plaintiff. Ann Boris submitted an affidavit containing false claims of domestic violence and privileged marital communications. Defendant Durling admitted the testimony over objection, denying Plaintiff's right to cross-examine.

613. These acts were not judicial functions, but administrative and fraudulent acts undertaken to ambush Plaintiff, fabricate evidence, and deny Plaintiff his constitutional right to cross-examine witnesses. As such, they are

244

not protected by judicial or qualified immunity. Defendants Withrow and Durling acted knowingly and intentionally to orchestrate Ann Boris, and John Boris' false testimony, fabricate evidence, and deny Plaintiff his right to cross-examine. Their actions were not mistakes or oversights, but deliberate acts of perjury and witness tampering designed to deceive the court and obstruct Plaintiff's access to a fair hearing.

614. Defendants Withrow and Durling' orchestration of false testimony and denial of Plaintiff's right to cross-examine were not lawful exercises of discretion but criminal conduct in violation of *18 U.S.C. §§ 1621* and *1512,* and thus not protected by judicial or qualified immunity.

615. Defendants Withrow and Durling' orchestration of false testimony and denial of Plaintiff's right to cross-examine were not isolated incidents but part of a broader conspiracy among Defendants to deprive Plaintiff of his rights. As alleged in Plaintiff's Fifteenth Claim for Relief under *18 U.S.C. § 1962(d)*, these acts were undertaken in furtherance of the enterprise's racketeering activity and are thus not protected by immunity.

### f) Fraud on the Court and Transcript Destruction

616. On July 13, 2016, during a recorded hearing at York Immigration Court, Defendant Durling, acting in his individual capacity as an Immigration Judge, ruled that Plaintiff's conviction was not a "crime of stalking" and that Plaintiff

was eligible for cancellation of removal. Following this ruling, Defendant Durling knowingly and intentionally directed the court reporter to omit this ruling from the official transcript of the hearing. This act was not a judicial function but an ultra vires act of fraud on the court, undertaken to deprive Plaintiff of his lawful rights and obstruct the judicial process.

617. On September 14, 2016, Defendants Durling and Gaffney held an ex parte hearing, without notice to Plaintiff to fabricate a false record denying that the July 13, 2016, ruling had occurred. This fabrication was not a lawful exercise of judicial authority but a deliberate act of obstruction of justice and conspiracy to defraud the court, in violation of *18 U.S.C. §§ 1512(c)* and *371*.

618. Defendant Durling's actions constitute fraud on the court, as he intentionally altered the record to deceive the court and Plaintiff; and obstruction of justice, as his actions were designed to impede Plaintiff's lawful access to relief and corrupt the judicial process, in violation of *18 U.S.C. §§ 1512(c)* and *371*; and an ultra vires conduct, as these acts were outside the scope of his lawful authority and not protected by judicial immunity, as held in *Mireles v. Waco*, 502 U.S. 9 (1991).

619. Defendant Durling's tampering with the transcript and fabrication of a false record were not isolated acts but part of a broader conspiracy among Defendants to deprive Plaintiff of his rights. As alleged in Plaintiff's Fifteenth

246

Claim for Relief under *18 U.S.C. § 1962(d)*, Defendant Durling's actions were undertaken in furtherance of a sophisticated enterprise involving multiple Defendants, including Defendant Gaffney. This enterprise engaged in a pattern of racketeering activity, including fabricating evidence, suppressing exculpatory materials, obstructing judicial review, and retaliating against Plaintiff for exercising his constitutional rights. Judicial immunity does not extend to non-judicial acts, including acts of fraud, obstruction, or conspiracy.

620. Thus, Defendant Durling's actions were undertaken in furtherance of the enterprise's racketeering activity and are not protected by judicial immunity.

### g) Falsification of Appellate Records

621. Between 2017 and 2023, at the Board of Immigration Appeals headquarters in Falls Church, Virginia, Defendants Pauley, Guendelsberger, Gemoets, and O'Connor repeatedly falsified appellate records. Defendant Pauley claimed Plaintiff "did not contest removability" despite explicit objections. Defendant Guendelsberger reinstated proceedings despite a Third Circuit stay. Defendants Gemoets and O'Connor denied motions to reopen despite a Third Circuit vacatur and terminated proceedings "without prejudice" to allow ICE to continue harassment.

622. These acts were not judicial functions, but administrative and

247

fraudulent acts undertaken to obstruct Plaintiff's access to relief and corrupt the appellate process. As such, they are not protected by judicial or qualified immunity. Defendants Pauley, Guendelsberger, Gemoets, and O'Connor acted knowingly and intentionally to falsify appellate records and deceive the BIA and the Third Circuit. Their actions were not mistakes or oversights, but deliberate acts of fraud designed to obstruct Plaintiff's rights.

623. As held in *Mireles v. Waco*, 502 U.S. 9 (1991), judicial and administrative officials are not entitled to immunity for non-judicial acts, including acts of fraud or obstruction. Defendants' falsification of appellate records was not a lawful exercise of discretion but criminal conduct in violation of *18 U.S.C. § 1519*, and thus not protected by immunity.

624. Defendants' falsification of appellate records was not an isolated incident but part of a broader conspiracy among Defendants to deprive Plaintiff of his rights. As alleged in Plaintiff's Fifteenth Claim for Relief under *18 U.S.C. § 1962(d)*, these acts were undertaken in furtherance of the enterprise's racketeering activity and are thus not protected by immunity.

### h) Mail And Wire Fraud (18 U.S.C. §§ 1341, 1343)

625. The Enterprise engaged in a scheme to defraud Plaintiff of his property and liberty interests using the mails and interstate wires. This scheme involved the interstate transmission of the fraudulent I-213, void detainers,

248

and court filings containing known material misrepresentations (e.g., that the conviction was final) to various government agencies and courts to obtain the property of Plaintiff's freedom and to cause the foreclosure of his Philadelphia condominium.

### i)  Summary and Continuity of Racketeering Pattern

626.  Between 2020 and 2023, Defendants Correa, Espinoza, and Ulloa, acting as Intensive Supervision Appearance Program ("ISAP") supervisors in Austin, Texas, knowingly and intentionally enforced surveillance and reporting conditions based on fabricated ICE detainers and void removal orders. These conditions were not grounded in lawful adjudication or valid enforcement authority, but were imposed to restrict Plaintiff's movement, deny access to Pennsylvania legal materials, and obstruct Plaintiff's ability to pursue FTCA and habeas litigation.

627.  The surveillance regime extended the Enterprise's control beyond formal detention and served no legitimate immigration purpose. It was undertaken in coordination with ICE Field Office leadership and designed to retaliate against Plaintiff for asserting his legal rights. These acts constituted retaliation against a litigant under *18 U.S.C. § 1513(e)* and obstruction of justice under *18 U.S.C. § 1512(c)*, as they were intended to hinder Plaintiff's access to judicial remedies and suppress protected litigation.

628. Defendants' conduct was not protected by qualified or absolute immunity. The rights at issue including Plaintiff's First Amendment right to petition the government and his Fifth Amendment right to access the courts were clearly established. As held in *Hartman v. Moore*, 547 U.S. 250 (2006), retaliatory actions taken by government officials in response to protected litigation violate the Constitution. The use of fabricated detainers and surveillance tools to obstruct legal claims is not a discretionary or adjudicatory function, but ultra vires misconduct undertaken in clear absence of jurisdiction.

629.  The ISAP surveillance was not an isolated administrative decision, but a continuation of the Enterprise's broader racketeering pattern. Defendants Correa, Espinoza, and Ulloa acted in concert with other Enterprise members to extend unlawful control over Plaintiff, suppress his litigation, and inflict ongoing injury. Their participation materially advanced the Enterprise's objectives and ensured continuity of its retaliatory scheme across jurisdictions and time.

630. As held in *Dennis v. Sparks*, 449 U.S. 24 (1980), private and government actors who conspire to commit unlawful acts are jointly liable for the harm caused. The retaliatory ISAP surveillance was a predicate act of racketeering under *18 U.S.C. § 1962(d)*, and a knowing violation of Plaintiff's

250

constitutional and statutory rights.

631.  As alleged in Plaintiff's Fifteenth Claim for Relief under *18 U.S.C. § 1962(d)*, these acts were undertaken in furtherance of the enterprise's racketeering activity to retaliate against Plaintiff, obstruct judicial proceedings, and deprive him of protected rights and are thus not protected by immunity.

632.  The foregoing predicate acts, committed by members of the Enterprise over a span of more than a decade, demonstrate both closed-ended continuity (a completed scheme resulting in Plaintiff's unlawful detention and removal) and open-ended continuity (a threat of ongoing misconduct targeting future litigants). These acts are related in purpose, method, participants, and impact, and collectively constitute a pattern of racketeering activity under *18 U.S.C. § 1961(5)*. Each act was committed in furtherance of the Enterprise's unlawful objectives and caused direct injury to Plaintiff's business and property interests.

### 4.  Personal Benefit of Enterprise Members

633. Each member of the Enterprise, whether acting in an official government capacity or as a private conspirator derived personal or institutional benefit from their participation in the racketeering scheme. These benefits were not limited to financial gain but included career

251

advancement, reputational protection, retaliation against Plaintiff, and avoidance of civil or criminal liability.

634. Federal officials, including ICE Field Directors, OPLA attorneys, DOJ litigators, and EOIR adjudicators, benefited by maintaining high removal metrics, securing favorable case outcomes, avoiding reversal or scrutiny of unlawful rulings, and preserving institutional authority. Their participation shielded their agencies from exposure, protected their own reputations, and advanced their careers through performance-based evaluations tied to removals and prosecutions.

635. Immigration Judges and BIA members benefited by suppressing evidence of procedural violations, avoiding appellate reversals, and maintaining control over dockets and outcomes. Their rulings, though jurisdictionally void, were used to insulate Enterprise from judicial review and to perpetuate Plaintiff's unlawful detention and removal.

636. Private conspirators including Allison Borowski, Rajani Pattinson, Leonidas Addimando, Ann Boris, and John Boris derived direct financial and reputational benefit. Borowski, Pattinson, and Addimando coordinated false complaints and parole obstruction to derail Plaintiff's civil rights lawsuits, thereby avoiding compensatory and punitive damages. Their actions were calculated to trigger ICE involvement and suppress litigation through

252

extrajudicial detention.

637. Ann Boris sought to deport Plaintiff to India in order to avoid equitable distribution of marital assets in a pending divorce proceeding. Her affidavit and ambush testimony were designed to fabricate a domestic violence narrative and secure removal, thereby extinguishing Plaintiff's property claims under Pennsylvania family law. These private actors knowingly participated in the Enterprise's affairs for personal gain, satisfying the "operation or management" test under *Reves v. Ernst & Young*, 507 U.S. 170 (1993), and reinforcing their liability under *18 U.S.C. § 1962(c)*.

### 5. Conducting Enterprise's Affairs Through a Pattern of Racketeering Activity

638. Each Defendant, within their respective tier of the Enterprise, knowingly and intentionally conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs through the pattern of racketeering activity described above. Their actions were not isolated incidents but formed a coordinated and continuous scheme spanning from at least 2011 through 2023.

639. Tier 1 Defendants—ICE Field Directors and OPLA leadership set policy, allocated resources, and directed operations to maintain Plaintiff's detention and removal despite jurisdictional defects.

640. Tier 2 Defendants—enforcement agents and government litigators

executed daily operations, fabricated evidence, suppressed exculpatory material, and prosecuted void proceedings.

641. Tier 3 Defendants—immigration adjudicators and BIA members, provided administrative cover by issuing unlawful orders, falsifying records, and obstructing appellate review.

642. Tier 4 Defendants—private conspirators and state officials, initiated false complaints, obstructed parole, and coordinated with federal actors to retaliate against Plaintiff and suppress his civil rights litigation.

643. Each Defendant's conduct furthered the Enterprise's common purpose: to unlawfully extend Plaintiff's punishment, obstruct his access to judicial relief, and secure his removal from the United States. Their coordinated actions demonstrate both closed-ended continuity (a completed scheme) and open-ended continuity (a threat of ongoing misconduct), satisfying the pattern requirement under *18 U.S.C. § 1961(5)*. Their roles in directing, managing, or executing the Enterprise's affairs satisfy the "operation or management" test under *Reves v. Ernst & Young*, 507 U.S. 170 (1993), and establish liability under *18 U.S.C. § 1962(c)*.

### 6. Injury to Business Or Property

644. The Enterprise, comprising neighbors, local law enforcement, ICE, DOJ, and adjudicators engaged in a continuous pattern of racketeering,

254

including fabricating evidence, suppressing exculpatory material, and obstructing Plaintiff's litigation. These acts directly injured Plaintiff's business, property, and constitutional rights As a direct and proximate result of the Defendants' coordinated pattern of racketeering activity, Plaintiff has suffered concrete injury to his business and property interests, as required under 18 U.S.C. § 1964(c). These injuries include both economic loss and deprivation of tangible and intangible property rights.

645.  Plaintiff was unlawfully incarcerated for 30 months beyond his state sentence and detained for an additional 26 months in federal custody under void immigration orders. This loss of liberty directly impaired Plaintiff's ability to earn income, maintain property, and pursue litigation.

646.  Plaintiff's Philadelphia condominium was foreclosed while he was unlawfully detained, resulting in the permanent loss of real property and equity. This foreclosure was proximately caused by Enterprise's obstruction of Plaintiff's parole and civil litigation.

647.  Plaintiff was unable to work as a statistical programmer due to prolonged detention and surveillance, resulting in substantial lost income and business opportunities. Enterprise's actions directly interfered with Plaintiff's ability to maintain professional engagements and contracts.

648.  During detention, Plaintiff's personal property including custom 22-

karat gold prescription eyeglasses valued at approximately $3,000 was seized and never returned. This destruction of property was committed by ICE personnel acting within the scope of the Enterprise's unlawful objectives.

649.  Plaintiff incurred significant legal fees and costs defending against void removal proceedings, retaliatory transfers, and fabricated charges. These expenses were necessitated by the Enterprise's obstruction of justice and fraudulent litigation tactics.

650.  As a result of the Enterprise's coordinated suppression of evidence, retaliatory detention, and manipulation of judicial processes, Plaintiff was forced to abandon or suffered dismissal of multiple meritorious civil claims, including *Vurimindi v. Borowski*, *Vurimindi v. HSFLB Condominium Owners Association*, and *Vurimindi v. Duke University*. These losses constitute injury to Plaintiff's property and litigation rights.

### 7.  Ultra Vires Conduct Piercing Immunity

651.  The individual actions of government defendants within the Enterprise particularly Immigration Judge Walter Durling and members of the Board of Immigration Appeals were taken in the clear absence of all jurisdiction and thus are not protected by judicial or qualified immunity. These acts were not discretionary errors within the bounds of lawful authority, but ultra vires conduct that violated statutory mandates, constitutional protections, and

256

binding appellate orders.

652. Defendants proceeded with removal proceedings despite Plaintiff's conviction being non-final under Pennsylvania and federal law, in direct violation of *8 U.S.C. § 1229(d)* and binding Third Circuit precedent in *Orabi v. Attorney General*, 738 F.3d 535 (3d Cir. 2014). This jurisdictional defect rendered all subsequent proceedings void ab initio.

653. Defendants fabricated legal conclusions by misapplying the categorical approach to deem Plaintiff's conviction a "crime of stalking," despite controlling precedent in *Taylor, Moncrieffe, Descamps,* and *Mathis* barring such classification. This manipulation of legal standards exceeded judicial authority and was undertaken to justify unlawful detention and removal.

654. Defendants knowingly relied on perjured testimony and fabricated evidence, including affidavits and oral statements from private conspirators, to support removal charges. Their admission of such evidence over objection violated Plaintiff's due process rights and constituted ultra vires adjudication.

655. Defendants altered the official record by directing the omission of exculpatory rulings from transcripts and obstructed Plaintiff's appellate rights by mailing orders to incorrect addresses and falsifying docket entries. These acts were administrative in nature and taken outside the scope of judicial

257

function.

656. Defendants retaliated against Plaintiff for exercising his First Amendment right to file civil lawsuits by prolonging detention, denying accommodations, and coordinating adverse rulings. Such retaliation is not protected by qualified immunity and constitutes a constitutional violation.

657. Defendants defied direct orders of the U.S. Court of Appeals for the Third Circuit, including stays of removal and vacatur of removal orders. Their refusal to comply with binding appellate mandates exceeded their lawful authority and pierced any claim to judicial immunity.

658. Plaintiff's timely post-conviction filings and notice of appeal in *Commonwealth v. Vurimindi* were deliberately withheld from the docket by the criminal court clerk in Philadelphia. This omission enabled ICE and DOJ officials to falsely assert that Plaintiff's conviction was final, triggering a void detainer and unlawful removal proceedings. The failure to docket was not a clerical error but a coordinated act of obstruction that materially advanced Enterprise's objectives. Plaintiff reserves the right to amend this complaint should discovery reveal further coordination or intent.

## XV.   FIFTEENTH CLAIM FOR RELIEF

(RICO Conspiracy – 18 U.S.C. § 1962(d))
(Against Defendants Hott, Decker, Kwiatkowski, Hoffman, Withrow, Bubier,

258

Gaffney, Durling, Pauley, Guendelsberger, Gemoets, O'Connor, Ervin, Ritchey, Joyce, Witte, Bible, Correa, Espinoza, Ulloa, Borowski, Pattinson, Addimando)

659.  Plaintiff hereby realleges and incorporates by reference all preceding paragraphs 1 through 658 as though fully set forth herein.

660.  Defendants knowingly and willfully conspired to violate Plaintiff's rights and *18 U.S.C. § 1962(c)* by agreeing to participate in the affairs of the Enterprise through a pattern of racketeering activity. Their coordinated actions including filing false complaints, advising on criminal charges, and obstructing Plaintiff's litigation, formed a unified enterprise with shared objectives and overt acts. Each Defendant was aware of the unlawful objectives and facilitated the scheme through direct acts or coordinated support.

661. The conspiracy included fabrication of evidence, suppression of exculpatory material, obstruction of judicial review, and retaliation against Plaintiff for protected litigation.

662.  As a direct and proximate result, Plaintiff suffered injury to his business and property, including unlawful detention, foreclosure, destruction of personal property, and loss of meritorious civil claims.

663.  Plaintiff seeks treble damages, attorney's fees, and all relief available under *18 U.S.C. § 1964(c)*.

259

664. Plaintiff asserts that the allegations set forth in Fourteenth and Fifteenth claims satisfy the pleading requirements under *18 U.S.C. § 1962(c)* and *(d)*, including the existence of an enterprise, a pattern of racketeering activity, continuity, and injury to business and property. Plaintiff reserves the right to submit a RICO case statement should the Court request further specificity pursuant to *Fed. R. Civ. P. 12(e)*.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against all Defendants, including but not limited to the United States, ICE Field Office personnel, OPLA attorneys, DOJ litigators, EOIR adjudicators, and private conspirators, jointly and severally, as follows:

1.　General damages in an amount to be proven at trial.

2.　Special damages in an amount to be proven at trial.

3.　Punitive and exemplary damages in an amount to be proven at trial.

4.　Judgment for violations of *18 U.S.C. § 1962(c)*.

5.　Judgment for conspiracy to violate *18 U.S.C. § 1962(c)*, pursuant to *§ 1962(d)*.

6.　Treble damages under 18 U.S.C. § 1964(c) for injury to business and property.

260

7.    Appointment of counsel and reasonable attorneys' fees under *28 U.S.C. § 2412*.

8.    Attorneys' fees and costs under EAJA and other applicable statutes.

9.    Injunctive relief requiring DHS, EOIR, and DOJ to implement safeguards for LPRs and persons with mental disabilities.

10.   Injunctive relief to prevent Enterprise from continuing its racketeering activity.

11.   Injunctive relief requiring Defendants to cease retaliatory surveillance, reform policies to prevent abuse of process, and implement safeguards for individuals targeted by collusive complaints.

12.   Declaratory judgment that Plaintiff's removal order is void ab initio.

13.   Such other relief as the Court deems just, equitable, and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on any and all issues triable by a jury.

Date: August 31, 2025                    Respectfully Submitted,
                                         s/- *Vamsidhar Vurimindi*
                                         Vamsidhar Vurimindi,
                                         Plaintiff, Pro Se
                                         821 Gunter Street
                                         Austin, TX 78702

261

## VERIFICATION

I, Vamsidhar Vurimindi verify the statements made in foregoing first amended complaint are true and correct. I understand false statements are subject to penalty under *28 U.S.C. § 1746*, relating to Unsworn declarations under penalty of perjury.

Date: August 31, 2025

Respectfully Submitted,
s/- *Vamsidhar Vurimindi*
Vamsidhar Vurimindi,
Plaintiff, Pro Se
821 Gunter Street
Austin, TX 78702

262